1  Thomas Buchele (CA Bar No. 129657)
   Earthrise Law Center
2  Lewis & Clark Law School
   10015 SW Terwilliger Blvd.
3  Portland OR  97219-7799
   Tel: 503-768-6736
4  Fax: 503-768-6642
   Email: tbuchele@lclark.edu
5
6  Attorney for Plaintiffs

7

8              UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11 **EARTH ISLAND INSTITUTE**, a non-        No :
   profit corporation; **CENTER FOR
12 BIOLOGICAL DIVERSITY**, a non-
   profit corporation,
13                                            **COMPLAINT FOR VACATUR,
                Plaintiffs,                   INJUNCTIVE, AND DECLARATORY
14                                            RELIEF**
                v.
15
   **UNITED STATES FOREST SERVICE,**
16 an agency of the United States Department  Administrative Procedure Act, 5 U.S.C. §§ 551
   of Agriculture; **MARGIE B. DEROSE**,      *et seq.*; National Environmental Policy Act, 42
17 Acting District Ranger, Mono Lake and      U.S.C. §§ 4321 *et seq.*; National Forest
   Mammoth Ranger District, Inyo National     Management Act, 16 U.S.C. §§ 1600 *et seq.*;
18 Forest, in her official capacity           United States Forest Service Project-Level
                                              Predecisional Administrative Review Process
19              Defendants.                   Regulations, 36 C.F.R. Pt. 218.

20

21

22

23

24

25

26

27

28

**JURISDICTION AND VENUE**

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 2412 (costs and fees). Plaintiffs seek judicial review of final agency actions of the USFS, as defined by the APA, 5 U.S.C. § 704 (actions reviewable).

2.     Venue is properly rested in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the events or omissions giving rise to the claims occurred in this district, primarily in Mono County.

**INTRODUCTION**

3.     Plaintiffs Earth Island Institute and Center for Biological Diversity challenge the Defendant United States Forest Service's ("USFS" or "Forest Service") Decision Notice/Finding of No Significant Impact ("DN/FONSI"), approving the Three Creeks Forest Health and Restoration Project ("Three Creeks Project" or "Project"). Defendant Acting District Ranger Margie B. DeRose ("DeRose") signed the DN/FONSI on January 26, 2018. Defendants USFS and DeRose are collectively referred to herein as "defendants" or "Forest Service." The DN/FONSI violates the National Environmental Policy Act ("NEPA") and its implementing regulations, violates the USFS's objection regulations, and violates the National Forest Management Act ("NFMA") and its implementing regulations.

4.     The Three Creeks Project DN/FONSI approves the commercial thinning of 9,590 acres of the Mono Lake and Mammoth Ranger Districts within the Inyo National Forest. That commercial thinning will include the logging of large trees, up to 24, or even 30, inches in diameter at breast height ("DBH"). How many large trees, how large those trees will be and what percentage of the overall logging those large trees will constitute is unclear from the Forest Service's final decision and supporting documents.

5.     While large trees were once more widespread in the Three Creeks Project area, they have become a rarity. Historically, it was common to see trees exceeding 100 feet tall and 40 inches DBH. Several wildlife species native to the area depend upon the presence of many large trees to provide essential habitat conditions. The populations of these species have declined along with the decline of large trees.

6. The Forest Service intends to sell the trees logged pursuant to this DN/FONSI for personal use, such as home heating, and commercial fuelwood. The Forest Service approved this Project for the stated purpose of controlling future wildland fires by returning the area to something closer to pre-settlement conditions, which featured fewer small trees, and far more large trees. The Forest Service's decision approving the Three Creeks Project offers no plausible explanation for why commercial thinning, including the removal of trees as large as 30 inches DBH, is necessary to move the project area closer to pre-settlement conditions. Even if logging some large trees were arguably consistent with moving the project area closer to pre-settlement conditions, the Forest Service's analysis of the Project's impacts also fails to explain why such commercial logging is warranted in an area where large trees are already scarce and in light of its detrimental impacts on wildlife species that depend on large trees.

7. The Forest Service's analysis of the impacts from this project violates NEPA, USFS's objection regulations, and NFMA, in several ways. Throughout the NEPA process, the Forest Service produced conflicting and inconsistent information without explanation, and did not provide an opportunity for the public to comment on these changes. The analysis also fails to provide an explanation for or even discuss the conflicting statements between and within the different NEPA documents resulting in inaccuracy and incomprehensibility. Additionally, the Defendants failed to consider an adequate range of alternatives, to the detriment of the environment generally, and specifically to native wildlife that require large trees. Moreover, the analysis in several key areas of the NEPA documents improperly relies on outdated science and fails to discuss contradicting science, which lead to the Forest Service failing to take a hard look at impacts to the environment and to wildlife species that depend upon large trees. Further, the overall goal of returning the forest to the Forest Service's view of pre-settlement conditions cannot be met following the current Project. The current Project will log at least some of the few remaining large trees that once dominated the area and create simple stands with even fewer large trees, as opposed to returning the area to pre-settlement conditions, and as such it is inconsistent with the Inyo National Forest Plan.

8. The Inyo National Forest is in the eastern portion of the Sierra Nevada, bordering

Yosemite National Park. Inyo National Forest is home to several popular destinations, including Mono Lake, a rare saline soda lake, and a multitude of year-round recreational trails offering birding opportunities, among others. These destinations are located near or directly within the Project area.

9.     The DN/FONSI provides only a cursory glance at possible impacts from the Project and does not adequately consider the impacts to species throughout the Project area, including the Black-backed Woodpecker and the Pacific Marten.

