Thomas Buchele, (CA Bar No. 129657)
Morgan Staric, *Admitted Pro Hac Vice*
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736 (Buchele)
Tel: 503-768-6825 (Staric)
Email: tbuchele@lclark.edu
Email: mstaric@lclark.edu

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**EARTH ISLAND INSTITUTE**, a non-profit corporation; **CENTER FOR BIOLOGICAL DIVERSITY**, a non-profit corporation,

Plaintiffs,

v.

**UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture; **MARGIE B. DEROSE**, Acting District Ranger, Mono Lake and Mammoth Ranger District, Inyo National Forest, in her official capacity

Defendants.

No. 2:19-cv-1271

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

TABLE OF ACRONYMS ........ vii

MEMORANDUM IN SUPPORT ........ 1

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 2

LEGAL BACKGROUND ........ 5

I. The National Environmental Policy Act. ........ 5

II. The National Forest Management Act. ........ 6

III. The Forest Service's Objection Regulations. ........ 6

JURISDICTION AND STANDING ........ 7

STANDARD OF REVIEW ........ 8

ARGUMENT ........ 9

I. The Forest Service Failed to Offer a Rational Basis for the Three Creeks Project and Failed to Ensure its Consistency with the Forest Plans in Violation of NEPA and NMFA. (Claims 1 and 10) ........ 9

II. The Forest Service Violated NEPA by Failing to Write in Plain Language, Creating Inconsistencies and Causing Confusion. (Claim 6) ........ 14

III. The Forest Service Violated NEPA in Failing to Evaluate All Reasonable Alternatives. (Claim 2) ........ 17

IV. The Forest Service Violated NEPA in Failing to Take a Hard Look at Impacts to Species. (Claim 3) ........ 20

A. The Forest Service failed to analyze how the Three Creeks Project's effects on the black-backed woodpecker's current and future habitat would impact the species. ........ 20

B. The Forest Service failed to consider the Three Creeks Project's impacts on Pacific marten throughout the entire Project area. ........ 23

V. The Forest Service Violated NEPA by Failing to Ensure the Quality of its Scientific Analysis. (Claims 4 and 5) ........ 25

VI. The Forest Service Violated NEPA and its Objection Regulations by Failing to Provide an Opportunity to Comment on the January 2018 EA. (Claim 9) .................. 30

VII. The Forest Service Violated NEPA in Failing to Prepare an EIS, and Instead Issued an Improper FONSI. (Claims 7 and 8) .................................................................. 32

VIII. This Court Should Set Aside and Vacate the Challenged Decision. ................................ 34

CONCLUSION ........................................................................................................................ 35

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020)....................25, 28

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ............... 8, 28

*Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166 (9th Cir. 2002).................... 7

*Camp v. Pitts*, 411 U.S. 138 (1973) .................... 35

*Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d. 1189 (E.D. Ca. 2017). ........... 8, 14, 16

*Citizens for Better Forestry v. U.S. Dep't of Ag.*, 341 F.3d 961 (9th Cir. 2003) .................... 8

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008).................... 17, 34

*Ctr. of Biological Diversity v. U.S. Fish and Wildlife Serv.*,
2020 WL 620834 (D. Az. February 10, 2020), *appeal filed*.................... 25

*Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954 (N.D. Cal. June 10, 2016) .................... 35

*Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997) .................... 33

*Earth Island Institute v. Morse*, 2009 WL 2423478 (E.D. Ca. Aug. 5, 2009).................... 9, 12, 29

*Earth Island Institute v. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006),
*overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008);.................... 20, 22, 24

*Earth Island Institute v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) .................... 29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000).................... 7

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 (D. Or. July 3, 2014).................... 32

*Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) .................... 6, 9

*Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062 (9th Cir. 2002) .................... 5

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
387 F.3d 989, (9th Cir. 2004).................... passim

*League of Wilderness Defs./ Blue Mountains Biodiversity Project v. Connaughton*,
752 F.3d 755 (9th Cir. 2014).................... 14

*League of Wilderness Defs./ Blue Mountains Biodiversity Project v. Peña*,
2015 WL 1567444 (D. Or. April 6, 2015) .................... 35

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 2012 WL 13042847 (D. Or. Dec. 10, 2012) .......... 35

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) .......... 9, 14, 27

*Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797 (9th Cir. 2005) .......... 19

*Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 845, 846 (9th Cir. 2003) .......... 25

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010) .......... 6, 32

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005) .......... 19, 32, 34

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372 (9th Cir. 1998) .......... 6, 12

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005) .......... 20, 34

*Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783 (S.D. West Virginia 2009) .......... 30

*Or. Envtl. Council v. Kunzman*, 817 F.2d 484 (9th Cir. 1987) .......... 14

*Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092 (9th Cir. 2010) .......... 14

*Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241 (E.D. Ca. 2006) .......... 8

*State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982) .......... 30

*The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)(en banc), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......... 8, 9, 25, 26

*W. Watershed Project v. Abbey*, 719 F.3d 1035, 1050 (9th Cir. 2013) .......... 17, 19, 20

**Statutes** **Page(s)**

5 U.S.C. § 706(2) .......... 8

5 U.S.C. § 706(2)(A) .......... 34

16 U.S.C. §§ 1601 *et seq.* .......... 6

16 U.S.C. § 1604(a) .......... 6

16 U.S.C. § 1604(c) .... 6

16 U.S.C. § 1604(g)(2).... 6

16 U.S.C. § 1604(g)(3).... 6

16 U.S.C. § 1604(i) .... 6

28 U.S.C. § 1331 .... 7

42 U.S.C. § 4332(2)(C) .... 6

42 U.S.C. § 4332(2)(E) .... 6

**Federal Regulations** **Pages(s)**

36 C.F.R. § 218.1 .... 6

36 C.F.R. § 218.2 .... 6

36 C.F.R. § 218.5 .... 7

36 C.F.R. § 218.22(a).... 7, 30

36 C.F.R. § 218.22 (d) .... 7, 30

36 C.F.R. § 219.19 .... 33

36 C.F.R. Part 220.... 5

40 C.F.R. §§ 1500–1508.28 .... 5

40 C.F.R. § 1500.1(a).... 5

40 C.F.R. § 1500.1(b) .... passim

40 C.F.R. § 1500.1(c).... 12, 14

40 C.F.R. § 1500.2(d) .... 5, 30

40 C.F.R § 1500.2(e).... 5, 17

40 C.F.R § 1501.4(b) .... 30, 32

40 C.F.R. § 1502.8 .... 14

40 C.F.R § 1506.6(a).... 5, 30

40 C.F.R. § 1508.9 ..... 6

40 C.F.R. § 1508.9(b) ..... 6

40 C.F.R. § 1508.13 ..... 6, 32

40 C.F.R. § 1508.25(c) ..... 6

40 C.F.R. § 1508.27 ..... 32

40 C.F.R. § 1508.27(a) ..... 33

40 C.F.R. § 1508.27(b)(1) ..... 33

40 C.F.R. § 1508.27(b)(3) ..... 33

40 C.F.R. § 1508.27(b)(5) ..... 34

40 C.F.R. § 1508.27(b)(5) ..... 34

**Federal Register** **Page(s)**

46 Fed. Reg. 18026 ..... 17, 19

## TABLE OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| CEQ | Council on Environmental Quality |
| DBH | Diameter Breast Height |
| DN | Decision Notice |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| MIS | Management Indicator Species |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| WUI | Wildland-Urban Intermix |

## MEMORANDUM IN SUPPORT

## INTRODUCTION

Large, majestic trees once commanded the Inyo National Forest. However, after decades of U.S. Forest Service ("Forest Service" or "Service") policies emphasizing commercial logging of large trees and excluding fire the dominating presence those large trees once brought to the area has now been severely reduced, if not eliminated altogether. In their place, small trees and saplings have taken ahold and are the new dominating force in the area. The loss of these large trees has impacted the forest in many significant ways. The forest stands are now subject to greater risk of wildfires because smaller, more fire-susceptible trees have replaced the crucial larger, fire-resistant trees. In addition to this, species that rely on large trees for nesting, shelter and foraging—like the black-backed woodpecker and Pacific marten—were once common, but as large trees became a rarity, so did these species.

The Forest Service's Three Creeks Project is being promoted as an effort to return the Project area to pre-European settlement conditions in hopes of restoring the area's resiliency to wildfire and diseases. To Plaintiffs', Earth Island and the Center for Biological Diversity (collectively "Earth Island"), bewilderment however, to achieve this, the Forest Service is proposing to commercially log of some of the few remaining large trees in the Project area and many more of the moderately-sized trees that, if left alone might soon become large trees. Unfortunately though, because of inconsistencies and unknowns throughout the Forest Service's National Environmental Policy Act ("NEPA") analysis, Earth Island and the public do not know how much commercial logging generally and logging of large trees specifically the Forest Service intends to conduct. To achieve the Project's desired pre-settlement conditions, the Forest Service should not need to log any large trees or even conduct commercial logging; pre-commercial thinning of the already too numerous, small trees, that create a far greater risk of fire, would achieve the Forest Service's stated goals. But even if removing some of the few remaining large trees was somehow necessary to achieve the desired conditions, the Forest Service must clearly articulate why it found such removal necessary and provide the exact number, or at least an estimate, of large trees it intends to remove. Without this information it is impossible for the

Forest Service, the public, and this Court to truly understand the environmental consequences of the Three Creeks Project, which violates NEPA and other applicable laws.

## FACTUAL BACKGROUND

The Three Creeks Project ("Three Creeks" or "Project") lies within the northern region of the Inyo National Forest along the eastern Sierra Nevada, and is located near Mono Lake and Mammoth Lake. AR 00005, 00007. The Three Creeks area is home to diverse wildlife species including the Pacific marten and black-backed woodpecker and provides wonderful outdoor recreation opportunities, such as wildlife viewing. AR 00040–42. Fire is a natural, integral process that was frequent throughout this region. AR 00007. However, after almost a century of the Forest Service excluding nearly all fires in the area, the forest stand structure has deviated from its more natural, pre-European settlement conditions. AR 00011.