10.    In order to prevent the Forest Service from logging in ways that will degrade forest that provides essential wildlife habitat and result in violations of the Forest Service's duties under NEPA, its Objection regulations, and NFMA, Plaintiffs seek from this Court an order and judgment:

   a.     Declaring that the Forest Service's DN/FONSI for the Three Creeks Project violates NEPA, 42 U.S.C. §§ 4321 *et seq.*, USFS Objection regulations, 36 C.F.R. Pt. 218, and/or NFMA, 16 U.S.C. §§ 1600 *et seq.* and is arbitrary, capricious, an abuse of discretion, and/or not in accordance with law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A);

   b.     Vacating and setting aside the USFS's illegal DN/FONSI as an illegal agency action under the APA;

   c.     Permanently enjoining the Forest Service from implementing the Three Creeks Project until the agency complies with NEPA, USFS Objection regulations, and NFMA;

   d.     Enter appropriate injunctive relief to ensure that Defendants comply with NEPA, USFS Objection regulations, and NFMA, and specifically to ensure that Defendants and their agents take no further actions toward proceeding with the challenged Three Creeks Project until they have complied with NEPA, USFS Objection regulations, and NFMA;

   e.     Awarding Plaintiff its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

f.      Awarding such further relief as the Court deems just and equitable.

**PARTIES**

11.     Plaintiff **EARTH ISLAND INSTITUTE ("EII")** is a nonprofit corporation organized under the laws of the State of California. EII is headquartered in Berkeley, California. EII's mission is to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment. Through education and activism, these projects promote the conservation, preservation, and restoration of the earth. One of these projects is the John Muir Project—whose mission is to protect all federal public forestlands from commercial exploitation that undermines and compromises science-based ecological management. John Muir Project offices are located in San Bernardino County, California. EII is a membership organization with over 15,000 members in the United States, over 3,000 of who use and enjoy the National Forests of California for recreational, educational, aesthetic, spiritual, and other purposes. EII through its John Muir Project has a longstanding interest in protection of national forests. EII's John Muir Project and EII members actively participate in governmental decision-making processes with respect to national forest lands in California and rely on information provided through the NEPA processes to increase the effectiveness of their participation.

12.     EII's members include individuals who regularly use public lands within the Inyo National Forest, including the Three Creeks Project areas proposed for logging in particular, for scientific study, recreational enjoyment, aesthetic beauty, and nature photography.  These members' interests will be irreparably harmed by the planned logging, as they will no longer be able to scientifically study these areas in their current state, take nature photographs of the area in its current state, or enjoy the aesthetic beauty of the unlogged forest habitat and its inhabitants.

13.     Plaintiff **CENTER FOR BIOLOGICAL DIVERSITY ("the Center")** is a non-profit corporation with offices in Oakland, Los Angeles, and Joshua Tree, California; Oregon; Washington; Arizona; New Mexico; Alaska; and Washington, D.C.  The Center is actively involved in species and habitat protection issues throughout North America and has more than 45,000 members, including many members who reside and recreate in California.  One of the

Center's primary missions is to protect and restore habitat and populations of imperiled species, including from the impacts of logging.

14.     The Center's members and staff include individuals who regularly use and intend to continue to use the Inyo National Forest, including the lands that are now planned for logging as part of the Three Creeks Project. These members and staff use the area for observation, research, aesthetic enjoyment, and other recreational, scientific, spiritual, and educational activities. Many of the Center's staff and members use the area to enjoy its character and to observe or study species, like the Black-backed Woodpecker and Pacific Marten, which have habitat, or potential habitat, within the Project area. These member's interests will be irreparably harmed by the planned logging in the Project area, as they will neither be able to visit and enjoy this area in its current state any longer, nor be able to observe or attempt to observe the species which use and are dependent on these areas in their current state.

15.     This suit is brought by EII and the Center, on behalf of themselves and their adversely affected members and staff. Both Plaintiffs have an organizational interest in the proper and lawful management of the Inyo National Forest. Plaintiffs' and their members' present and future interests in the use of the Three Creeks Project areas are and will be directly and adversely affected by the challenged decision. Those adverse effects include, but are not limited to: (1) impacts to wildlife and their habitats within and around the Project area from logging; (2) reduction and impairment of recreation opportunities; (3) impaired aesthetic value of forest lands, trails, and landscapes caused by Defendants' logging; and (4) loss of scientific study and viewing opportunities with regard to wildlife in areas proposed for logging.  In addition, Plaintiffs and their members and staff have an interest in ensuring that Defendants comply with all applicable laws, regulations, and procedures pertaining to the management of national forest lands. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NEPA, NFMA, and other federal laws. Because Defendants' actions approving the Project violate the law, a favorable decision by this Court will redress the actual and imminent injury to Plaintiffs.

16.     The Plaintiffs have participated extensively in administrative actions to protect

their interests within the Inyo National Forest. The Center and EII actively participated in the administrative process for the Three Creeks Project, including submitting substantive comments and objections. The Plaintiffs have exhausted any and all available administrative remedies. Following 5 U.S.C. §§ 702 & 704, a reviewable final agency action exists and is subject to this Court's review.

17.     Defendant **FOREST SERVICE** is an agency of the United States and is a division of the Department of Agriculture, and is charged with managing the public lands and resources of the Inyo National Forest, in accordance with NEPA and NFMA and their implementing regulations.

18.     Defendant **MARGIE B. DEROSE**, Acting District Ranger for the Mono Lake and Mammoth Ranger Districts, approved the Three Creeks Project in the Inyo National Forest and signed the DN/FONSI. The DN/FONSI is the Forest Service's final agency action regarding the Three Creeks Project. Defendant DeRose is sued only in her official capacity.

### STATUTORY AND REGULATORY FRAMEWORK

### National Environmental Policy Act (42 U.S.C. §§ 4321 *et seq.*)

19.     Congress enacted the National Environmental Policy Act ("NEPA") in 1969. NEPA's primary purposes are to ensure fully informed decision-making and to provide for public participation in environmental analysis and decision-making. 40 C.F.R §§ 1500.1(b), (c). To this end, NEPA directs all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment.