Historically, large, fire resistant trees over 24 inches diameter breast height ("DBH") dominated the Three Creeks area and very large trees exceeding 40 inches DBH and 100 feet in height were common. AR 00009. Unfortunately, the Forest Service's previous fire exclusion combined with commercial timber harvesting vastly changed the forest structure. AR 00011. Throughout the Project area, large trees over 24 inches DBH are now rare, non-existent, or have recently died. AR 00010. In fact, small trees less than 8 inches DBH now dominate the area, making up 65 percent of the forest stands. AR 00010, 00560. These small, young trees make up most of the increased accumulated fuels in the Project area. AR 00007 (area fuels increased as dead material accumulated on the forest floor and young trees began to fill in the space made available from fire exclusion and commercial timber harvesting).

Throughout its NEPA documents, the Forest Service uses inconsistent definitions for large, moderate, and small trees, *see infra* Argument Section II; however, for consistency in this brief Earth Island will use the following definitions. Earth Island understands large trees to be trees over 24 inches DBH, moderate trees are those between 8 and 24 inches DBH, and small trees are below 8 inches DBH. The trees at the far end of this "moderate" range are however well on their way to becoming the large, more desirable for wildlife and fire resistant, trees.

Currently within the Project area horizontal diversity is limited because the large trees that

once defined the region are now absent. AR 00010. Large trees currently make up less than 3 percent of the entire Project area. *See* AR 00560 (the Forest Service divided the Project area into 4 strata: Strata 1 contains 5 large trees per acre, which make up 2 percent of the strata; Strata 2 contains 6 large trees per acre, which make up 3 percent of the strata; Strata 3 contains 5 large trees per acre, which make up 9 percent of the strata; and Strata 4 contains 13 large trees per acre, which make up 4 percent of the strata). On the other hand, small trees make up 65 percent of the entire Project area. *See id.* (small trees make up 66 percent of Strata 1; 61 percent of Strata 2; 61 percent of Strata 3; and 67 percent of Strata 4). The remaining trees are moderate-sized trees.

Through the Three Creeks Project the Forest Service asserts that it is improving the area's resiliency to wildfire and returning it to pre-settlement conditions by logging 130 units, totaling 9,590 acres.[1] AR 00005; *but see infra* note 12. To achieve this, the Service is proposing to conduct commercial thinning (removal of trees over 8 inches DBH), pre-commercial thinning (removal of trees less than 8 inches DBH), and prescribed fire. AR 00460. By using commercial thinning, this Project will ultimately remove large and moderate sized trees throughout the area.

In October 2012, the Forest Service issued its NEPA scoping notice for the Project. AR 01502, 01503–07. Several interested parties submitted scoping comments, including Earth Island. *See e.g.* AR 01388–99, 01400–01, 01404–501. The Forest Service published its first Environmental Assessment ("EA") for public notice and comment in March 2016 ("2016 EA"). AR 00806. Its second EA was published for objections in July 2017 ("2017 EA"). AR 00759. Both of these EAs are quite similar. In their description of the proposed actions, both state that the vast majority of trees to be logged would be between 10–20 inches DBH, using commercial thinning, with trees over 24 inches DBH also being logged. AR 00133, 00250. These EAs also described similar current conditions and post-logging desired conditions, stating that currently within the area large trees are rare, nonexistent, or have recently died and that the area has an average basal area of 115 square feet, AR 00128, 00245, and that the Project sought to achieve

[1] The Project size was amended following the Clark and Owens River fires in 2016, going from 138 units at 10,187 acres to 130 units at 9,590 acres. AR 00005, 00241.

stands that average 22 large trees per acre and 147 square feet of basal area.[2] AR 00127, 00244.

Earth Island submitted comments on the 2016 EA and objected to the 2017 EA, raising numerous concerns about the Three Creeks Project. *See* AR 00753–58, 00779–99. Earth Island highlighted that the Forest Service relied on the outdated 2004 Sierra Nevada Forest Plan Amendment ("2004 Framework") when it decided to maintain only a maximum of three snags (standing, dead or dying trees) per acre, when numerous species, including the black-backed woodpecker and Pacific marten require significantly more snags per acre and other near ground cover. AR 00753–54, 00779–80, 00791–95. Earth Island provided the Forest Service with numerous recent scientific studies detailing the black-backed woodpecker's snag habitat requirements and the impacts that forest management activities can have on Pacific martens, AR 00753–55, 00779–80, 00791–95, but the Service either ignored or mischaracterized these studies. The removal of a significant number of trees, and in particular large trees, negatively impacts these species. The Pacific marten, a Forest Service sensitive species and a management indicator species ("MIS"), requires structurally complex forests with large trees and a high amount of down logs, snags, and other near ground cover. AR 00608, 00616. The black-backed woodpecker, another MIS, requires forest stands with a very high density of medium and large snags, preferring areas that have recently experienced a high intensity fire. AR 00041, 00791, 01357.

Earth Island's comment and objection also highlighted the ineffectiveness of thinning, raising concerns as to why the Forest Service found it necessary to undertake the Three Creeks Project altogether or why it could not implement conduct it in a different, more environmentally beneficial manner. AR 00755–56, 00797–98.

Without addressing the majority of Earth Island's concerns, the Forest Service issued its final EA in January 2018 ("2018 EA"). AR 00001–104. The 2018 EA's description of current conditions is similar to prior EAs, stating that large trees are rare, nonexistent, or have recently died and that the area has a current average basal area of 115 square feet. AR 00010. Overall however, the 2018 EA is quite different from the 2016 and 2017 EAs. It states, for the first time,

[2] Basal area relates to stand density, but it is never defined for the public in the EAs. Earth Island understands it to be the cumulative horizontal surface area of all trees in a given area measured at breast height. Thus a few large trees or many more small trees could create the same basal area.

that the vast majority of trees to be logged would now be less than 10 inches DBH; however commercial thinning would still occur with the majority of merchantable trees to be logged between 10–20 inches DBH and trees over 24 inches DBH could still be logged. AR 00015. The amount of commercial thinning that the Project authorizes is not disclosed. The 2018 EA also changed the desired post-logging conditions, seeking to maintain only 14 large trees per acre and achieve a basal area of 70–152 square feet. AR 00009. In essence, the 2018 EA seeks to maintain fewer large trees per acre than previous EAs, even though these trees historically dominated the region. *See* AR 00009. Despite substantially changing the implementation and outcome of the Three Creeks Project, neither Earth Island nor other members of the interested public were given an opportunity to comment on or object to the 2018 EA. When it published the 2018 EA, the Forest Service also published its final Decision Notice/Finding of No Significant Impact ("DN/FONSI") approving the Three Creeks Project. AR 00105–118.

## LEGAL BACKGROUND

### I. The National Environmental Policy Act.

NEPA is America's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). It has two aims. First, it forces federal agencies to "consider every significant aspect of the environmental impact of a proposed action." *Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002). Second, NEPA demands that agencies provide ample opportunity for public participation in decision-making processes. *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004); 40 C.F.R. § 1506.6(a).[3] An agency's NEPA process must result in the public receiving all relevant environmental information before the agency makes its decision and the information must be of high quality and contain accurate scientific analysis so that meaningful public participation can occur. 40 C.F.R. §§ 1500.1(b), 1500.2(d). Agencies must use the NEPA process to identify and assess alternatives to their proposed actions that avoid or minimize adverse impacts on the environment. *Id.* § 1500.2(e). To this end, NEPA mandates preparation of an Environmental Impact Statement ("EIS") for all

[3] Each agency has its own regulations adding detail to the controlling Council on Environmental Quality ("CEQ") regulations regarding how to conduct NEPA analyses. *See* 40 C.F.R. §§ 1500–1508.28; 36 C.F.R. Part 220 (Forest Service NEPA regulations).

"major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Agencies may first create an EA to determine whether an EIS is necessary. 40 C.F.R. § 1508.9. An EA is a public document in which an agency must assess a range of reasonable alternatives by weighing the direct, indirect, and cumulative environmental impacts of each. *Id.* §§ 1508.9(b) (citing to NEPA's mandate, 42 U.S.C. § 4332(2)(E) to study, develop and describe appropriate alternatives), 1508.25(c). If an EA concludes the proposed action will result in no significant environmental impacts, the agency will issue a FONSI. *Id.* § 1508.13. A FONSI "must supply a convincing statement of reasons" to support that determination. *Native Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010).

**II. The National Forest Management Act.**

Congress enacted the National Forest Management Act ("NFMA") in 1976 to establish a legal framework for managing natural resources on Forest Service lands. 16 U.S.C. §§ 1601 *et seq*. Among other things, NFMA requires the Forest Service to prepare a land and resource management plan ("Forest Plan") for each national forest, *Id.* § 1604(a), and include in the Forest Plan standards and guidelines for how the forest shall be managed. *Id.* §§ 1604(c), 1604(g)(2), 1604(g)(3). NFMA requires that all site-specific actions authorized by the Forest Service be consistent with the Forest Plan. *Id.* § 1604(i). "Pursuant to the NFMA, the Forest Service must demonstrate that a site-specific project would be consistent with the land resource management plan of the entire forest." *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1377 (9th Cir. 1998); *see also Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002) ("All site specific actions must be consistent with adopted forest plans").

**III. The Forest Service's Objection Regulations.**

The Forest Service provides regulations establishing a pre-decisional administrative review process (now known as the objection process) for proposed Forest Service projects documented with a decision notice. 36 C.F.R. § 218.1. An objection is a written document seeking pre-decisional administrative review of a proposed project implementing a Forest Plan and documented with an EA. *Id.* at § 218.2. Those who submitted written comments on a proposed project can file an objection. *Id.* Certain projects are required to be subject to legal

notice and the opportunity to comment, including proposed projects for which an EA is prepared as well as "proposed projects . . . for which a supplemental or revised EA . . . is prepared based on consideration of new information or changed circumstances." *Id.* at §§ 218.22(a); 218.22 (d). This provides the public the ability to comment on a proposed action, as well as ensures that the right to file an objection is maintained for those who do comment. *Id.* at § 218.5.