20.     The Council on Environmental Quality ("CEQ") promulgates uniform regulations to implement NEPA. These regulations are binding on all federal agencies and can be found at 40 C.F.R. §§ 1500–1518.4.

21.     The CEQ regulations require federal agencies to adopt procedures to implement NEPA that supplement the CEQ regulations. *Id.* § 1507.3. The USFS's NEPA procedures can be found at 36 C.F.R. §§ 220.1–220.7.

22.     NEPA requires all federal agencies to prepare a "detailed statement," referred to as an Environmental Impact Statement ("EIS"), assessing the environmental impacts of all "major

Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

23.     Alternatively, an agency may instead prepare an Environmental Assessment ("EA") in order to help determine whether or not a proposed activity will significantly affect the quality of the human environment. An EA is "a concise public document for which a federal agency is responsible." 40 C.F.R. § 1508.9(a). The EA needs to include sufficient evidence and analysis in order to determine whether an EIS or a Finding of No Significant Impact ("FONSI") is required. *Id.* § 1508.9, *see also* 36 C.F.R. § 220.7(b)(3)(i).

24.     The scope of NEPA's review of environmental effects is broad; the agency must consider direct, indirect, and cumulative effects. 40 C.F.R. § 1508.8 (defining the term "effects" and explaining that it includes indirect effects and is synonymous with "impacts"). Effects include consideration of impacts on "ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health" interests. *Id.*

25.     Under USFS's applicable NEPA regulations, the approval of the Three Creeks Project triggered NEPA requirements, and the need to prepare an EA. 36 C.F.R. § 220.7(a).

26.     Agency actions taken pursuant to NEPA are reviewable by this Court under the APA. 5 U.S.C. §§ 702, 704, 706.

### *EA Requirements*

27.     All EAs must include (1) a description of the need for the project, (2) a description of the proposed action and alternative(s), (3) a discussion of the environmental impacts of the proposed actions and alternative(s), and (4) a note of the agencies and persons who were consulted throughout the process. 36 C.F.R. § 220.7(b). Importantly, an EA needs to "provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a [FONSI]". 40 C.F.R. § 1508.9(a)(1).

28.     Public scrutiny is essential to implementing NEPA. *Id.* § 1500.1(b). NEPA requires agencies to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. *Id.* § 1506.6(a). NEPA procedures ensure that environmental information be

made available to public officials and citizens before decisions are made and actions are taken. *Id.* § 1500.1(b).

29.    NEPA requires that all agencies "study, develop, and describe appropriate alternatives to recommend courses of action." 42 U.S.C. § 4332(2)(E). This requirement "extends to all such proposals, not just . . . [environmental] impact statements." 40 C.F.R. § 1507.2(d). The EA shall also provide sufficient evidence and analysis of the environmental impacts of the proposed action, as well as the alternative(s). 36 C.F.R. § 220.7(b)(3)(i).

30.    NEPA requires agencies to take a hard look at the environmental consequences before taking a major action. This includes considering all foreseeable direct and indirect impacts, as well as cumulative impacts.

31.    To determine the significance of a federal action, CEQ regulations require agencies to look to both the context and intensity of the action. 40 C.F.R. § 1508.27. Context refers to the significance of the action in regards to society as a whole, the affected region, the affected interests, and the locality. Both short- and long-term effects are relevant to the action's context. *Id.* § 1508.27(a). The intensity of the action is evaluated based on several factors, including, but not limited to, the degree to which the possible effects on the human environment are highly uncertain or involve unknown characteristics, the degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration, whether the action is related to other actions with individually insignificant but cumulatively significant impacts, and the degree to which an action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act. *Id.* § 1508.27(b). "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." *Id.* § 1508.27(b)(7).

32.    Accurate scientific analysis is essential to NEPA implementation. *Id.* § 1500.1(b).

33.    NEPA documents need to be written in plain language so that decisionmakers and the public can readily understand them. Documents are unacceptable if they are indecipherable to the public.

34.     After completing an adequate EA, the agency shall prepare either an EIS or a FONSI. An agency must prepare an EIS when it makes a determination that the action has the potential to significantly effect the environment. 36 C.F.R. § 220.6(c). A FONSI will be prepared if the action causes no significant effect to the human environment; but the agency must provide a convincing statement of reasons to explain how the impacts are insignificant. 40 C.F.R. § 1508.13.

**National Forest Management Act (16 U.S.C. §§ 1600 *et seq.*)**

35.     The National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*, is the primary statute governing the administration of national forests. Agency actions taken pursuant to NFMA are reviewable under the APA. 5 U.S.C. §§ 702, 704, 706.

36.     NFMA requires the Forest Service to develop and implement a land and resource management plan ("LRMP" or "Forest Plan") for each unit of the National Forest System. 16 U.S.C. §1604. Forest Plans guide natural resource management activities forest-wide, setting standards, management area goals and objectives, and monitoring and evaluation requirements. A Forest Plan must provide for multiple uses for the forest, including: density, recreation, range, wildlife, fish, timber, and wilderness.

37.     Under NFMA all permits, contracts, and other instruments for the use of National Forest System lands "shall be consistent with the land management plans." *Id.* § 1604(i). Therefore, after a forest plan is developed, all subsequent agency action, including site-specific actions, must comply with NFMA and the governing Forest Plan.

38.     The Land and Resource Management Plan governing the Inyo National Forest ("Inyo Forest Plan") was adopted in 1988. During the 2000's the Forest Service amended every Forest Plan in the Sierra Nevada by adopting the "Sierra Nevada Forest Plan Amendment of 2004" ("2004 Framework"). The 2004 Framework was designed to address inefficiencies within previous Forest Plans and amendments by focusing on old forest ecosystems and associated species and fire and fuels.

39.     Among the Desired Conditions for General Forests is to have the forest structure and function within areas emphasized for old forest to resemble pre-settlement conditions.