## **JURISDICTION AND STANDING**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because all of Plaintiffs' claims arise under federal laws. Plaintiffs, Earth Island and the Center for Biological Diversity (the "Center"), have Article III standing to bring this action because Plaintiffs' members have standing to sue in their own right, the interests Plaintiffs seek to protect are germane to the organization's purpose, and individual members' participation is not necessary for the Court to provide relief. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Plaintiffs' members have standing because they have suffered an injury in fact, that was caused by the challenged action, and that is likely to be redressed by the requested relief. *Id.* at 180–81. Environmental plaintiffs establish injury in fact when they aver that they use the affected area and their aesthetic and recreational interests will be lessened by the challenged activity. *Id.* at 183. Plaintiffs' members regularly hike and view wildlife within the Three Creeks Project area. *See* Declaration of Chad Hanson ("Hanson Decl.") ¶ 10–16; Declaration of Tonja Chi ("Chi Decl.") ¶ 8–13; Declaration of Justin Augustine ("Augustine Decl.") ¶ 9–12. Chad Hanson, director of Earth Island Institute's John Muir Project and a member of the Center, has been invested in outdoor recreation since his time as a Boy Scout and has been recreating in the Project area since his childhood. Hanson Decl. ¶ 10–11. Additionally, Plaintiffs' "desire to use, observe, and study . . . animal species is undeniably a cognizable interest for purposes of standing," *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1172 (9th Cir. 2002), and Plaintiffs' members do utilize the Three Creeks area for professional research purposes. *See* Hanson Decl. ¶ 17–24; Chi Decl. ¶ 14–19. These interests are directly threatened by the Three Creeks Project, Hanson Decl. ¶ 16, 24; Chi Decl. ¶ 13, 19; Augustine Decl. ¶ 12, constituting an injury in fact.

These injuries were caused by the Forest Service's inadequate 2018 EA and illegal DN/FONSI. Had the Forest Service conducted a proper NEPA analysis, the Forest Service's decision may have been different. *See Citizens for Better Forestry v. U.S. Dep't of Ag.*, 341 F.3d 961, 975–76 (9th Cir. 2003). As such, causation and redressability are satisfied and Plaintiffs' members have standing.

Earth Island's mission is to support action projects including the John Muir Project, which seeks to protect federal public lands from degradation due to logging to benefit biodiversity. Declaration of David Phillips ¶ 2, 3, 5. The Center's mission declares that the welfare of human beings is deeply linked to nature and thus it works to secure a future for all species, great and small. Augustine Decl. ¶ 2. Plaintiffs' members' interest in enjoying this area in its natural state and viewing wildlife for professional and recreational purposes are germane to Plaintiffs' purposes and none of Plaintiffs' members are necessary parties to this case. Thus, Plaintiffs have standing and this Court has jurisdiction over all of Plaintiffs' claims and requests for relief.

## STANDARD OF REVIEW

Earth Island's claims regarding the Forest Service's violations of NEPA, NFMA, and the Forest Service's Objection Regulations are governed by the Administrative Procedure Act ("APA"). In APA cases, courts use summary judgment procedures under Federal Civil Procedure Rule 56 "to determine whether the evidence in the administrative record permitted the agency to make the decision it did." *Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d. 1189, 1199 (E.D. Ca. 2017). The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be[:] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2); *see Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). In order for an agency decision to withstand APA scrutiny the agency "must examine the relevant data and articulate a satisfactory explanation for its action. *Soda Mountain Wilderness Council v. Norton*, 424 F. Supp. 2d 1241, 1260 (E.D. Ca. 2006). When presented with supported scientific uncertainties, an agency must include a full and fair discussion of said uncertainties. *The Lands Council v. McNair*, 537 F.3d 981, 1002–03 (9th Cir. 2008)(en banc), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council,*

*Inc.*, 555 U.S. 7 (2008). An agency's action is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or an explanation that is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *The Lands Council*, 537 F.3d at 993.

## ARGUMENT

### I. The Forest Service Failed to Offer a Rational Basis for the Three Creeks Project and Failed to Ensure its Consistency with the Forest Plans in Violation of NEPA and NMFA. (Claims 1 and 10)

An agency is required to explain its decision, considering relevant factors and articulating a rational connection between the facts found and the choice made. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011). "If an agency has failed to make a reasoned decision based on an evaluation of the evidence, the Court may properly hold that an agency had acted arbitrarily and capriciously." *Earth Island Institute v. Morse*, 2009 WL 2423478 *6 (E.D. Ca. Aug. 5, 2009) (Forest Service's failure to make a reasoned decision within an EA violated NEPA). Additionally, "all . . . actions must be consistent with adopted forest plans." *Idaho Sporting Cong.*, 305 F.3d at 966. Here, the Forest Service offered no rational explanation for why it needs to conduct the Three Creeks Project, why it needs to conduct commercial logging, including the logging of larger trees, or how these actions are consistent with the Inyo Land and Resource Management Plan, amended by the 2004 Framework.

The Three Creeks Project seeks to return the forest to pre-settlement desired conditions, including achieving a desired basal area. Basal area relates to stand density and is the cumulative horizontal surface area of all trees in a given area measured at breast height. The Three Creeks desired basal area is 70–140 square feet per acre.[4] AR 00015. The current basal area for the entire Project area however is 115 square feet per acre. AR 00010. Even on an individual strata basis, two of the four strata are squarely within the desired range of 70–140 square feet, one is slightly

[4] While there is confusion regarding what the actual desired basal area is, *see infra* Argument Section II, for the purposes of this section, Earth Island will assume the desired basal area is 70–140 square feet because even under this narrower desired basal area range, the current conditions already fit within the range, or, on an individual strata basis, are very close to within the range.

below at 66 square feet, and the last is slightly above at 165 square feet. AR 00010. It is clear the Three Creeks area is already achieving the desired pre-settlement conditions for basal area, but the Forest Service fails to acknowledge this within any of its EAs. Because the Project area already resembles certain desired conditions, it is unclear as to why the proposed logging needs to occur at all. If the current desirable basal area is nevertheless a problem, it is likely the result of too many small trees under 8 inches DBH that create an unacceptable fire hazard. As such, the Forest Service needs to explain why commercial thinning of trees over 8 inches DBH, and even including some large trees over 24 inches DBH, is a part of this Project. The Forest Service is required to rationally explain its decision and consider all relevant factors; its failure to acknowledge, let alone discuss, the fact that the current basal area is already within the desired range is improper and violates NEPA.

The Forest Service also failed to explain how the Project as proposed, which includes commercial thinning that removes moderate-sized trees (8–24 inches DBH) and large trees (over 24 inches DBH), will meet the Project's purpose and need and achieve the overall pre-settlement desired stand conditions. The Three Creeks Project seeks to return the forest to pre-settlement conditions to increase resiliency to wildfire, drought, and pathogens AR 00007, 00009. The current overall stand conditions in the Project area are altered from pre-settlement times. AR 00011. Currently, smaller trees dominate the Project area—nearly 65 percent of the entire area contains trees less than 8 inches DBH—while larger, more fire resilient trees exceeding 24 inches DBH, are often rare, non-existent, or have recently died. AR 00010, 00560. In fact, large trees currently make up less than 3 percent of the entire Project area. *See* AR 00560. In pre-settlement times however, larger, older trees, generally exceeding 24 inches DBH dominated the area and very large trees, exceeding 40 inches DBH and 100 feet tall were common. AR 00009. The 2018 EA also specifically states that the Forest Service is seeking to achieve an average of 14 large trees per acre. *Id.* Large, old forest structures take decades to centuries to develop, so in order to increase the number of large trees in the Project area, both large trees and moderate trees that may soon become large trees would need to be maintained. AR 00854.

Despite the current lack of large, fire-resistant trees in the Three Creeks area, the Forest

Service is seeking to log both large trees and moderate trees that may soon become large trees. The Three Creeks Project proposes commercial thinning (i.e. removal of trees over 8 inches DBH) and notes that the majority of merchantable trees to be removed are between 10–20 inches DBH and that trees over 24 inches DBH may also be removed.[5] AR 00015, 00460. The Forest Service however never discusses precisely how much commercial logging it intends to undertake or how many large and moderate trees it plans to log throughout the Project area. Given that very few large trees remain in the area, the Service should inform the public of the exact number of large trees it intends to remove, or at least offer a much more specific estimate. This is particularly important because there are approximately only 7 large trees per acre remaining in the entire Project area.[6] AR 00560 (the Project area was divided into 4 strata: Strata 1 contains 5 large trees per acre; Strata 2 contains 6 large trees per acre; Strata 3 contains 5 large trees per acre; and Strata 4 contains 13 large trees per acre).

It is perplexing and arbitrary for the Forest Service to assert that it is returning the Project area to pre-settlement conditions dominated by large trees, but at the same time assert that it will log some of the few remaining large trees in the area. AR 00009, 00015. The best, and perhaps the only, way for the Three Creeks area to achieve the desired 14 large trees per acre, *see* AR 00009, is for the Service to retain all large trees within the area, as well as larger, moderate trees (between 8–24 inches DBH) that are almost large or on their way to becoming large.

The Forest Service offers no rational explanation for to why it needs to conduct commercial logging at all, or at a minimum why it needs to conduct commercial logging that authorizes the removal of some of the few remaining large, fire-resistant trees when there is

---

[5] There is confusion and uncertainty in the Forest Service decision documents regarding the size of tree to be removed, *see infra* Argument Section II, however for purposes of this section Earth Island will assume the vast majority of trees to be removed are less than 10 inches DBH, even though nothing in the DN itself requires that. But even under this view, commercial thinning is still part of the project and merchantable trees between 10–20 inches DBH will be logged and trees over 24 inches DBH could be removed. The Forest Service never explains or justifies why commercial thinning generally or the removal of large trees specifically is necessary to achieve the desired conditions. *See infra* Argument Section III.