Within the Inyo Forest, old and large trees dominated in pre-(European) settlement times, averaging 14 large trees per acre (24 inches DBH), but very large trees (over 40 inches DBH) were also common.

### United States Forest Service Project-Level Predecisional Administrative Review Process Regulations (36 C.F.R. Pt. 218)

40.     The USFS provides regulations establishing a predecisional administrative review (also known as objection) process for proposed actions of USFS projects documented with a decision notice. 36 C.F.R. § 218.1

41.     Objections are written documents seeking predecisional administrative review of a proposed project implementing a land management plan that are documented with an EA, and can be filed by those who have submitted written comments to the specific project during the commenting opportunity. *Id.* § 218.2.

42.     These regulations note that certain projects are subject to legal notice and the opportunity to comment, among these are projects for which a revised EA is prepared based on consideration of new information or changed circumstances. *Id.* § 218.22(d). This not only provides the public with an opportunity to comment, but ensures that the right to file an objection is maintained for those who comment. *Id.* § 218.5.

### Administrative Procedure Act (5 U.S.C. §§ 551 *et seq.*)

43.     Section 702 of the APA, 5 U.S.C. § 702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."

44.     Under section 704 of the APA, 5 U.S.C. § 704, only "final agency actions" are reviewable. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

45.     Under section 706 of the APA, 5 U.S.C. § 706, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2).

**SUMMARY OF FACTS**

46.     Located along the California and Nevada border, the Inyo National Forest covers almost 2 million acres of land, with a large majority of the forest being located in California. The forest is apart of the Sierra Nevada and neighbors both Yosemite and Sequoia National Park.

47.     The Inyo's forests, rivers, and lakes provide important habitat for fish and wildlife, including the Black-backed Woodpecker and the Pacific Marten.

48.     The Three Creeks Project is 9,590 acres in size. It is located within the northern region of the Inyo National Forest, just south of Mono Lake. The Project area consists of many destinations, including Mammoth Lake, a town boasting recreation opportunities, as well as a number of popular rivers for canoeing/kayaking and trails for birding opportunities.

49.     Defendants first alerted the public to the Project after they published a scoping notice in October 2012. The scoping notice proposed to thin trees for the stated purpose of promoting forest structure and density to achieve long-term resiliency and sustainability. The notice also highlighted that forest stands in the area currently lack older, larger, and more fire resilient trees.

50.     Defendants prepared several EAs before they issued a DN/FONSI in January 2018.

51.     The Forest Service published the first EA in March 2016 (hereinafter known as the "March 2016 EA"). The stated purpose in this March 2016 EA remained to thin trees in order to reduce wildfire intensity and meet desired pre-European settlement conditions. Two alternatives were considered, the no action alternative and the proposed action alternative, which seeks to achieve pre-settlement conditions.

52.     The March 2016 EA described pre-settlement conditions in the project area as an area where large trees prevailed–older, larger trees (over 24 inches DBH) dominated the area and trees exceeding 40 inches DBH and 100 feet in height were common. The current forest conditions however, have more smaller trees (less than 8 inches DBH) and large trees are rare, non-existent, or have recently died. Despite the differences in historical and current conditions,

this EA proposed that the "vast majority" of trees to be thinned would be in the 10-20 inches

DBH size range. If this proposal were followed, the smaller and more fire-susceptible trees that

already dominate the area would remain, and rare large trees would be logged.

53.     The Forest Service distributed a revised EA in July 2017 (hereinafter known as the

"July 2017 EA"). This EA still claimed an overall purpose of wildfire resistance and returning

to pre-European settlement conditions. Once again two alternatives were considered (the no

action and proposed action alternatives).

54.     In the July 2017 EA the Forest Service describes the same desired and current

forest conditions–highlighting the historical dominating force of old large trees, yet noting how

noticeably the area changed by now being dominated by trees that are less than 8 inches DBH.

This EA again notes that the "vast majority" of trees to be thinned are between 10-20 inches

DBH, but it also stated, somewhat in contradiction, that smaller trees will be preferentially cut.

Although smaller trees may be cut under this EA, the overall effect of this proposal would leave

a huge amount of small, fire susceptible trees in the area, going against the purpose and need of

creating an area that is more resilient to wildfires.

55.     The Forest Service published a second, "revised EA" in January 2018 (hereinafter

known as the "January 2018 EA"); the Forest Service's Three Creeks Project webpage labels

the January 2018 EA as the "Final EA." Increasing wildfire resiliency remained the purpose and

need for this project.

56.     In the January 2018 EA the description of desired pre-settlement conditions is

different than previous EAs; however, it still highlighted the dominating force of older, large

trees (generally over 24 inches DBH, and some even over 40 inches DBH). The current forest

conditions are once again noted as overly dense, with a majority of the area now dominated by

smaller trees (less than 8 in DBH) and larger trees being a rarity. Again, two alternatives were

considered, the no action and proposed action alternatives. The proposed action alternative

however now notes a different logging structure. Now, for the first time, and after all

opportunities for public comment have passed, the January 2018 EA explains that the "vast

majority" of trees to be thinned will be less than 10 inches DBH, but it is still noted that trees as

1    large as 30 inches DBH could be logged as well.

2        57.    There is no explanation within any EA as to why the purpose and need of wildfire

3    resiliency and returning to pre-settlement conditions needs to be achieved by logging any large

4    trees, over 10 inches DBH.

5        58.    The Inyo National Forest is home to numerous wildlife species, including the

6    Pacific Marten and the Black-backed Woodpecker. The forest encompasses some of the

7    southern-most portion of the Black-backed Woodpecker's range, making the area significant for

8    this species.

9        59.    The impacts these species face because of logging within the Three Creeks Project

10   area were only minimally analyzed within the Forest Service's EAs.