[6] Despite knowing this specific and highly relevant information about the number of large trees currently in the area, the Forest Service never included this information in the EAs themselves. It is only found only in a specialist report. *See* AR 00560.

already a clear deficiency of such trees in the area. In fact, in a Forest Service report, the agency stated given the overall deficit of large trees in the Sierra Nevada and the time necessary for their renewal, it needs to protect large trees from removal. *See* AR 05649. Instead of protecting these large trees however, the Service has authorized the logging of some of the last large, fire-resistant trees in the area. *See* AR 00015, 00038. In deciding to log some of the few remaining large, fire-resistant trees, as well as the moderate trees that may soon become large trees, the Forest Service failed to make a reasoned decision based on an evaluation of the evidence. *See Earth Island Institute*, 2009 WL 2423478 *6.

One of NEPA's core purposes is for the NEPA process to "help public officials make decisions that are based on [an] understanding of environmental consequences," and to inform the public about their understanding of the consequences. 40 C.F.R. §§ 1500.1(b), 1500.1(c). Here, the Forest Service failed to discuss why it needs to conduct the Three Creeks Project when the basal area already resembles pre-settlement conditions and why in implementing the Project it needs to conduct commercial logging and log the few remaining larger, fire-resistant trees. In failing to offer these explanations it appears as though the Three Creeks Project is not based on an understanding of the environmental consequences it may cause, in violation of NEPA.

The Forest Service similarly violated NMFA by failing to demonstrate that the Three Creeks Project is in compliance with the 2004 Framework. *See Neighbors of Cuddy Mountain*, 137 F.3d at 1377 (Pursuant to NFMA, Forest Service must show that a project is consistent with the forest plan). The Project area consists of Wildland-Urban Intermix ("WUI") defense and threat zones and General Forest lands. AR 00008. The 2004 Framework states that in WUI lands, desired conditions include having stands dominated by large, fire-tolerant trees, in hopes to reduce fire severity in nearby developed areas. AR 00008, 08163–64, 00678. In General Forest lands, the agency seeks to have the area resemble pre-settlement conditions, which according to the 2018 EA includes being dominated by large, fire-tolerant trees. AR 0008, 08164–65. The 2004 Framework also states the leave basal area in areas outside of WUI-defense zones should generally be comprised of the largest trees. AR 08174. Thus, managing for large, fire-tolerant trees is crucial to ensuring compliance with the 2004 Framework. As discussed above, the Forest

Service however is proposing to log some of the few remaining large trees and moderate trees that may become large trees, making it incredibly difficult, if not impossible, to create a stand dominated by large trees at any time in the foreseeable future. This not only impacts the desired stand structure, but also an area's resiliency to wildfires, which is important in WUI lands. The Three Creeks area currently has a high fuel density due to the number of small trees (less than 8 inches DBH) and very high load shrub and small tree understory in the area. AR 00007, 00010, 00414, 05081. To increase wildfire resiliency the Forest Service needs to remove these small diameter trees and retain old, large fire-tolerant trees. AR 09198, 01417. The Forest Service shies away from this however because the smaller diameter trees have little or no commercial value compared to the larger trees. The Forest Service's decision to include commercial thinning as a part of the project and to therefore log some of the few remaining large and moderate fire-resistant trees fails to achieve WUI and General Forest desired conditions and is ultimately inconsistent with the 2004 Framework, in violation of NFMA.

Additionally, despite the Three Creeks Project being highly similar to recent decisions rendered on the Inyo, including the 2007 Jeffrey Pine Forest Health and Fuels Reduction EA ("2007 Project"), the Forest Service never undertook a detailed review of the outcomes of these projects or provided the monitoring data from these projects. AR 00055, 00084 (monitoring is standard practice). In fact, the 2007 Project was similar enough to the Three Creeks Project that it was used by the Forest Service to draft the desired conditions for Three Creeks. *See* AR 16467–74. When discussing these other projects, the 2018 EA simply provides a conclusory statement that within stands where treatments were completed "conditions for tree growth and development, and resilience to wildland fire and insects/diseases were improved." AR 00054. The 2007 Project and the monitoring done in connection with it were briefly discussed in the Three Creeks Hydrology and Soils specialist report, but the monitoring data was never provided. AR 00531. While all of the outcomes and monitoring data of these similar project, including the 2007 Project, should have been made publicly available during the Three Creeks NEPA process, Earth Island is particularly interested in how the 2007 Project and other similar projects impacted the

black-backed woodpecker and Pacific marten.[7] In refusing to discuss or offer the specific outcomes and monitoring data from the 2007 Project, the Forest Service failed to provide a reasoned explanation for the Three Creeks Project and is seeking to undertake the Project without a full understanding of its environmental consequences, in violation of NEPA. *See N. Plains Res. Council, Inc.*, 668 F.3d at 1078 (required to consider relevant factors and articulate a rational basis); 40 C.F.R. §§ 1500.1(c), 1500.1(b) (environmental consequences must be understood and the same information needs to be provided to the public).

The Forest Service's failure to offer a rational basis for the Three Creeks Project and ensure its consistency with the 2004 Framework violates NEPA and NFMA.

## II. The Forest Service Violated NEPA by Failing to Write in Plain Language, Creating Inconsistencies and Causing Confusion. (Claim 6)

"[Environmental assessments] shall be written in plain language so that decisionmakers and the public can readily understand them . . . [EAs] are unacceptable if they are indecipherable to the public." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996, *citing* 40 C.F.R. § 1502.8. NEPA documents need to be clear and concise to provide the public with an understanding of the proposed action's environmental impacts. *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 493–94 (9th Cir. 1987); *see also Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 n.24 (9th Cir. 2010) ("Clarity is at a premium in NEPA"). Inconsistencies within NEPA documents create confusion, indicating the agency failed to take a hard look. *Conservation Cong.*, 235 F. Supp. 3d at 1213–15. Importantly, "the public should not be required to parse [NEPA documents] to determine how an area will be impacted." *League of Wilderness Defs./ Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 761 (9th Cir. 2014). There are significant inconsistencies and uncertainties among and within the Three Creeks NEPA documents, causing Earth Island and the public to be unsure of how the Three Creeks Project will be implemented and unable to determine the full magnitude of its environmental impacts.

The purpose of the Three Creeks Project is to increase resiliency to wildfire and return the Project area to pre-European settlement conditions. AR 00007–008, 00009. Thus, the description

[7] Commenters specifically requested the Forest Service make the 2007 Project's monitoring data publicly available. AR 00776.

of desired pre-settlement conditions as well as how the Forest Service proposes to meet these conditions is crucial for understanding how the Project will be implemented and thus what effects it will have. Unfortunately, the Three Creeks NEPA documents, including the draft and final EAs as well as specialist reports, are inconsistent and unclear regarding both the desired conditions of forest stands post-logging and how the Forest Service will achieve these conditions.[8]

The three EAs—2016, 2017, and 2018—articulate different desired conditions for the number of large trees per acre to be retained following logging, ranging from only 14 in the 2018 EA, to possibly 22, in the 2016 and 2017 EAs. *See* Declaration of Morgan Staric ("Staric Decl.") ¶ 6, 7 and Ex. 1. The Service provides no explanation within the 2018 EA for why the desired number of large trees was reduced. The Forest Service also provides inconsistent definitions for large, moderate, and small trees within and among its NEPA documents.[9] *See id.* Ex. 1. In order to truly understand the impacts of its Project, the Forest Service should provide a clear and consistent definition for the various tree size classes, especially large trees. The three EAs and various specialist reports also provide different desired basal areas, and the 2018 EA alone, specifically provides different desired basal areas.[10] *See id.* Most concerning however, is the fact that the three EAs and numerous specialist reports are also inconsistent regarding the size of trees to be removed in order to meet the desired pre-settlement conditions. *See id.* Importantly the 2018 EA is again itself very unclear regarding the number and size of trees to be removed—stating that while the majority of trees to be thinned are below 10 inches DBH, the majority of merchantable trees to be thinned are between 10–20 inches DBH; that there would be multiple opportunities for commercial cutting (removal of trees over 8 inches DBH); and that trees removed would range from 8–20 inches DBH, but that trees up to 30 inches DBH could be removed. *See* AR 00009, 00015, 00038; *see also* AR 00460. Despite stating that commercial logging will in fact occur, the Forest Service never discusses the amount of commercial logging it intends to undertake. The

---

[8] Importantly, the final DN/FONSI is silent regarding these issues. *See* AR 00105–118.

[9] For the Court's ease and its own consistency, Earth Island defines large trees as above 24 inches DBH, moderate trees as between 8–24 inches DBH, and small trees as below 8 inches DBH.

[10] Basal area relates to stand density and is the cumulative horizontal surface area of all trees in a given area measured at breast height; a tree that is 24 inches DBH (10 inches radius) has a basal area of 3.14 square feet.

Service also fails to provide the precise number or even an estimate of how many large and moderate-sized trees (that could soon become large trees) would be logged; this is especially troubling given the significant deficit of large trees in the area. AR 00010, 00560.

These inconsistencies and uncertainties do not allow Earth Island, the public, or decisionmakers to determine the size of trees to be logged or the amount of trees, particularly large trees, that will remain after logging.[11] The size of trees and the number of large trees to be logged is particularly important in determining whether this Project will retain crucial large trees and whether fuels will in fact be reduced following logging, thus achieving the purpose of the Project as well as consistency with the 2004 Framework, *see supra* Argument Section I.

NEPA's principal twin aims are fostering better decision-making and informing public participation. *Conservation Cong.*, 235 F. Supp. 3d at 1213. In *Conservation Congress*, the proposed project's limited operating period was stated inconsistently throughout the NEPA record, making it difficult for the plaintiff, the court, and perhaps even the agency to know how the limited operating period would be enforced. *Id.* at 1214. "This confusion makes it difficult to discern the Project's impacts . . . and makes it difficult for the public to play a role in the decision-making process . . . running counter to one of NEPA's principal aims." *Id.* The Three Creeks NEPA documents present similar substantial inconsistencies regarding the size of trees to be logged, as well as the desired amount of remaining large trees per acre and leave basal area. These inconsistencies have led Earth Island, and this Court, to being unaware and unsure of the ultimate scope of the Project as well as its environmental consequences, including whether and to what extent large, mature trees, will be logged.[12]

The inconsistent and confusing discussions of the circumstances surrounding the Three Creeks Project fail to satisfy NEPA's hard look and public participation requirements. Thus, the

---

[11] Even if the Forest Service states it knows precisely how the Three Creeks Project would be implemented, documents are unacceptable if they are indecipherable to the public. *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996.