11       60.    The March 2016 EA looks briefly at impacts to species within the area. It notes

12   that the Black-backed woodpecker's habitat "may be enhanced" because it is possible that some

13   trees may die following the underburning that will occur post thinning. This is the only

14   statement regarding possible impacts to the woodpecker. The Pacific Marten is highlighted as

15   both a sensitive species and management indicator species within the project area. The March

16   2016 EA noted that the marten prefers habitat with large diameter trees and snags (standing,

17   dead or dying trees), and that the project may reduce habitat quality for the species. The EA

18   also states that there will be a loss of structural complexity and near ground cover, both of

19   which are important features for marten habitat. The March 2016 EA then lists 3 treatment units

20   as being frequented by martens, thus less invasive treatment would occur in these areas.

21       61.    The July 2017 EA's analysis on impacts to species was no different than the

22   March 2016 EA's analysis. There was a similar (if not identical) statement about the Black-

23   backed woodpecker's habitat being "enhanced" because of the possibility of trees dying after

24   underburning occurs. Focusing on the Pacific Marten, the analysis was also similar to the March

25   2016 EA, changing only in regards to the cumulative effects analysis. The July 2017 EA notes

26   the marten's habitat preferences (large trees, snags, structural complexity, etc.) as well as

27   specifies the three treatment units that would receive less invasive treatments due to marten use

28   in those areas.

62.     The January 2018 EA's review of impacts to species was once again similar to the July 2017 and March 2016 EAs, but there were a few differences. For the first time, the EA listed the Black-backed Woodpecker as a management indicator species representing snags in burned forests. This EA goes on to note that there would be no direct impacts to the species because there is no burned forest in the project area, but it does state that there may be the indirect effect of modifying future habitat recruitment rates on 9,590 acres (the entire project area). Also, for the first time in the Forest Service's analysis, the January 2018 EA considered cumulative impacts on the Black-backed Woodpecker, concluding there would be no direct cumulative impacts. Turning to the Pacific Marten, the analysis in the January 2018 EA is very similar, if not identical, to the analysis in the July 2017 EA, specifying the units treated with marten use in mind and noting habitat preferences. There is one difference however, the January 2018 EA makes a brief reference to a 2016 study on marten's habitat use, stating that maintaining or increasing structural variation will increase marten use in these areas, and suggesting that the planned commercial thinning would benefit martens, when the cited 2016 study concluded the opposite.

63.     The Pacific Marten is listed as a sensitive species in the Pacific Southwest Region. Sensitive species are those that the Forest Service identifies because their population viability is a concern on the forestlands within a region. Populations of all sensitive species must be maintained at viable levels in habitats distributed throughout their geographic range.

64.     The EAs specify 3 of 130 units for less invasive treatment in order to protect the Pacific Marten and its habitat. However, they fail to fully analyze the impacts to Pacific Martens in the other 127 units and fail to properly identify the species' home range. Additionally, studies the Defendants relied upon in the January 2018 EA are mentioned only in passing and are not fully addressed, much to the detriment of the EA's consideration of impacts to the species.

65.     Diverse forest structures are important for martens. A marten's home range consists of several thousand acres (over 2,500 acres for males and over 1,000 acres for females). Simple structures (trees of relatively the same age class) within a marten's home range have

severely decreased use, or are avoided altogether by the species.

66.     The Black-backed Woodpecker is a rare species within the Inyo National Forest, with likely less than 700 pairs in the Sierra Nevada as a whole. The species relies upon large patches of recently killed trees with very high densities of medium and large snags. Snags are often created following an intense fire. In order to achieve the large number of snags required, the area needs to have a number of large trees present *prior* to a disturbance, such as a fire. If large trees in the area are logged, it will severely reduce the possible habitat for the species. The species is substantially threatened by ongoing fire suppression, post-fire salvage logging, as well as mechanical thinning "fuel reduction" logging projects. Despite being provided with recent information about habitat requirements for the woodpecker, the Forest Service continues to rely on outdated science when analyzing impacts.

67.     The 2004 Framework from the Forest Service has a general guideline of maintaining just 3 snags/acre in eastside pine (another term for Jeffrey pine) forests. However, more recent studies indicate that current forest management practices do not provide for sufficient snag retention and may impact species. The U.S. Fish and Wildlife Service specifically notes that the woodpecker is associated with areas comprised of "*high densities* of larger snags" and areas with "standing dead timber that contain[] an *abundance* of snags." Despite having access to new studies that focus on the woodpecker's specific needs, and which conclude that several times more larger snags per acre are needed for this species than the current 3 per acre standard, the Forest Service relied on the 2004 Framework, which provides only a cursory mention to the Black-backed woodpecker.

68.     An agency is required to look into both short and *long*-term effects of treatment. However, the Defendants focused too narrowly on the present effects of the project and did not properly consider how the Project would impact the Black-backed Woodpecker in the future.

69.     Defendants sought public comment on the initial March 2016 EA and objections to the revised July 2017 EA. However, the Defendants did not offer the public an opportunity to comment on the most recent, revised January 2018 EA, even though there were significant changes between the July 2017 EA and January 2018 EA.

70.     The January 2018 EA subtly changed and/or added several important characteristics regarding the desired pre-settlement conditions. However, none of these differences were highlighted, nor was anyone allowed to comment on the changes. Further, The January 2018 EA itself contains inconsistencies regarding the size of trees to be thinned–one section notes that the majority of trees to be thinned are smaller (below 8 in DBH), whereas another section in the same EA states trees removed would be between 8-20 inches DBH, yet trees up to 30 inches could be removed as well. Although there were numerous differences between and even within the EAs, the most glaring are the changes in the desired conditions of the forest, which explicitly shifts the overall outcome of the Project. Between the July 2017 and January 2018 EAs, the desired stand description, basal area, and tree density changed, yet this was neither highlighted for readers nor offered for comment.