[12] The NEPA documents in both Three Creeks and *Conservation Congress* are also inconsistent regarding the number of acres to be treated, causing additional confusion. *Conservation Cong.*, 235 F. Supp. 3d. at 1214–15; AR 00005 (9,590 acres), 00038 (8,941 acres). While this inconsistency alone would likely not warrant a finding against the Forest Service, the agency would be wise to be more careful. *Conservation Cong.*, 235 F. Supp. 3d. at 1215.

Forest Service arbitrarily and capriciously failed to write in plain language in violation of NEPA.

## III. The Forest Service Violated NEPA in Failing to Evaluate All Reasonable Alternatives. (Claim 2)

NEPA requires federal agencies to give full and meaningful consideration to all reasonable alternatives in an EA. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1217 (9th Cir. 2008). This requirement includes an analysis of alternatives that "will avoid or minimize" a proposal's adverse effects. 40 C.F.R § 1500.2(e); *see also W. Watershed Project v. Abbey*, 719 F.3d 1035, 1050, 1053 (9th Cir. 2013). Agencies must also analyze and compare a full spectrum of viable alternatives. *See* CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). Here, despite being presented with multiple alternatives for the Three Creeks Project—including the use of only prescribed fire, precommercial thinning, or a combination of both—the Forest Service failed to fully and meaningfully consider said alternatives, arbitrarily and capriciously violating NEPA. 40 C.F.R § 1500.2(e); *see Abbey*, 719 F.3d at 1050 ("The existence of a viable but unexamined alternative renders an EA inadequate.")

The 2018 EA's proposed course of action for the Three Creeks Project utilizes a combination of commercial thinning, precommercial thinning, and prescribed fire to meet the Project's purpose and need "to manage the selected Jeffrey pine . . . units through promoting forest health by increasing resiliency to wildfire, drought and pathogens, and for restoration and improvement of a variety of habitat types." AR 00007, 00460. The Forest Service described the desired conditions for the area as a return to pre-European settlement conditions, characterized by domination of "older, larger trees, generally exceeding 24 inches" in diameter. AR 00009.

Earth Island objected to the 2017 EA, arguing the Service failed to consider reasonable alternatives including the use of only prescribed fire or precommercial thinning, or a combination of the two. AR 00755–56. The Service declined to consider any of the suggested alternatives, instead, considering only the proposed action alternative and no action alternative in the final 2018 EA. AR 00015. The Forest Service does not dispute that the prescribed fire and precommercial thinning alternatives meet the Three Creeks Project's purpose and need; instead, the Service omits any reference to these alternatives in its final EA. *See* AR 00001–104. Despite

the Service's refusal to address the suggested alternatives, the prescribed fire and precommercial thinning options represent viable alternatives plainly within the Project's purpose and need.[13]

The prescribed fire alternative promotes forest health in accordance with the Project's purpose and need. The use of controlled burning will generally target smaller, fire-susceptible trees more likely to catch and spread larger fires. AR 00007. Prescribed fire is an effective tool for achieving the Project's purpose and need because of its ability to "reduce the buildup of hazardous fuels, enhance wildlife habitat, . . . thin overstocked stands, [and] control some insects and disease." AR 12327. The use of prescribed fire will also help return the forest to pre-settlement conditions with a greater concentration of larger trees remaining in the area post-treatment. *See* AR 00009. The precommercial thinning alternative also falls within the Project's purpose and need. Thinning only younger, more fire-susceptible trees of less than 8 inches DBH will reduce the amount of fuel in the forest that is likely to catch and spread into a larger wildfire. AR 00007. This serves the Project's goal of reducing wildfire risk, while protecting the larger trees essential to returning the forest to pre-settlement conditions. An alternative that utilizes only precommercial thinning promotes the Project's goals of fire resistance, without causing the potential ecosystem harms associated with the logging of larger trees, such as reduction of wildlife habitat. Because precommercial thinning and prescribed fire both meet the Project's purpose and need, a combination of these alternatives would also meet the purpose and need.

In addition to promoting the Project's purpose and need, these alternatives all support the Forest Service's desired conditions of returning to pre-settlement conditions characterized by larger and older trees. AR 00009. Such conditions are not currently present in the forest, with the Service recognizing that trees exceeding 24 inches DBH are "rare, non-existent, or have recently died." AR 00010. The prescribed fire and precommercial thinning alternatives better advance these conditions by protecting the remaining large trees in the forest, and in doing so promote fire resiliency, drought and disease resistance, and preserve wildlife habitat.

---

[13] Notably, the proposed action, which includes commercial thinning, does not meet the Project's purpose and need because this will not increase wildfire resiliency and it includes logging some of the few remaining large trees in the area, which will cause the area to continue to deviate even further from pre-settlement conditions as opposed to moving towards achieving them, *see supra* Argument Section I.

Given the Forest Service's knowledge of the impacts associated with commercial thinning, the agency's refusal to consider prescribed fire or precommercial thinning, or a combination of these alternatives amounts to a failure to give full and meaningful consideration to all reasonable alternatives as required by NEPA. *Abbey*, 719 F.3d at 1050. NEPA does not impose a numerical requirement on agencies in terms of the number of alternatives it must evaluate. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005). Instead, the reasonableness of the agency's alternatives analysis is measured in terms of substance. *Id.* Evaluating only a no action alternative and a proposed action alternative in an EA may satisfy NEPA's reasonable alternatives requirements in certain instances, however, the "existence of a viable but unexamined alternative renders an [EA] inadequate." *Abbey*, 719 F.3d at 1050. The CEQ specified in its NEPA regulations that "a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared . . . An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness." CEQ, Forty Most Asked Questions, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981). These guidelines indicate that when a range of alternatives exists, it is necessary and appropriate for the action agency to consider alternatives spanning the range of potential actions, something the Forest Service has failed to do in refusing to consider prescribed fire and precommercial thinning only alternatives, which fall squarely within the range of options between the no action and the Service's proposed action alternatives. Failure to consider viable alternatives within the range of the no action and proposed action alternatives violates NEPA. *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 814 (9th Cir. 2005).

Additionally, an agency's decision to "not consider such an alternative, without adequate explanation, shows that it did not take the hard and careful look" required by NEPA. *Abbey*, 719 F.3d at 1053. Because the Forest Service was aware of the prescribed fire and precommercial thinning alternatives, all of which satisfied the Project's purpose and need, the Service was obligated to either evaluate such alternatives in the EA, or to give an "adequate explanation" as to why the agency did not study the alternatives in the EA. *See Id.* The Forest Service failed to consider these viable alternatives, but also omitted any reference or explanation as to why such

alternatives were not evaluated in the EA. Absent such an explanation the Service has not complied with its obligations under NEPA.

Prescribed fire and precommercial thinning alternatives, which eliminate the removal of moderate and large sized trees, by not including commercial thinning as a part of the Project, are within the range of the no action and proposed action alternatives, and appear better suited to achieve the Project's goals while limiting harm to the environment and helping to restore the forest to the desired pre-settlement conditions. These viable alternatives support the Project's purpose and need; as such, the Forest Service has failed to uphold its obligations under NEPA to examine viable alternatives in its NEPA analysis. *Abbey*, 719 F.3d at 1050.

## IV. The Forest Service Violated NEPA in Failing to Take a Hard Look at Impacts to Species. (Claim 3)

Agencies are required to take a "hard look" at their actions by considering all foreseeable direct and indirect impacts. *Earth Island Institute v. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *see also Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 993 (applying NEPA's hard look requirement to EAs). The hard look requirement includes "both a complete discussion of relevant issues as well as meaningful statements regarding the actual impact of proposed projects." *Earth Island*, 442 F.3d at 1172. General statements regarding possible impacts do not constitute a hard look absent justification regarding why more definitive information could not be provided. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005). Throughout the Forest Service's public NEPA analysis for the Three Creeks Project the agency failed to take a hard look at impacts to the black-backed woodpecker and the Pacific marten.

### A. The Forest Service failed to analyze how the Three Creeks Project's effects on the black-backed woodpecker's current and future habitat would impact the species.

The black-backed woodpecker is a rare, habitat specialist that relies on forest stands with a high density of medium and large snags—roughly 100 per acre. AR 01111, 00791–95. Optimal black-backed habitat includes dense, mature forests that have recently experienced a high intensity, stand-replacing fire or high beetle mortality. AR 01357. Black-backed woodpeckers

"are often considered keystone species for their role in excavating cavities used by many other wildlife species." AR 00863. This species is also an MIS representing snags in burned forests.[14] AR 00041. Unfortunately, black-backed woodpeckers have become increasingly rare, AR 00852, and are threatened by landscape level thinning, fire suppression, and other fuel reduction activities that reduce tree densities in future burned areas. AR 00869–70, 00885. Here, the Forest Service failed to discuss how the proposed logging's effects on future snag habitat recruitment and green forests would impact black-backed woodpeckers. By failing to consider and disclose these effects, the Forest Service has not taken the hard look required by NEPA.