71.     The stand description in the January 2018 EA changed from an average of 22 large trees per acre, to only 14 large trees per acre. The basal area changed from 147 square feet per acre to a range of 70-152 square feet per acre. The tree density was never noted in the July 2017 EA, but was added in the January 2018 EA, for the first time.

72.     Additionally, despite receiving comments and/or objections on the July 2017 EA, the Defendants did not incorporate those comments and/or objections into the January 2018 EA. The comments/response sections (Appendix B) are word for word the same between the July 2017 and January 2018 EAs.

73.     Although Defendants were provided with possible alternatives to consider, they failed to discuss why these alternatives were not analyzed or why the Proposed Action Alternative was preferred over these potentially less invasive possible alternatives. Instead Defendants look past the possible alternatives with brief remarks.

74.     The failure to provide a cogent rationale for this project, improper analysis of impacts to species, as well as not properly relying on current scientific data underscores the Forest Service's failure to take a hard look at the project's impacts in the January 2018 EA, which improperly served as the basis for the DN/FONSI. Moreover, the startling differences between the EAs shows the uncertainty of the impacts of this Project; and even more egregious

is the fact that no one was able to properly scrutinize the significantly revised January 2018 EA–going against one of NEPA's core purposes.

75.     The Project as it stands is riddled with harmful impacts and lacks any clear benefit. Allowing the Three Creeks Project to continue would set the Project area far behind the desired pre-settlement condition, and imperil not only wildlife within the area, but also injure the recreational opportunities for Plaintiffs' members and others.

## CLAIMS FOR RELIEF

### *Defendant's Violations of NEPA and APA*

76.     Plaintiffs reallege and incorporate by reference all preceding paragraphs into each of the counts set forth below.

### <u>Claim 1</u>

### (Failure to Ensure Scientific Accuracy and Integrity and to Offer a Rational Basis for the Project)

77.     Accurate scientific analysis is essential to NEPA implementation. 40 C.F.R. § 1500.1(b). Moreover, an agency needs to set forth its reasoning clearly enough to permit the public to meaningfully and constructively comment. It is a fundamental that the public be given an indication of what the agency proposes to do.

78.     The January 2018 EA states that the desired basal area ("BA") for the overall project area is a range of 70-152 square feet per acre. The same EA also provides the current average and mean BA of the project area, divided into 4 'strata.' The current average BA for the 4 strata is as follows: Strata 1 has a mean BA of 110 square feet per acre, Strata 2 has a mean BA of 120 square feet per acre, Strata 3 has an average BA of 66 square feet per acre, and Strata 4 has a mean BA of 165 square feet per acre—resulting in an overall average of 115 square feet per acre.

79.     The Defendants fail to state any cogent explanation for why they need to thin these strata when the average or mean BA of most individual strata are currently within the desired BA range, or even well below it.

80.     Even if Plaintiffs had been given an opportunity to comment to the January 2018

EA, the Defendant's reasoning and analysis is either not actually disclosed or too convoluted to permit Plaintiffs the ability to meaningfully and constructively participate in the NEPA process.

81.     Defendants provided no rational connection between the facts provided and the conclusions/decision made. This is arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

### **Claim 2**

### **(Failure to Consider an Adequate Range of Alternatives)**

82.     NEPA mandates that an agency "shall to the fullest extent possible" use the NEPA process "to identify and assess the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the environment." 40 C.F.R. § 1500.2. Reasonable alternatives include those that substantially meet the agency's purpose and need. CEQ regulations specifically require agencies to examine alternatives to the proposed action in conducting an EA. *Id*. § 1508.9(b). USFS regulations define the environmentally preferred alternative as "the alternative that will best promote the national environmental policy as expressed in NEPA's section 101; … [o]rdinarily, the environmental preferable alternative is that which causes least harm to the biological and physical environment; it is also the alternative which best protects and preserves historic, cultural, and natural resources." 36 C.F.R § 220.3.

83.     The Three Creeks Project's purpose and need is listed as "managing the selected Jeffrey pine [] units through promoting forest health by increasing resiliency to wildlife, drought and pathogens, and for restoration and improvements of a variety of habitat-types." The Project's desired conditions are described as returning to pre-European settlement conditions.

84.     Defendants failed to analyze alternatives beyond simply the Proposed Action Alternative and the No Action Alternative. Although analyzing these two alternatives can be valid in some circumstances, there was no meaningful explanation in the EA as to why the Project's goals and desired condition could not be met through other means, such as prescribed fire or precommerical thinning of trees under 8 inches DBH.

85.     Moreover, different alternatives were proposed for analysis throughout the

comment period—including use of only prescribed fire or precommerical thinning. However, it is unclear why these alternatives, which are less invasive, and on their face appear more likely to meet the Project's purpose and need, were not considered.

86.     This failure to fully consider all reasonable and feasible alternatives throughout its analysis is arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

### Claim 3

### (Failure to Take the Requisite 'Hard Look' at Impacts to Species)

87.     NEPA requires agencies to take a "hard look" at environmental consequences before taking an action. In order to satisfy NEPA's "hard look" requirement, agencies need to consider all foreseeable direct and indirect impacts that the actions poses, along with cumulative impacts that result from the proposed project together with other projects (past, present, or future). In determining an action's significance, the agency needs to analyze both the context and intensity of the action—including looking at short- and long-term effects as well as cumulative impacts. 40 C.F.R. § 1508.27.

88.     The EAs analysis on impacts to the Pacific Marten was too limited to fully understand the indirect and cumulative effects that the Project will have on the species. Only 3 units throughout the entire Project area were designated as marten habitat and listed for less invasive treatment. Within the remaining 127 units, some of which are among or adjacent to the 3 designated units, the overall impacts to martens are not fully considered. There was no analysis regarding how the reduction of habitat quality would impact the species.