Fire suppression actively prevents high quality black-backed woodpecker habitat—areas with high densities of medium and large snags—from being created. AR 00927, 00947. For an area to have high densities of medium and large snags, it must first have pre-disturbance high density of medium and large trees. AR 00753–54. The Three Creeks Project however, proposes to log medium and large trees and reduce larger tree density, inhibiting future snag production and ultimately reducing black-backed habitat. AR 00015, 00753–54, 01107 (mechanical treatments can reduce snag density), 01355, 01363 (management leaves insufficient number of snags to support foraging; black-backed woodpeckers forage preferentially on large trunks of snags in burned forests). Importantly the Three Creeks Project proposes to retain only 39–79 trees of all size classes per acre, AR 00009, but quality black-backed habitat requires roughly 100 medium and large snags per acre. AR 00791–95. Thus even if the entire Project area were to contain only medium and large trees and all burn and all 39–79 trees that would remain after the Project is fully implemented became snags, it would still not create quality habitat. This loss of habitat may negatively impact the black-backed woodpecker. This is especially concerning because snag recruitment in the Inyo is slow and snags are already in such short supply in the Inyo that the viability of snag dependent species may already be threatened. AR 06213, 06534. In fact, studies

---

[14] The Forest Service's EAs never explain why an MIS is selected. MIS are selected because their population changes may indicate the effects of land management activities. AR 08333. The Forest Service is required to "(1) at a project scale, analyze the effects of proposed projects on the habitat of each MIS affected by such projects, and (2) at the bioregional scale, monitor populations and/or habitat trends of MIS." AR 00585.

have found that in areas that have undergone even moderate pre-fire logging and then experienced later fire, black-backed woodpecker occupancy was reduced by 50 percent. AR 00792. In its 2018 EA, the Service, for the first time states that that logging "may have the indirect effect of modifying the future recruitment rate of high quality [black-backed woodpecker] habitat on up to 9,590 acres." AR 00042. The Service, however, fails to analyze how this loss of future habitat could impact the already rare black-backed woodpecker. The EA's general statement about possible effects to future habitat, without any analysis of the actual impacts to the black-backed woodpecker's viability, is not sufficient to satisfy NEPA's hard look requirement. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 995 (NEPA requires a "sufficient description of the actual environmental effects that can be expected," simply stating an environmental concern may be impacted, without more information does not constitute a hard look); *see also Earth Island*, 442. F.3d at 1159 (a hard look requires a complete discussion of relevant issues and statements regarding the actual impacts of a proposed project).

Green forest habitat is also important to black-backed woodpecker conservation. AR 00863. The Three Creeks NEPA documents, however, focus solely on the black-backed woodpecker's use of burned forests, never discussing the black-backed woodpecker's use of green forests. *See* AR 00041–42, 00058–59 (stating that because there are no burned forests within the Project area there will be no direct impacts on the species and the only indirect impact relates to future recruitment of burned habitat). While burned forests are generally the black-backed woodpecker's preferred habitat, they also nest and forage in green forests that have a high number of snags. AR 00868, 01111–17. In fact, because of the ongoing suppression of high intensity fire, green forest habitats help maintain black-backed woodpecker populations. AR 00910. Unfortunately, removal of fuels and low snag retention—both of which are proposed in the Three Creeks Project—threaten black-backed woodpeckers, particularly in green forests. AR 00870. Despite the importance of green forests, the Forest Service entirely failed to discuss how the proposed logging could impact green forests and the black-backed woodpeckers that rely on them. *See* AR 00041–42, 00058–59. This failure to completely discuss a relevant issue violates NEPA. *See Earth Island*, 442. F.3d at 1159, 1172.

### B. The Forest Service failed to consider the Three Creeks Project's impacts on Pacific marten throughout the entire Project area.

The Pacific marten is a Forest Service sensitive species as well as an MIS representing late-seral, closed canopy coniferous forests.[15] AR 00588, 00616. Martens are one of the most habitat specific mammals in North America, AR 13382, 16409, relying on highly complex stand structures with large diameter trees, multiple vegetation layers, large snags and down logs, and high to moderate canopy closure. AR 00608, 00616. Martens have experienced considerable habitat loss due to human activities and are particularly susceptible to habitat fragmentation and population isolation because they have large home range requirements, specialized habitat needs, and are unable to disperse across unacceptable habitat. AR 04903, 04910. In fact, the effects of forest thinning are the largest potential direct threats from human activities to martens. AR 09653. Presumably recognizing the possible impacts facing martens, the Forest Service designated 3 units as "marten units" where less invasive logging will occur.[16] AR 00020, 00038. The Service however fails to adequately analyze the impacts martens face in the other 127 Project units—some of which experience similar marten use as the 3 marten units or are within or adjacent to the marten units. *See* Staric Decl. ¶ 8–12 and Ex. 2; AR 00619. This is particularly concerning because in the eastern Sierra Nevada, martens require large home ranges—males require 2,749 acres and females require 1,155 acres—yet the marten units only encompass 623 acres.[17] AR 00038, 08748. The Forest Service failed to fully analyze how the Three Creeks Project would impact martens throughout the entire Project area, particularly regarding the loss of habitat cover.

There are approximately 1,220 acres of late-seral, closed canopy forest marten habitat

---

[15] The Forest Service's EAs never explain why a species is designated as sensitive. A species is considered sensitive when its population viability is a concern as evidenced by (1) a significant downward trend in population numbers or density or (2) downward trends in habitat capability that would reduce a species' existing distribution. AR 2647.

[16] While the marten units are referenced in the 2018 EA, the design features articulating the marten units as well as other best management practices are ultimately not discussed or listed in the final the DN/FONSI, so Earth Island is unsure of whether or not these design features will in fact occur within the Project area. *See* 00105–118. The lack of design features in the DN compounds the confusion surrounding this Project, *see infra* Argument Section II.

[17] There is some inconsistency regarding the size of the marten units. Some specialist reports state the marten units encompass 623 and/or 729 acres. *See* AR 00606, 00615 (Amended BE, states 623 and 729 both); 00579 (Migratory Landbird Report states 729).

within the Project area outside of the marten units. AR 00044. Martens require a very high level of habitat connectivity and overhead cover is essential—canopy closure over 70 percent represents high quality habitat. AR 00616, 13247. Currently, canopy closure in the Project area rarely exceeds 50 percent, except in the densest stands. AR 00619. While canopy closure will not be impacted within the 3 marten units, AR 00020, it would be reduced on 1,220 acres of marten habitat within the other 127 units, possibly below optimum levels. AR 00044, 00040. The Project could also impact near ground cover (i.e. large snags and down logs) because although large snags and down logs are often absent throughout the Project area, AR 00598, 00619, the Project proposes to decrease the density of down logs on 1,220 acres of marten habitat outside of the marten units.[18] AR 00598, 00058. Martens are negatively impacted by the simplified forest stands that the Three Creeks Project seeks to achieve as they affect the species' ability to forage without increased risk of predation. AR 05554 (Moriarty study, which the Forest Service failed to adequately analyze, *see infra* Argument Section V. Despite the impacts martens face, the Forest Service simply states martens may avoid treated stands until crown closure increases, AR 00040, which will not return to pretreatment levels for 10 years. AR 00043. The Forest Service however, does not adequately disclose and analyze how the loss of 1,220 acres of habitat will impact this sensitive species' viability. The Forest Service's failure to analyze the impacts facing Pacific martens, specifically its loss of 1,220 acres of habitat, shows its failure to take a hard look. *Earth Island*, 442. F.3d at 1172; *see also* AR 02632 (Forest Service manual stating there must be no impacts to sensitive species without an analysis of the adverse effects on the populations, its habitat, and on the viability of the species as a whole).

The Forest Service's failure to consider impacts on the black-backed woodpecker and Pacific marten are particularly egregious given the Sierra Nevada represent the southernmost extent of both species' range. AR 00895 (map depicting the black-backed woodpeckers range); 13383, 15681 (The Sierra Nevada represent the southernmost extent of the martens' range). Peripheral populations, or populations at the edge of a species range, are particularly important to

[18] Within the marten units, the Forest Service proposed to minimize removal of near ground structures. AR 00606.

the overall viability of a species. *See Ctr. of Biological Diversity v. U.S. Fish and Wildlife Serv.*, 2020 WL 620834 *21 (D. Az. February 10, 2020) (populations at the edge of a species' range often hold the key to persistence of the species), *appeal filed*; *see also Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 845, 846 (9th Cir. 2003) (peripheral populations "may have more genetic divergence than central populations, making them more important to the survival of the species, particularly in response to adaption to environmental change").

The 2018 EA provided general, conclusory statements about how the Project may impact the future recruitment of black-backed woodpecker habitat and how the loss of habitat cover on 1,220 acres may lead to martens avoiding the Project area for ten years. AR 00042, 00043, 00044, 00058. The Forest Service however, failed to discuss the relevant implications of these impacts—how will the viability of these rare and sensitive species be effected by the years of habitat loss? The Service also failed to discuss how the Project would impact the black-backed woodpecker's current use of green forests. These failures are especially concerning given that these Sierra Nevada populations are critical to the species' overall persistence.

The Forest Service acted arbitrarily and capriciously in failing to take a hard look at impacts to the black-backed woodpecker and Pacific marten.

## V. The Forest Service Violated NEPA by Failing to Ensure the Quality of its Scientific Analysis. (Claims 4 and 5)

"Accurate scientific analysis . . . [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b). An agency's failure to engage with and consider contrary scientific opinions renders an EA inadequate. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, Section III(A) (9th Cir. 2020) (recently published, page numbers currently unavailable)[19]. When presented with supported scientific uncertainties, an agency must include a full and fair discussion of said uncertainties. *The Lands Council*, 537 F.3d at 1002–03. The Forest Service violated NEPA by failing to discuss the uncertainties regarding the impacts to species and the required amount of snags to be maintained in the Project area. The Forest Service also violated NEPA by failing to meaningfully

[19] Earth Island has only been able to locate the published opinion on Westlaw, which contains no page numbers. When an opinion with page numbers becomes available, Earth Island will provide the Court with proper pin cites.

consider a recent study discussing forest-thinning's negative impacts on Pacific marten.

The 2018 EA states that only a maximum of three snags per acre will be maintained throughout the Project area. AR 00020 (where feasible, attempt to retain up to 3 snags per acre). This requirement stems from the 2004 Framework and is not based on the black-backed woodpecker's specific habitat requirements. Without any discussion of the amount of snags that certain snag-dependent species require, the 2004 Framework provides general guidelines for snag retention based on forest types, stating that the Forest Service should retain 3 of largest snags per acre in eastside pine and eastside mixed conifer forest types. AR 08174. The Three Creeks Project is located in an eastside pine forest. AR 00040. Earth Island, however, notified the Forest Service of considerable recent scientific evidence finding that the black-backed woodpecker requires significantly more snags per acre—approximately 100 medium and large snags per acre for quality habitat—and that even in areas with 40–80 medium and large snags per acre, potential black-backed occupancy rapidly approaches zero. AR 00791–95, *see also* AR 00905. Additionally, in one study focusing on green forests, researchers found black-backed woodpeckers required at least 11 large snags per acre, but also found occupancy increased when the amount of large snags doubled. AR 00780, *see also* AR 00868–69. Despite being provided with more recent studies focusing on the black-backed woodpecker's specific habitat needs, the Forest Service failed to consider them, and continued to rely on the 2004 Framework's minimal 3 snags per acre requirement, which was set without discussing the habitat requirements of snag-dependent species. The amount of snags in the area is critical because within the Inyo snags are in short supply and recruitment is slow, so maintaining enough snags is crucial to ensuring the viability of snag dependent species, like the black-backed woodpecker. AR 06213, 06534.