89.     Additionally, the analysis of impacts on Black-backed Woodpeckers did not focus on any long-term and/or cumulative effects. The species relies on areas with recently killed trees (often caused by disturbances, such as fires) and with very high densities of snags. In order to create areas with a high density of snags, there needs to be sufficient tree density pre-disturbance. By reducing the density of trees pre-disturbance and the possibility of intense future fires, Defendants are severely limiting the amount of snags that this species relies upon. The EAs contain no analysis of the structure of the forest post treatment *and* post future

disturbances—thus there is no analysis regarding how the logging of trees pre-disturbance could harm Black-backed Woodpeckers.

90.     The inadequate analysis regarding both the Pacific Marten and Black-backed Woodpecker is arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

## <u>Claim 4</u>

### (Improper Reliance on Outdated Science)

91.     It is essential to NEPA that scientific analysis within NEPA documents is of high quality. 40 C.F.R. § 1500.1(b). An agency's analysis cannot rest on outdated science.

92.     Despite being provided with newer science following public comments, the Defendants continued to rely on an older scientific study that notes requirements for the Black-backed Woodpecker as vastly different. These new studies were never referenced or discussed in the January 2018 EA.

93.     The 2004 Framework relied upon by Defendants does not provide an analysis of Black-backed Woodpeckers nor their habitat requirements, but concluded that just 3 of the largest snags per acre should remain in Jeffrey pine forest types.

94.      Newer scientific studies, which the Forest Service had access to, note that the Black-backed Woodpecker is generally found in areas with high densities of larger snags; and that the species is associated with areas containing an abundance of larger snags—far more than the current 3 per acre standard.

95.     Current science indicates that the present standard of maintaining just 3 snags per acre is not appropriate for maintaining Black-backed woodpecker habitat. Newer, more up to date, studies have been released noting the snag densities required and preferred for the species. The Forest Service never discussed these more up to date findings, despite being provided with some of these studies.

96.     The studies sent to the Forest Service note that forest thinning has an impact on the Black-backed woodpecker. The Forest Service asserts that thinning forests reduces the intensity of future fires; the Black-backed woodpecker prefers to nest in areas that recently experienced a

high-intensity fire, or otherwise has high densities of larger snags, while the project would maintain only 3 per acre. Even, if a stand experiences a low-intensity fire, the woodpecker may avoid the area altogether. Thus, thinning greatly reduces post-fire habitat suitability.

97.     The lack of analysis regarding and complete dismissal of newer conflicting science is arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

**Claim 5**

**(Improper Analysis of Conflicting Science)**

98.     Accurate scientific analysis is essential to the NEPA process. 40 C.F.R. § 1500.1(b). NEPA requires agencies to disclose, analyze, and make good faith responses to considered contrary scientific opinions.

99.     In Plaintiffs objection to the July 2017 EA, they provided Defendants with a new study focusing on Pacific Martens habitat use–Moriarty et al., "Forest Thinning Changes Movement Patterns and Habitat Use by Pacific Marten," published in 2016. The study analyzed how the marten's use of its habitat, particularly its home range, is impacted based on forest structure.

100.     Although the January 2018 EA included a reference to this newer study, the Defendants' analysis fails to discuss the overall implication of the study. In fact, the study is only given one brief mention within the entire EA. No good faith analysis or response was given to this new study.

101.     The lack of analysis of the newer conflicting science is arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A)

**Claim 6**

**(Failure to Write in Plain Language)**

102.     NEPA documents need to be written in plain language so that decisionmakers and the public can readily understand them. If the documents are indecipherable to the public, they are unacceptable.

103.     There are numerous inconsistencies throughout the different EAs, as well as inconsistencies within the final January 2018 EA itself. Defendants also failed to provide any

explanation or reasoning for these inconsistencies.

104.    The July 2017 EA describes the desired conditions as an area averaging 22 large trees per acre with a basal area of 147 square feet per acre. The same EA notes that the "vast majority" of trees to be thinned are between 10-20 inches DBH. The January 2018 EA described the desired conditions as an area averaging only 14 large trees per acre with a basal area range of 70-152 square feet per acre, as well as having a tree density of 39-79 trees per acre of all size classes. The logging within the January 2018 EA is targeting a "vast majority" of small trees (less than 10 in DBH), but also notes that a majority of merchantable trees between 10-20 inches DBH will also be logged.

105.    There are inconsistencies surrounding this tree size issue elsewhere in the January 2018 EA. Although the EA states in one section that the majority of trees to be thinned will be below 10 inches DBH, in a different section there is an entirely contradictory statement. Within the description of effects relative to the FONSI, the January 2018 EA also states that the trees removed would range from 8-20 inches DBH, however trees up to 30 inches DBH may also be removed.

106.    The Forest Service did not explain why these significant changes were made between EAs and how those changes truly impact the Project overall. Additionally, inconsistencies within the final January 2018 EA make it impossible for the public to determine what will actually occur during the Project's implementation.

107.    These inconsistencies and failure to explain the changes between the EAs make the final EA unreadable. Thus the January 2018 EA and DN/FONSI are arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

### **Claim 7**

**(Improper Assessment of a Finding of No Significant Impact)**

108.    A FONSI can be prepared if the Defendants determine on the basis of the EA that an EIS is not required because there will be no significant effects to the human environment from the proposed action. 40 C.F.R. § 1501.4(e).

109.    The DN/FONSI prepared in this case was improper because the EA on which it

was based, the January 2018 EA, was plainly inadequate and did not provide sufficient support for a finding of no significant impact as a result of the Defendants' action.

110. Defendants' DN/FONSI was arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

**Claim 8**

**(Failure to Prepare an EIS)**

111. NEPA requires that Defendants prepare an EIS "in every recommendation or report on proposals for legislation and other major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1502.3. These agencies must complete an EIS if (1) the proposed project "is a major federal action" and (2) the proposed project may "significantly affect the quality of the human environment." 42 U.S.C. § 4332; *see also* 40 C.F.R. § 1508.18.