"[T]he Forest Service must acknowledge and respond to comments . . . that raise significant scientific uncertainties and reasonably support that such uncertainties exist," by conducting a full and fair discussion of environmental impacts. *The Lands Council*, 537 F.3d 1001, 1002. Ultimately, the Service must, at a minimum, support its conclusions with studies that it deems reliable, and "explain the conclusions it has drawn from its chosen methodology, and the reasons it considered the underlying evidence to be reliable." *Id.* at 994; *see also N. Plains Res.*

*Council, Inc.*, 668 F.3d at 1075 (extending this requirement to NEPA analyses). Here, Earth Island notified the Forest Service that black-backed woodpeckers require many more snags per acre for both nesting and foraging than what the Forest Service is currently proposing to maintain and submitted several studies confirming this. *See* AR 00020 (Project maintaining a maximum of 3 snags per acre), 00791–795 (black-backed woodpeckers require roughly 100 medium and large snags per acre, select areas with 132 medium and large snags per acre, select sites with average 133 snags per acre, occupancy approaches zero when less than 40–80 snags per acre), 00905 (species used areas with 109 snags per acre for nesting). The Forest Service, however, maintained its decision to retain up to three snags per acre; but it did so without any discussion of the studies submitted by Earth Island or support of other studies it found reliable.[20] *See* AR 00020. The Forest Service failed to fully and fairly discuss the impact that minimal snag retention may have on black-backed woodpeckers; had it fully discussed the recent studies submitted by Earth Island, it may have found that the three snags per acre requirement is insufficient to maintain or create black-backed woodpecker habitat, which could harm the species' viability.

In their objection, Earth Island also brought the Forest Service's attention to the recent Moriarty study that analyzes impacts on Pacific marten from activities that reduce the structural complexity of forest stands. *See* AR 00754–55, 05554–66. Martens require diverse and complex forests with large diameter trees and large snags and down logs. AR 00608, 00616. While the Forest Service appears to have considered the Moriarty study, admitting in the 2018 EA that "increasing structural variation will increase the use of these stands by martens[,]" it fails to fully discuss and evaluate the study. AR 00041 (citing to the Moriarty study). The Moriarty study specifically discusses that efforts to reduce wildfire intensity often simplify forest structures and can have negative effects on marten movement dynamics and foraging capability. AR 05555, 05563. Importantly, in its 2001 Sierra Nevada Forest Plan Amendment, the Forest Service stated that conservation of martens will require a better understanding of the species' sensitivity to management activities. AR 15483. The Moriarty study specifically focuses on marten sensitivity

[20] None of the Three Creeks Project wildlife specialist reports—MIS Report, Biological Evaluation, or Migratory Landbird Conservation Report—provide information regarding the black-backed woodpecker's snag habitat requirements. *See* AR 00579–83, 00584–603, 00604–30.

to logging activities, yet the Forest Service is choosing not to consider the entirety of the study because it does not suit its present needs.

The Forest Service must also take a hard look at and carefully consider information about potential environmental impacts. *Blackwood*, 161 F.3d at 1212. The Pacific marten is both a Forest Service sensitive species and an MIS; as such possible impacts on martens are of great concern to the agency and the pubic. AR 00588, 00616. When the Forest Service prepared the 2016 EA, there was a gap in understanding how fuels treatments impacted martens. AR 09653, 15483. The 2016 Moriarty study filled this gap. Recognizing the importance of the Moriarty study, in its 2017 objection, Earth Island brought this study to the Forest Service's attention. AR 00754–55. Unfortunately, instead of focusing on relevant implications presented in the Moriarty study, which finds that treatments designed to reduce the wildfire intensity negatively impacted martens and that to benefit martens, the most obvious recommendation is to plan fuels treatments outside of their habitat, AR 05563, the Forest Service's 2018 EA focused on a narrow discussion regarding increased marten use of stands with increased structural variation. AR 00041. By cherry-picking information from the Moriarty study that favors the agency and ignoring the information that may show the Project could have negative impacts on the martens throughout the entire Project area, the Forest Service failed to carefully consider information about the impact fuels treatments may have on martens and the species' viability.

The Forest Service further violates NEPA when it fails "to engage with the substantial body of research cited by [plaintiffs]." *Bark*, 958 F.3d at Section III(A). In *Bark*, the Ninth Circuit found the Forest Service violated NEPA by drawing general conclusions and not engaging with the considerable scientific and expert opinions provided by plaintiff that contradicted the EA. *Id.* Here, Earth Island similarly supplied numerous studies, indicating that the Forest Service's three snags per acre requirement is insufficient to maintain or create black-backed woodpecker habitat. *See* AR 00753–54, 00791–95, 00905. Despite having these studies, the Forest Service did not engage with them, and instead drew general conclusions regarding the black-backed woodpeckers preference for burned forests. AR 00041–42, 00058–59. Earth Island also brought the Forest Service's attention to the Moriarty study, which focuses on how the Pacific marten's habitat use

is impacted by fuels management projects. AR 00754–55. While the 2018 EA includes a brief reference to this study, it fails to meaningfully consider the study's overall implication. AR 00041. In fact the Moriarty study specifically finds that "fuels treatments that simplify forest structure . . . have negative effects on marten movement dynamics . . . [and] the most obvious recommendation to benefit martens is to plan fuels treatments outside of their habitat." AR 05563. Treatments of the type proposed in the Three Creeks Project will cause structural simplification by removing trees, including large trees, and maintaining minimal snags and down logs within areas of documented marten use, running directly counter to the guidance issued in the Moriarty study. Had the Forest Service fully considered the Moriarty study, it may have concluded that the Project would have significant impacts on the Pacific marten.

In response to Earth Island's objection, the Forest Service made significant changes to its 2018 EA, *see infra* Argument Section VI; *see also* AR 00666–72. In its objection response, the Service specifically stated that it needed to review and incorporate the Moriarty study into its Project analysis as appropriate. *See* AR 00671. The Service's 2018 EA however, despite making many other significant changes, made only one brief statement about the Moriarty study. *See* AR 00041. It is peculiar and arbitrary for the Forest Service to overall make substantial changes to its 2018 EA, while avoiding a fair and meaningful discussion of the Moriarty study.

While agencies have discretion in assessing scientific evidence, they are required to seriously consider the issues and respond to reasonable opposing viewpoints. *Earth Island Institute*, 2009 WL 2423478 * 6, *citing Earth Island Institute v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003). In *Earth Island v. Morse*, the Forest Service's misinterpretation of a relevant study resulted in an erroneous use of data and "corrupted the scientific accuracy and integrity of its [EA]." *Id.* *8, *citing* 40 C.F.R. § 1502.24. Here, in its 2018 EA, the Forest Service mischaracterized the Moriarty study by only citing to a narrow statement about structural variation and ignoring other relevant information. AR 00041. The Service's failure to consider the overall implications from the Moriarty study regarding the negative impacts martens face from logging activities, inhibited its analysis of impacts to the species and ultimately corrupted the scientific accuracy and integrity of the 2018 EA.

The Forest Service's failure to disclose and meaningfully consider the recent studies submitted and identified by Earth Island was arbitrary and capricious in violation of NEPA.

**VI. The Forest Service Violated NEPA and its Objection Regulations by Failing to Provide an Opportunity to Comment on the January 2018 EA. (Claim 9)**

Public scrutiny is essential to the NEPA process, as such NEPA requires agencies to encourage and facilitate public involvement. 40 C.F.R. §§ 1500.1(b), 1500.2(d). Agencies must make diligent efforts to involve the public when conducting environmental reviews. *Id.* at §§ 1506.6(a), 1501.4(b) (to the extent practicable, agencies shall involve the public when preparing EAs). Public commenting procedures are the heart of the NEPA process. *State of Cal. v. Block*, 690 F.2d 753, 770 (9th Cir. 1982); *see also Ohio Valley Envtl. Coalition v. U.S. Army Corps of Eng'rs*, 674 F. Supp. 2d 783, 809 (S.D. West Virginia 2009) (commenting is the heart of an EA). Whether in the context of an EIS or an EA, public involvement is critical to NEPA. *Ohio Valley*, 674 F. Supp. 2d at 792. The Forest Service's objection regulations affirmatively require the agency to provide an opportunity to comment on EAs, as well as when, after consideration of new information or changed circumstances, the Forest Service prepares a supplemental or revised EA. 36 C.F.R. §§ 218.22(a), 218.22(d). Here, after considering new information and changing the circumstances surrounding the Three Creeks Project, the Forest Service prepared its 2018 EA without providing the public an opportunity to comment on or object to the 2018 EA. This refusal to permit public participation violates NEPA and Forest Service regulations.

The Forest Service prepared three EAs for the Three Creeks Project. *See* AR 00001–104, 00119–222, 00237–320. Earth Island submitted a comment on the 2016 EA, AR 00779–99, and objected to the 2017 EA, AR 00753–58. However, after receiving the Forest Service's response to their objection, Earth Island requested the agency file a supplemental EA, or EIS, and allow public comment on the new information and circumstances that should be addressed in the supplemental EA or EIS, based on the vague instructions in the Forest Service's objection response. AR 00664–65; *see also* AR 00666–72, 00673–85. The Forest Service ultimately filed a new EA, the 2018 EA, which is considerably different from the 2016 and 2017 EAs. However, neither Earth Island nor other members of the interested public were given an opportunity to offer their thoughts or concerns about the 2018 EA and the new and changed information it contains.