112. Although NEPA regulations allow an agency to avoid preparing a complete EIS by first preparing an EA and then issuing a FONSI, 40 C.F.R. § 1508.9, the inadequate EA and underlying record here do not support the Defendants' DN/FONSI and failure to prepare an EIS.

113. Given the impacts that the Three Creeks Project can have on the environment and native species and the inadequacy of the EAs, Defendants' failure to prepare an EIS was arbitrary, capricious or not in accordance with NEPA, in violation of 5 U.S.C. § 706(2)(A).

***Defendant's Violations of NEPA and USFS Objection Regulations***

114. Plaintiffs reallege and incorporate by reference all preceding paragraphs into each of the counts set forth below.

**Claim 9**

**(Failure to Provide an Opportunity for Public Comment)**

115. NEPA requires agencies to make diligent efforts to involve the public in preparing and implementing their NEPA procedures. 40 C.F.R. § 1506.6(a). "A proposed project or activity for which a supplemental or revised EA … is prepared based on consideration of new information or changed circumstances" is subject to legal notice and the opportunity to

comment. 36 C.F.R. § 218.22(d).

116.    The January 2018 EA was published following objections raised to the July 2017 EA. Some of the objections provided the Forest Service with new information, for example the 2016 study by Moriarty et al. focusing on habitat use by Pacific Martens. The January 2018 EA references this new information, yet no one was given an opportunity to comment and/or object to the January 2018 EA.

117.    The January 2018 EA also changed several key details regarding the desired forest condition (i.e. the desired stand description, basal area range, and trees per acre), which is essential to the overall outcome of the Project. There were also changes to the circumstances regarding how to achieve these desired conditions–the March 2016 and July 2017 EAs note that the "vast majority" of trees to be thinned are between 10-20 inches DBH, yet the January 2018 EA notes that the "vast majority" of trees to be thinned will be below 10 inches DBH. Despite these changes in circumstance between the March 2016/July 2017 EAs and the January 2018 EA, the public was not given an opportunity to comment and/or object to the January 2018 EA.

118.    Based on USFS Objection regulations as well as NEPA's goal of public scrutiny, the Defendants improperly denied the public a chance to engage with Defendants and comment on the final January 2018 EA, which served as the basis for the illegal DN/FONSI. 36 C.F.R. § 218.22(d).

119.    In the absence of such public scrutiny, Defendant's DN/FONSI is arbitrary, capricious or not in accordance with NEPA or USFS's Objection regulations, in violation of 5 U.S.C. § 706(2)(A).

### *Defendant's Violations of NFMA and APA*

120.    Plaintiffs reallege and incorporate by reference all preceding paragraphs into each of the counts set forth below.

### Claim 10

### (Failure to Maintain Consistency with the Forest Plan)

121.    Once a Forest Plan has been developed, all subsequent agency actions must comply with NFMA and be consistent with the governing forest plan.

122.     The Inyo Forest Plan and 2004 Framework note that a project's desired conditions are plan requirements. Moreover, the 2004 Framework states that the general desired condition for old growth emphasis areas is to have forest structures and functions resemble pre-settlement conditions.

123.     The Inyo National Forest's pre-settlement/desired conditions are described in detail in the January 2018 EA. The EA notes that older, larger trees dominated the overall appearance of the forest, with stands maintaining a basal area range of 70-152 square feet per acre. Historically the trees per acre ranged from 39-79, while the mean tree diameter was 22 inches as large trees were common in the area.

124.     The current conditions within the Inyo National Forest are different; trees exceeding 24 inches in diameter are "rare, non-existent, or have recently died." In order to have the area become dominated by older and larger trees (over 22 inches DBH), achieving the desired condition in the near to medium term, medium-sized trees (between 10-20 inches DBH) need to be protected and maintained.

125.     The January 2018 EA states that the majority of merchantable sized trees to be thinned are between 10-20 inches DBH and even trees over 24 inches DBH may be removed to meet desired basal area goals. Thus, even if the majority of trees to be thinned would be less than 10 inches DBH, which is unclear, larger trees will still be logged if the Project is implemented as it is currently described.

126.     Despite clear evidence before it that larger trees were the dominating force of the pre-settlement Inyo National Forest, the Defendants are still planning to log some of the few remaining large trees, or trees that will become large trees in the near future.

127.     Thus, the January 2018 EA is inconsistent with the 2004 Framework's requirement of achieving pre-settlement conditions, which is arbitrary, capricious or not in accordance with NFMA, in violation of 5 U.S.C § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray for an order and judgment:

a.     Declaring that the Forest Service's DN/FONSI for the Three Creeks

Project violates NEPA, USFS Objection regulations, and/or NFMA, and is arbitrary, capricious, or not in accordance with law under the APA, 5 U.S.C. § 706(2)(A);

        b.     Vacating and setting aside the USFS's illegal DN/FONSI as an illegal agency action under the APA;

        c.     Permanently enjoining the Forest Service from implementing the Three Creeks Project unless and until the agency complies with NEPA, USFS Objection regulations, and NFMA;

        d.     Entering appropriate injunctive relief to ensure that Defendants comply with NEPA, USFS Objection regulations, and NFMA, and specifically to ensure that Defendants and their agents take no further actions toward proceeding with the challenged Three Creeks Project unless and until they have complied with NEPA, USFS Objection regulations, and NFMA;

        e.     Awarding Plaintiff its reasonable attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

        f.     Awarding such further relief as the Court deems just and equitable.

Respectfully submitted this 9th day of July, 2019.

/s/ Thomas Buchele
Thomas Buchele (CA Bar No.129657)
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland, OR 97219-7799
Tel: 503-768-6643
Fax: 503-768-6642
Email: tbuchele@lclark.edu

Attorney for Plaintiffs Center for Biological Diversity and Earth Island Institute.