The 2018 EA changed the Project area's desired forest conditions as well as how the Forest Service would achieve these conditions. These crucial changes impact the overall outcome of the Three Creeks Project and Earth Island never had the opportunity to address these changes. Discussing the desired conditions of the 2016 and 2017 EAs, the Forest Service states it wants to achieve a basal area around 147 square feet and maintain 22 large trees per acre. AR 00127, 00244. The 2018 EA changed these desired conditions. The Forest Service now wishes to achieve a basal area between 70–152 square feet and maintain only 14 large trees per acre; additionally for the first time the 2018 EA includes the desired overall trees per acre, 39–79 trees, and states the desired mean tree diameter is 22 inches DBH.[21] AR 00009. There is no explanation for why the Forest Service changed the desired conditions between the EAs. The 2018 EA also changed the circumstances for how the Forest Service will achieve these desired conditions. The 2016 and 2017 EAs note that the vast majority of trees to be cut are between 10–20 inches DBH. AR 00133, 00250. The 2018 EA, however, for the first time, states that the vast majority of trees to be cut are below 10 inches DBH, but that the majority of merchantable trees to be cut are between 10–20 inches DBH. AR 00015. Earth Island should have been given an opportunity to comment on the 2018 EA and address these changes, including the chance to point out that an alternative that does not include commercial logging is even more viable and reasonable after these changes.

The 2018 EA also includes new information about the black-backed woodpecker and Pacific marten. The 2018 EA for the first time recognized the black-backed woodpecker as an MIS and included additional information regarding its habitat needs and possible indirect effects to the species' habitat.[22] AR 00041–42, 00058–59. When discussing impacts to Pacific marten, the 2018 EA included a very brief discussion of the recent Moriarty study that Earth Island discussed in their objection. AR 00041, AR 00754–55. However, the Forest Service improperly analyzed this study and ignored the overall conclusion that fuels treatments impact martens. *See*

---

[21] There are inconsistent statements regarding the basal area and size of trees to be cut within the 2018 EA itself, *see supra* Argument Section II, but for purposes of this argument Earth Island is discussing changes among specific sections of the EAs. Earth Island would have likely raised concerns with these inconsistencies had they been permitted to comment on the 2018 EA.

[22] While some indirect impacts are acknowledged, they were not given the hard look required by NEPA, *see supra* Argument Section IV.

*supra* Argument Section V. Earth Island should have been provided an opportunity to comment on the new information regarding the black-backed woodpecker and Pacific marten.

The Forest Service's refusal to provide an opportunity to comment on the 2018 EA circumvented the heart of the NEPA process, in violation of NEPA and its own regulations.

**VII. The Forest Service Violated NEPA in Failing to Prepare an EIS, and Instead Issued an Improper FONSI. (Claims 7 and 8)**

Agencies may prepare EAs to analyze environmental impacts. *See* 40 C.F.R. § 1501.4(b). If the EA concludes that a proposed project will result in no significant environmental impacts, the agency will issue a FONSI. *Id.* at § 1508.13. A FONSI "must supply a convincing statement of reasons" to support that determination. *Native Ecosystems Council*, 599 F.3d at 937. However, "[a]n agency is required to prepare an EIS when there are substantial questions about whether a project *may* cause significant degradation of the human environment." *Native Ecosystems Council*, 428 F.3d at 1239 (emphasis in original). Here, the Forest Service's FONSI is based on an improper EA, making the FONSI improper and it further failed to supply a convincing statement of reasons to support its FONSI and failed to properly address the context and intensity of the Three Creeks Project.

The Forest Service's decision to prepare a FONSI was improper because it was made without critical information regarding the true effects of the Three Creeks Project. As detailed above, the Forest Service failed to take the requisite hard look throughout its 2018 EA. Thus, the Three Creeks FONSI is necessarily arbitrary and capricious because it relied on the deficient 2018 EA. *See Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 *40 (D. Or. July 3, 2014).

The Forest Service should have instead prepared an EIS because a review of the Project's context and intensity shows the Project's impacts on the human environment are significant. *See* 40 C.F.R. § 1508.27. The Three Creeks FONSI improperly and arbitrarily determined that the context of the Three Creeks Project was not significant and that none of the ten intensity factors were implicated by the Project. AR 00115–17. In fact, the Project's context is significant and it will likely have impacts under several intensity factors.

The Forest Service improperly ignores the context of the Project. *Id.* NEPA requires the agency to consider the significance of an action in several contexts, including the affected region,

the affected interests, and locality. 40 C.F.R. § 1508.27(a). Here, the Forest Service is proposing to log 9,590 acres and to some extent will accomplish this via commercial thinning (logging trees over 8 inches DBH). AR 00460. The Three Creeks Project's context is significant due to the size of the Project and the Forest Service's removal of some of the few remaining large trees. *See Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 551 (W.D. Pa. 1997) (EIS was required for a project in excess of 5,000 acres that involved "even-aged" management).[23]

The Forest Service's FONSI fails to adequately analyze or disclose the Project's impacts, particularly regarding the extent to which large trees will be removed and how the Project will effect the black-backed woodpecker and Pacific marten, *see supra* Argument Sections II, IV. Thus, the Project's effects analysis is insufficient under 40 C.F.R. § 1508.27(b)(1).

The Forest Service's determination that the Project will have no impacts on unique resources, such as ecologically critical areas or wild and scenic rivers, is also inadequate. *See Id.* § 1508.27(b)(3). The Sierra Nevada and Three Creeks Project area represent the southernmost extent of the black-backed woodpecker's and Pacific marten's home range. AR 00894, 13383, 15681. Populations at the edge of a species range are ecologically critical because they often hold the key to persistence of the species. *See supra* Argument Section IV. The Project area also includes rivers designated as *Scenic* and *Recreational* under the Wild and Scenic Rivers Act. AR 00053; *see also* AR 16467 (Forest Service needs to stress that the project will protect, and to the extent possible, enhance Wild and Scenic river values). Although the EA and FONSI briefly mention the Wild and Scenic River segments, the Forest Service only provides conclusory statements about design features protecting these segments, failing to fully disclose and/or analyze impacts to these areas.[24] AR 00116; *see also* AR 00001–104. The FONSI fails to fully analyze impacts to the species, particularly at the edge of their home range, and impacts to the

---

[23] Even-aged stands are composed of a single age class. 36 C.F.R. § 219.19. Here the Forest Service's removal of some rare, large trees will maintain a forest stand dominated by small, young trees.

[24] Although the Service notes that design criteria will protect the Wild and Scenic River segments, none of the design criteria appear to apply to the Wild and Scenic River segments specifically, but to the watershed or waterbody buffer zones/riparian conservation areas generally. *See* AR 00024–25.

wild and scenic rivers within the Project area.

The Project's effects on the human environment are extremely uncertain. *See* 40 C.F.R. § 1508.27(b)(5). First, the overall application of the Project is uncertain. As detailed above, the Forest Service has not accurately discussed how the Project will be implemented, *see supra* Argument Section II, thus it, the public, and this Court cannot be certain of the range of impacts the Project may have. Effects to species are even more uncertain because while the Forest Service appears to acknowledge a few impacts facing species, like the fact that the possibility of future black-backed woodpecker habitat is being destroyed, it never discusses how this loss of habitat will impact the viability of the rare and sensitive species in the Project area. *See supra* Argument Section IV. *See Native Ecosystems Council*, 428 F.3d at 1240 (EIS is mandated where uncertainty can be resolved by providing information to help prevent speculation of potential effects).

The Three Creeks Project is ultimately seeking to achieve desired pre-settlement conditions. AR 00009. The Project however will be unable to achieve these conditions because it is proposing to remove large, fire-resistant trees, thus it is inconsistent with the 2004 Sierra Nevada Framework. *See supra* Argument Section I. The Forest Service also failed to provide an opportunity to comment on the 2018 EA. *See supra* Argument Section VI. These constitute a violation of NFMA and Forest Service Objection regulations, and thus threatens a violation of federal law. *See* 40 C.F.R. § 1508.27(b)(10).

If even *one* of the intensity factors exists, an EIS may be required. *Ocean Advocates*, 402 F.3d at 865. Here, four factors may apply, easily justifying an EIS. Importantly, Earth Island "need not show that significant effects *will in fact occur*, but only that there are substantial questions whether a project may have a significant effect." *Ctr. for Biological Diversity*, 538 F.3d at 1219, (emphasis in original, internal quotes omitted). The Forest Service's FONSI is thus arbitrary and capricious and an EIS should be prepared.

## VIII. This Court Should Set Aside and Vacate the Challenged Decision.

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If an agency's decision "is not

sustainable on the administrative record made, then the [agency's] decision must be vacated." *Camp v. Pitts*, 411 U.S. 138, 143 (1973); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 2012 WL 13042847 *2 (D. Or. Dec. 10, 2012) (vacatur is "standard remedy"); *Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954 *13 (N.D. Cal. June 10, 2016) (because vacatur is presumptive remedy, "it is Defendants' burden to show that vacatur is unwarranted"). Here, due to the Forest Service's manifest violations of federal law they cannot show that vacatur is unwarranted and the Court should vacate the challenged DN/FONSI and 2018 EA. *See League of Wilderness Defs./ Blue Mountains Biodiversity Project v. Peña*, 2015 WL 1567444 *1 (D. Or. April 6, 2015) (court vacated agency decision and underlying NEPA document).

## CONCLUSION

For the reasons set forth above in Earth Island's motion and in its supporting declarations and exhibits, Earth Island respectfully requests that this Court grant its motion for summary judgment and vacate the challenged agency actions.

Respectfully submitted on this 29th day of May, 2020

/s/ Thomas Buchele
Thomas Buchele (CA Bar No.129657)
/s/ Morgan Staric
Morgan Staric, *Admitted Pro Hac Vice*
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland OR 97219-7799
Tel: 503-768-6736 (Buchele)
Tel: 503-768-6825 (Staric)
Email: tbuchele@lclark.edu
Email: mstaric@lclark.edu

*Attorneys for Plaintiffs Earth Island Institute and Center for Biological Diversity*