PAUL SALAMANCA
Attorney
United States Department of Justice
Environment & Natural Resources Division
TAYLOR FERRELL
SEAN C. DUFFY
Trial Attorneys
Natural Resources Section
150 M Street NE
Washington, DC 20002
Ph: (202) 305-0874 (Ferrell)
Ph: (202) 305-0445 (Duffy)
taylor.ferrell@usdoj.gov
sean.c.duffy@usdoj.gov

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| EARTH ISLAND INSTITUTE, *et al.*,<br>Plaintiffs,<br>v.<br>UNITED STATES FOREST SERVICE *et al.*,<br>Federal Defendants, | No. 2:19-cv-1271-MCE-DB<br><br>**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS


INTRODUCTION ..... 1

I. FACTUAL BACKGROUND ..... 1

A. The Inyo National Forest and the Three Creeks Area ..... 1

B. The Forest Plan Framework ..... 3

C. The Project ..... 4

1. Treatment Methods ..... 4

2. Public Involvement ..... 5

3. Analysis of Alternatives ..... 6

4. Analysis of Environmental Impacts ..... 7

II. LEGAL BACKGROUND ..... 7

A. National Environmental Policy Act ..... 7

B. National Forest Management Act ..... 8

C. Judicial Review Under the Administrative Procedure Act ..... 9

III. ARGUMENT ..... 9

A. The Project purpose and need are clearly explained [Claim 1]. ..... 9

B. The decision documents adequately explain the silviculture and treatment features [Claim 6]. ..... 12

C. The Forest Service properly considered a reasonable range of alternatives [Claim 2]. ..... 14

D. The Forest Service took a hard look at environmental impacts on wildlife species [Claim 3]. ..... 17

1. The Forest Service adequately considered impacts on the Pacific marten. ..... 18

2. The Forest Service adequately considered impacts on the black-backed woodpecker. ..... 22

3. The Forest Service reasonably considered and applied high quality science [Claims 4, 5]. ..... 25

E. The Forest Service took a hard look at the Project's impacts and properly concluded that an EIS is not required. [Claims 7, 8]. ............................... 27

1. The Forest Service Applied the Proper Context ............................ 27

2. Plaintiffs also fail to show that any of the CEQ intensity factors are present. ........................................................................... 28

a. Beneficial impacts ............................................................ 29

b. Unique Characteristics ...................................................... 29

c. Uncertainty ......................................................................... 30

d. The actions do not threaten violation of any law. .............. 30

F. Plaintiffs and the public had an adequate opportunity to comment on the Project and the Forest Service was not required to conduct a new comment period for the 2018 EA [Claim 9]. ........................................................... 30

G. The Project Complies with NFMA [Claim 10]. ......................................... 33

H. Vacatur would be an unwarranted and overbroad remedy ......................... 34

CONCLUSION ........................................................................................................... 35

## TABLE OF AUTHORITIES

### CASES

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) .......... 34

*Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87 (1983) .......... 7

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938 (9th Cir. 2008) .......... 8

*Bowman Transp. Inc. v. Arkansas–Best Freight System*, 419 U.S. 281 (1974) .......... 13

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584 (9th Cir. 2018) .......... 15

*Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir. 2012) .......... 34

*Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003) .......... 8

*Conservation Cong. v. United States Forest Serv*. 235 F. Supp. 3d 1189 (E.D. Cal. 2017) .......... 14

*Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997) .......... 28, 29

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004) .......... 15

*Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012 ) .......... 16

*Earth Island Institute v. Morse*, 2009 WL 2423478 (E.D. Ca. Aug. 5, 2009) .......... 11, 12

*Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089 (9th Cir.2003) .......... 34

*Friends of Se. Future v. Morrison*, 153 F.3d 1059 (9th Cir. 1998) .......... 9, 13

*Greenpeace Action v. Franklin*, 14 F.3d 1324 (9th Cir. 1992) .......... 17, 30

*Greenpeace, Inc. v. Cole*, 50 F. Supp. 3d 1158 (D. Alaska 2014) .......... 34

*Griffin v. Yuetter*, 944 F.2d 908 (9th Cir. 1991) .......... 34

*Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174 (9th Cir.1990) .......... 16

*Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008) .......... 15

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) .......... 9

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) .......... 26, 30

*Modesto Irrigation Dist. v. Gutierrez*,
619 F.3d 1024 (9th Cir. 2010) .......... 9

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995) .......... 34

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) .......... 9

*Native Ecosystems Council v. U.S. Forest Serv.*,
428 F.3d 1233 (9th Cir. 2005) .......... 15, 16, 17

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) .......... 8, 9, 33

*Nat'l Parks & Conservation Ass'n v. Babbitt*,
241 F.3d 722 (9th Cir. 2001) .......... 17

*Navickas v. Conroy*,
575 F. App'x 758 (9th Cir. 2014) .......... 13

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) .......... 9

*Nw. Envtl. Defense Ctr. v. Wood*,
947 F. Supp. 1371 (D. Or. 1996) .......... 29, 30

*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) .......... 8

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 35

*Price Rd. Neighborhood Ass'n v. DOT*,
113 F.3d 1505 (9th Cir. 1997) .......... 21

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) .......... 7, 8

*Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*,
No. 1:12-CV-1171-CL, 2013 WL 4786242 (D. Or. Sept. 6, 2013) .......... 14

*Soda Mountain Wilderness Council v. United States Bureau of Land Mgmt.*,
No. 1:12-CV-001171-CL, 2013 WL 12120098 (D. Or. May 29, 2013) .......... 13

*Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*,
100 F.3d 1443 (9th Cir. 1996) .......... 9

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
435 U.S. 519 (1978) .......... 8, 9

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) .......... 16

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) .......... 15, 16

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .......... 9

**STATUTES**

16 U.S.C. § 1604(e)(1) .......... 8

16 U.S.C. §§ 1600-1687 ........ 8
42 U.S.C. § 4321 ........ 7
42 U.S.C. § 4332(2)(C) ........ 8, 17
5 U.S.C. § 706(2)(A) ........ 9
5 U.S.C. §§ 701-706 ........ 9

**REGULATIONS**

36 C.F.R. § 218.12 ........ 31
36 C.F.R. § 218.22(d) ........ 31
40 C.F.R. § 1508.11 (2019) ........ 8
40 C.F.R. § 1508.27 ........ 27
40 C.F.R. § 1508.27(b) ........ 7
40 C.F.R. § 1508.9(a) ........ 8

## INTRODUCTION

The Three Creeks Jeffrey Pine Forest Health & Restoration project proposes to promote forest health by increasing resiliency to wildfire, drought, and pathogens, and to restore habitat on the Inyo National Forest by thinning smaller trees and using prescribed fire. Prior to commencing the Project, the Forest Service examined the environmental impacts of the Project on forest resources and prepared a detailed environmental assessment. It concluded that the Project would not have a significant environmental impact and it thus approved the Project.

Plaintiffs claim the Forest Service failed to adequately explain the Project and analyze environmental impacts and argue that it reached the wrong conclusions as to those impacts. Plaintiffs also claim that the Project is not consistent with the Forest Plan. The record refutes Plaintiffs' claims. It shows that the Forest Service adequately explained the Project's purpose and need, took a hard look at and explained its potential impacts, and reasonably concluded that the Project would not result in significant environmental impacts. And the record shows that the Project is consistent with the Forest Plan. Because the Forest Service fully complied with NEPA and NFMA, Federal Defendants' cross-motion for summary judgment should be granted in full, and Plaintiffs' motion for summary judgment should be denied.

## I. FACTUAL BACKGROUND

### A. The Inyo National Forest and the Three Creeks Area

The Inyo National Forest (Inyo) lies on the eastern side of the Sierra Nevadas. The Three Creeks project area consists of 130 stands totaling 9,590 acres of Jeffrey pine forest that are part of a much larger forested area located on both the Mono Lake and Mammoth Lakes Ranger Districts. AR 00009. Prior to the late 1800s, the Jeffrey pine forest in the Three Creeks area was typical of other Jeffrey and ponderosa pine forests in the western United States. *Id*. Stands were generally open, and older, larger trees dominated the area, which averaged 14 large trees (>24 inches diameter at breast height (dbh)) per acre, with a mean tree diameter of 22 inches. *Id*. In the eastern region of the Sierra Nevada, stands burned frequently (every 7 – 15 years) at low intensities, which perpetuated a heterogeneous vertical and horizontal structure with multiple age classes of trees, groups of denser trees, gaps, and interspersed single trees. AR 00007.

In 1924, the Forest Service and other land management agencies began suppressing and controlling wildland fires, which had historically played an important role in the ecosystem. AR 0007. In addition, logging practices removed the large diameter trees from the landscape. *Id*. Due to logging and the absence of fire, these forests grew back denser and more homogenous. Both surface and aerial fuels increased as dead material accumulated on the forest floor, and young trees began to fill in available space. *Id*. Since the 1970s, this increased density—combined with higher summer temperatures and prolonged droughts—has resulted in numerous and frequent high-intensity, large-scale wildfires. *Id.* (citing *Gruell* (2001), AR 04683-89; *Mallek* (2013), AR 05224-05251; *Miller* (2009), AR 05354-05371; and *Steel* (2015), AR 06056-06078).

The project area consists of approximately 21% Wildland-Urban Intermix (WUI)[1] and 79% General Forest (GF). *See* EA, Table 1 (AR 00026-00032). The Forest Service divides the project area by condition, identifying four general Strata. AR 00010. Throughout the project area, stands are now dominated by smaller trees, *i.e.* those smaller than 8 inches dbh, and stand density has reached levels that are two to five times higher than the historical density. *See* Fig. 1, below; AR 00560. According to the silviculture report—which defines large trees as those measuring greater than 24 inches dbh—there are currently five large trees per acre (TPA) in strata 1, six TPA in strata 2, five TPA in strata 3, and thirteen TPA in strata 4 (AR 000560).




*Figure 1. Comparison of relative numbers of small, medium, and large trees per acre. AR00560*

[1] WUI is an area where human habitation is mixed with areas of flammable wildland vegetation. AR 08163

Another metric that demonstrates the over-density trend in the project area is stand density index ("SDI"). Silvicultural analysis of SDI indicates that when a tree stand "reaches a SDI of 230," it is "the beginning of a 'zone of imminent bark beetle mortality.'" AR 00011. Analyzing current SDI for each strata within the project area, the Forest Service estimates that if no action is taken, all but one of the four strata will be above SDI 230 within 10 years. *Id.*

**B. The Forest Plan Framework**

In 2004, the Forest Service adopted the Sierra Nevada Forest Plan Amendment ("2004 Framework"), which replaced the 2001 Sierra Nevada Forest Plan Amendment to the Inyo National Forest Plan. AR 08121-96. The 2004 Framework presents a strategy for addressing the fire situation in the Sierras in combination with key components of the conservation strategy for old forest-dependent species. AR 08126. The 2004 Framework prioritizes areas in which thinning projects will occur and sets forth standards and guidelines for those projects in the different areas in the Sierra Nevada. AR 08128. In the Record of Decision for the 2004 Framework, the Forest Service stated that its "first emphasis is on reducing fuels in the wildland urban interface (WUI)." *Id*. The Forest Plan includes in its standards and guidelines that "[t]rees 30 inches dbh and larger will be retained in all thinning projects" and that "trees 25 inches dbh and above will be retained in most treated areas." *Id.*

The Framework recommends thinning, salvage, and prescribed and natural fires to make forests less susceptible to the effects of uncharacteristically severe wildfires, as well as invasive pests and diseases. AR 08139. The integrated strategy includes methods of thinning trees and brush removal ("fuels treatments"). The Framework recognizes that this strategy would provide for the removal of some medium-sized trees to increase the likelihood of accomplishing long-term desired conditions. AR 08140. The Framework includes a standard and guideline that "[f]or all mechanical thinning treatments, design projects to retain all live conifers 30 inches dbh or larger. Exceptions are allowed to meet needs for equipment operability." AR 08173. Further, for mechanical thinning treatments outside defense zones in the eastside pine type, projects should retain 30 percent of the existing basal area, with the retained basal area generally comprised of the largest trees. AR 08174.

**C. The Project**

The purpose of this Project is to promote forest health by increasing resiliency to wildfire, drought, and pathogens, and to restore and improve a variety of habitat-types over 9,590 acres of Jeffrey pine forest. AR 00007–08. The project is needed because current conditions do not meet the desired conditions, primarily due to past fire suppression and forestry practices. AR 00009. Currently, across the project area, several metrics present a troubling scenario. "[T]ree densities range from 2 to 5 times greater than [natural range of variability] conditions with much smaller average diameters." AR 00010. The large number of small trees create a homogenous environment that is conducive to high severity crown fires. *Id.* In addition, as these forests continue to grow, the densely-situated trees compete with each other, reducing available nutrients, light, and moisture, with the resultant stresses causing trees to become "more likely to succumb to pest and pathogen outbreaks, drought, and climate change resulting in higher mortality rates and increased fuel build-up." *Id.*

**1. Treatment Methods**

To meet its purpose and need, the Project will thin excess trees, treat fuels, and use prescribed fire on 130 Jeffrey pine units. AR 00012. The Forest Service intends to thin trees using a thin from below technique, which will preferentially cut smaller diameter trees. AR 00057. "For all units, the vast majority of trees to be thinned would be less than 10 inches [dbh]." AR 00015. The Project design also will encourage heterogeneity by expanding existing gaps and creating new ones. AR 00015-16. The new gaps will promote vertical diversity and maintain and accentuate a diversity of tree age classes. *Id*. The Project also includes numerous design features and unit-by-unit treatment methods meant to protect or improve habitat for wildlife and plants, and protect water quality and other resources. AR 00015–26.

The Forest Service divided treatment units into four strata for sampling purposes.[2] As shown above in figure 1, all four strata are dominated by smaller tree stands (nearly 60 percent

[2] As noted above, the project area consists of approximately 79% General Forest, 18% WUI (T) and 3% WUI (D). The Forest Service tailored different design features for the different zones (AR 00016, 00018, 00020), and different desired conditions (AR 00008).

less than 8 inches dbh). AR 00560. The EA distinguishes smaller trees (less than 10 inches) from the mid-size and large trees that it characterizes as "merchantable." *Id*. "The majority of merchantable trees which would be thinned would be 10 – 20 inches dbh." And trees over 24 inches dbh would only be removed to protect larger trees or when goals could not be met by cutting smaller trees. *Id.;* AR00009. No trees over 30 inches dbh would be cut as part of this project unless deemed a direct operational safety hazard." AR 00522. "While it is expected multiple commercial and public wood cutting opportunities will occur as a result of project approval, product extraction is a by-product of implementation, as forest health and restoration are the primary purpose of this proposal." AR 00009.[3]

**2. Public Involvement**

Public outreach for the Project began in fall 2012, when the Forest Service issued its scoping notice. AR 01503-01507. Over the following four years, the Forest Service completed necessary surveys and compiled reports, including silviculture, fuels and fire, wildlife and aquatics, hydrology and soils, and cultural resources. The Forest Service published a draft EA in March 2016. AR 00237-320. The John Muir Project and Earth Island Institute (collectively "Earth Island"), submitted comments on the draft EA the following month. AR 00779-99. They requested withdrawal of the Project and the Framework. AR 00779. Earth Island disputed (1) that fire intensity is above historic levels and is at risk of increasing and (2) the Project's baseline of Black-backed woodpecker habitat; (3) it contended that larger stream buffers are needed to avoid potentially significant impacts to the Sierra Nevada Yellow-Legged Frog; and (4) it argued that the 2004 Framework is "obsolete" because its assumption that risk of intense fires is undesirably high and its objective to reduce the intensity of fires is misguided. *Id.* During the summer of 2016—while the Forest Service was considering comments—the Clark and Owens

[3] Some Project documents differentiate trees that are smaller than 8 inches dbh from trees that are greater than 8 inches dbh by designating the smaller than 8 inch trees "pre-commercial" and the larger trees "commercial." *See e.g.* AR 00460. However, the Project does not differentiate the method of removal between these two designations, as thinning of both "pre-commercial" and "commercial" trees would be done by "Hand fell/chainsaw or mechanical harvester." *Id.*

River Fires burned within several units covered by the Project. AR 00005.[4] Based on the impact of these fires, the Forest Service determined that treatments were not necessary in these units and removed nearly six hundred acres from the Project. AR 00005; AR 00259-00263.

In July 2017, the Forest Service completed a revised EA and draft decision notice for the Project. AR 00119-222; AR 00223-00236. Earth Island and Center for Biological Diversity, who are the Plaintiffs here, submitted objections to the revised EA. AR 00753-00758. Their objections raised issues that no commenter had raised during the previous comment period, including that the Forest Service considered an inadequate range of alternatives. AR 00755. The Forest Service addressed these challenges in a Final Revised EA, which highlighted six clarifications that were being incorporated in response to those objections. AR 00667-00672; AR 00115. The Acting District Ranger signed the Decision Notice authorizing the Project in January 2018. AR 00115

**3. Analysis of Alternatives**

During the scoping and comment periods, the Forest Service developed project alternatives based on input from the public and other agencies. AR 00006. Based on the issues raised by the public, the Forest Service developed two alternatives—the proposed project and a "no action" alternative. The Forest Service then considered the impacts of the Project in comparison with the expected impacts from the no action alternative. AR 00034.

In analyzing the impacts of the no action alternative, the Forest Service used current data on existing conditions such as over-competition, homogeneity, and high fuel loads. From these, the Forest Service predicted impacts that included insect and disease outbreaks and the possibility of high-intensity wildfire, which would in turn create increased risk to all resources and decreased forest health, including destruction of wildlife habitat. AR 00033–34. The Forest Service rejected the no action alternative because it does not meet the Project's purpose and need and would perpetuate overly dense stand conditions and decreased forest health. AR 00114.

---

[4] For the Owens River Fire, approximately 74% of the 5,460 acres burned at high and moderate soil burn severity. AR 10080. As to the smaller area where the fire did not burn as severely, the Forest Service attributed that reduced severity in part to recent fuel reduction work. *Id.*

In contrast, the Forest Service found that proposed treatments in the action alternative would improve stand growth and vigor "almost immediately," which would expedite the growth of smaller diameter trees into the larger diameter classes and result in decreased mortality from inter-tree competition, pests and pathogens. AR 00562–63. *See also*, AR 00413 (Fuel and Fires Report) (In comparison to no treatment, "all modeled treatments reduced the mean flame length, rate of spread, and burn probability both across the project area and within the wildlife habitat prescription stand.")

**4. Analysis of Environmental Impacts**

The Forest Service analyzed the direct, indirect, and cumulative effects of the proposed action (AR 00033-53;00056-00061) and incorporated and discussed resource specialist reports that analyzed the proposal's impacts to various resources, including, *inter alia*, silviculture (AR 00551-578), wildlife habitat (BE) (AR 00604-00630), cultural resources (AR 00348-00406), and air quality (AR 00321-328). The Forest Service's cumulative impacts analysis (AR 00055-61) included discussion of how the Project would impact resources, when combined with other past, present and reasonably foreseeable future actions in and around the project area, including additional thinning and fuels reduction measures, previous fires, off-highway vehicle use and recreational activity, and the town of June Lake's water management. *Id*. To determine whether the effects of the Project would be "significant" and require the preparation of an environmental impact statement, the Forest Service also analyzed Council on Environmental Quality significance factors to determine the context and intensity of the Project impacts. AR 00033–62; 40 C.F.R. § 1508.27(b). The Forest Service concluded the actions in Alternative 2 do not individually, or cumulatively, cause any significant environmental impacts. *Id*.

## II. LEGAL BACKGROUND

### A. National Environmental Policy Act

NEPA, 42 U.S.C. §§ 4321 *et seq.*, requires federal agencies to examine the environmental effects of proposed federal actions. *Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983). NEPA does not mandate particular substantive results, but only prescribes a necessary process for analyzing potential environmental effects. *Robertson v. Methow Valley Citizens Council*, 490

U.S. 332, 350-51 (1989); *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir. 2008). NEPA's "mandate to the agencies is essentially procedural" and is designed "to insure a fully informed and well-considered decision." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978). NEPA and its implementing regulations require the preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (2019). Under certain circumstances, an agency may prepare "a more limited document, an Environmental Assessment (EA)." *Methow Valley Citizens Council*, 490 U.S. at 354-56 (citing 40 C.F.R. § 1501.4(a), (b)). An EA is a "'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Id.* (alterations in original) (quoting 40 C.F.R. § 1508.9(a)).

### B. National Forest Management Act

Administration of the Inyo National Forest is governed by the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600-1687, which provides for forest planning and management at two levels: the forest level and the individual project level. At the forest level, NFMA directs the Forest Service to "develop, maintain, and, as appropriate, revise [forest plans] for units of the National Forest System." *Id.* § 1604(a). A forest plan is a general planning tool that establishes the overall management direction for the National Forest unit, and serves as a programmatic statement of intent to guide future site-specific decisions. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 729 (1998) (noting that forest plans furnish broad, programmatic guidance for the management of the Forest); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 966 (9th Cir. 2003). Forest plans guide all natural resource management activities in the National Forests, and must "provide for multiple use and sustained yield of the products and services" derived from the National Forests, including "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. . . ." 16 U.S.C. § 1604(e)(1). At the project level, the Forest Service implements the applicable forest plan by undertaking site-specific projects, which must be consistent with the plan. *See id.* § 1604(*i*). "[T]he Forest Service's interpretation and implementation of its own forest plan is entitled to substantial deference," *Native Ecosystems*

*Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012), and will not be disturbed unless it is plainly erroneous. *Id.* at 1052.

### C. Judicial Review Under the Administrative Procedure Act

Judicial review of agency compliance with NEPA and NFMA is reviewed under the standard set forth in the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 701-706; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002). APA review is generally limited to the administrative record that was before the agency at the time of its decision. *Id.*; *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450. Under the APA, a court may set aside an agency action if it determines that the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quotation marks and citation omitted).

The court's task in reviewing agency action under the APA is simply "to insure a fully informed and well-considered decision, not necessarily a decision [the court] would have reached had [it] been [a member] of the decisionmaking unit of the agency." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). Courts must therefore uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). This is especially true in the context of management of Forest Service lands, for "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands." *Lands Council v. McNair*, 537 F.3d 981, 990 (9th Cir. 2008); r*ev'd on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

## III. ARGUMENT

### A. The Project purpose and need are clearly explained [Claim 1].

NEPA affords agencies "considerable discretion to define the purpose and need of a project." *Friends of Se. Future v. Morrison*, 153 F.3d 1059, 1066 (9th Cir. 1998). Here, the

Forest Service reasonably exercised that considerable discretion, fully documenting the baseline conditions in the project area, explaining the desired conditions for the Area, and explaining how the project will help attain those desired conditions. AR 0007-09. In discussing the current conditions in the project area, the Forest Service set forth the "troubling scenario" of current density in the project area and provided metrics and studies in support of those baseline findings. AR000010. In its explanation of these baseline conditions, the Forest Service cited studies that documented mean fire interval and used quantitative metrics such as mean basal area, Stand Density Index (SDI), and Fire Regime Condition Class (FRCC) to compare current conditions to historic conditions. AR0009; AR00559-61.

The Forest Service then explained that this over-density increases the risk of high severity crown fires and invites inter-tree competition, creating risk for disease and infestation. *Id*. The Forest Service cited scientific sources for those metrics, and it contextualized those metrics by providing recent historical data on fires, insect, and disease, each of which demonstrate the risks associated with the current conditions in the Area. AR00010-11. The Forest Service connected the dots between these density metrics and various risks to the project area, including disease and extreme fire. *See* AR00011 ("current overly-dense, more horizontally uniform stand conditions make tree-to-tree spread of annosus root disease more likely"); *Id*. ("Stands in this analysis have missed low-intensity, surface fire anywhere from three to perhaps eight or ten times in the last 80 to 120 years,. . . thus allowing surface and ladder fuels to greatly increase, which can more quickly lead to wildland fires escaping initial containment efforts and becoming high-intensity, stand-replacing fires"). Having discussed these baseline conditions, the Forest Service explained its objective of returning the Forest to its natural fire regime, characterized by "frequent, low intensity burning." AR0009.

Finally, the Forest Service explained how the Project would help move the stands in the project area toward the desired conditions. The EA used modeling to forecast the "potential changes to fire behavior which may result as a result of the proposed action." AR00035. These models showed that proposed treatments will improve stand growth and vigor "almost immediately," which would expedite the growth of smaller diameter trees into the larger diameter

classes and result in decreased mortality from inter-tree competition, pests and pathogens. AR 000562.

Plaintiffs argue that the Forest Service's definition of the purpose and need is arbitrary and capricious the Forest Service offered no rational explanation for why it needs to conduct the Three Creeks Project. Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Br") 9-14, ECF No. 31. Specifically, Plaintiffs assert that "[b]ecause the Project area already resembles certain desired conditions," as measured by basal area, "it is unclear as to why the proposed logging needs to occur at all." *Id* at 10.[5] But the EA is clear as to why the project is needed: the thoroughly documented over-density of small trees has made the Forest unacceptably at risk of severe fire and disease. Plaintiffs' argument focuses exclusively on the metric of mean basal area and ignores the EA's discussion of several other indicators by which the project area presents unfavorable conditions. The EA notes that, while the stands generally meet the desired basal range, tree densities in the project area are "2 to 5 times greater than [natural] conditions with much smaller average diameters." AR00010. The EA then explains how these suboptimal density and diameter conditions make trees "more likely to succumb to pest and pathogen outbreaks, drought, and climate change resulting in higher mortality rates and increased fuel buildup." *Id*. Further, the EA explains the need for the project by applying Stand Density Index (SDI), by which metric three of the four stands will approach a "zone of imminent bark beetle mortality" within ten years, if action is not taken. AR 00011 (citing study).

Plaintiffs cite the district court case of *Earth Island Institute v. Morse*, 2009 WL 2423478 *6 (E.D. Cal. Aug. 5, 2009) in support of their argument that the Forest Service's statement of the purpose and need violated NEPA. *See* Pls.' Br. 9. But that case is distinguishable. There, the district court found that the Forest Service used erroneous scientific data, which resulted in an overstatement of the current density of the forest and artificially created a "need" to intensively

---

[5] Plaintiffs mischaracterize the Project as a "logging" Project. Production of forest products are a by-product of this project. The primary purpose is promotion of forest health by increasing resiliency to wildfire, drought and pathogens, and for restoration and improvement of a variety of habitat-types. AR00080. To the extent that any thinned trees are sold commercially, that does not change (or intensify) the environmental impacts of the Project.

log medium and large trees from the project area. *Earth Island Inst. v. Morse*, No. 208CV-01897-JAM-JFM, 2009 WL 2423478, at *6 (E.D. Cal. Aug. 5, 2009). Unlike in *Morse*, Plaintiffs here have identified no use of erroneous scientific data that artificially justified a need for treatment where it would otherwise not exist. Specifically, Plaintiffs have not alleged that the Forest Service's density calculations or use of metrics such as SDI are erroneous. Because the EA reasonably explains the connection between these metrics and the purpose of the Project, the Forest Service's definition and explanation of the purpose and need complies with NEPA.

### B. The decision documents adequately explain the silviculture and treatment features [Claim 6].

The Forest Service adequately analyzed and explained the Project's treatment features in order to take a "hard look" at the impacts of the Project. The NEPA documents consistently describe the treatment method as a "thin from below" method, through which the Forest Service will remove smaller, suppressed, intermediate, and co-dominant trees. *See* AR00015 (2018 EA); AR00552 (Silviculture Report); AR00080 (Response to comment 1-1). The EA states that, because the Forest Service plans to use the thin-from-below method, "[f]or all units, the vast majority of trees to be thinned would be less than 10 inches [dbh]." AR00015. This finding is supported by other documents in the record, which uniformly show that small trees dominate all stands in the project area. *See supra*, Fig. 1. The Forest Service's plan to thin from below—i.e. to preferentially cut smaller and co-dominant trees—in a project area that is dominated by small trees presents a sufficiently clear basis for the Forest Service and the public to assess how that plan will impact various resources and to understand the Project's impacts.

Plaintiffs assert that the Forest Service's analysis is flawed because some NEPA documents contain inconsistencies about certain data, including desired conditions, tree size definition, and the number and size of trees would be thinned by the Project. Pls.' Br. 15-22. First, Plaintiffs mischaracterize some portions of the EA as being inconsistent. For example, Plaintiffs state that:

> Importantly the 2018 EA is again itself very unclear regarding the number and size of trees to be removed—stating that while the majority of trees to be thinned are below 10

> inches DBH, the majority of merchantable trees to be thinned are between 10–20 inches DBH.

Pls.' Br. 21. Plaintiffs appear to assert that these two statements are contradictory; they are not. The first sentence sets forth that, for all stands, the vast majority of trees to be thinned are small trees. The second sentence discusses only the small subset of trees that are not included in the "vast majority" and explains the size range of trees within that subset that will be thinned. These statements are wholly reconcilable, and together they emphasize that the Project will focus on thinning smaller trees and preserving larger trees, which will move the project area toward the desired conditions. Plaintiffs' characterization that the EA is unclear in the number and size of trees to be removed is incorrect.

Even if there are some minor inconsistencies within the NEPA documents regarding tree size, these inconsistencies do not undermine the Forest Service's analysis of impacts. *See Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) ("In determining whether the [NEPA document] contains a reasonably thorough discussion, we may not fly-speck the document and hold it insufficient on the basis of inconsequential, technical deficiencies." (citation and quotation omitted)). A court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp. Inc. v. Arkansas–Best Freight System*, 419 U.S. 281, 286, 95 (1974). Here, the Forest Service's analytical path is easily discerned. The Forest Service's analysis consistently looked at the impacts of thinning from below—and thus preferentially thinning smaller trees—in an area that is dominated by smaller trees. If the NEPA documents here contain slight variations on the measurements that distinguish "small" from "medium" trees, those definitional differences do not alter the analysis of impacts.

Plaintiffs also argue that the Forest Service was required to specify the number of medium or large trees that may be removed in order to take a "hard look" at the Projects impacts, Pls.' Br. 15-16. But NEPA does not require the type of specificity Plaintiffs seek here. *See Navickas v. Conroy*, 575 F. App'x 758, 760 (9th Cir. 2014) ("The Forest Service had no obligation to identify the specific trees that would be removed as part of the Project."); *Soda Mountain Wilderness Council v. United States Bureau of Land Mgmt.*, No. 1:12-CV-001171-CL, 2013 WL 12120098,

at *6 (D. Or. May 29, 2013), *report and recommendation adopted in part, rejected in part sub nom. Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*, No. 1:12-CV-1171-CL, 2013 WL 4786242 (D. Or. Sept. 6, 2013)("hard look" did not require EA to identify the precise amount of trees to be harvested). The Forest Service's analysis of impacts did not flow from a premise that a particular number of a particularly-sized tree would be removed; the analysis flowed from the premise that the "vast majority" of trees to be thinned will be smaller than 10 inches dbh, and that design features will protect particular resources. *See, e.g.* AR 00019-21 (wildlife habitat design features). All of those key premises are consistent, and the Forest Service's analysis of impacts that flowed from those premises was reasonable and is discernible.

The Forest Service's analytical consistency here distinguishes this case from *Conservation Cong. v. United States Forest Serv*. 235 F. Supp. 3d 1189 (E.D. Cal. 2017). In that case, the district court found that the Forest Service inconsistently discussed limiting operating periods ("LOP") to protect northern spotted owl habitat. *Id*. at 1214. The court found that the confusion about the Forest Service's enforcement of the LOP made it "it difficult to discern the Project's impacts" and also made it "difficult for the public to play a role in the decision-making process or project implementation." *Id*. Here, as discussed above—notwithstanding slight variations of definitions between small, medium, and large trees—the Forest Service's analysis of impacts from thinning from below is readily discernible.

### C. The Forest Service properly considered a reasonable range of alternatives [Claim 2].

The Forest Service met its NEPA obligations by considering two alternatives—the proposed alternative and the "no action" alternative. Plaintiffs' claim that the Forest Service considered an insufficient number of alternatives fails for two reasons. *First*, Plaintiffs waived this argument by not proposing their preferred alternative during either the scoping comment period, or the 30-day comment period on the 2016 EA. *See* AR 01388-99; AR 00779-99.[6] Even

[6] In fact, the only action requested by Plaintiffs in their comments—that the Project proposal be withdrawn entirely (AR 01388, AR 00779)—was thoroughly analyzed in the EA under the no-action alternative.

though every version of the EA has contained only two alternatives, it was not until 2017, following the issuance of the Revised EA, that Plaintiffs—in their formal objection—argued for the first time that the Forest Service failed to consider a different alternative that used only prescribed fire, pre-commercial thinning, or a combination thereof. AR 00755–56. "Persons challenging an agency's compliance with NEPA must structure their participation so that it alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (original alterations, citations, and internal quotation marks omitted). A failure to identify "in their comments any rulemaking alternatives beyond those evaluated in the EA" causes those belatedly objecting to an agency rulemaking to "forfeit[ ] any objection to the EA on the ground that it failed adequately to discuss potential alternatives to the proposed action." *Id*. at 764–65; *see also N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1156 & n.2 (9th Cir. 2008) (finding that where an alternative was not brought to the agency's attention until after the comment period closed, "any objection to the failure to consider that alternative has been waived"); *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 605 (9th Cir. 2018) (where plaintiffs failed during the notice and comment period to propose to BIA the consideration of an additional alternative, they "waived any argument that the failure to consider those alternatives represented a violation of NEPA."). As in those cases, the Plaintiffs here did not raise their proposal for another alternative in a timely manner, and the Forest Service was not given an opportunity to meaningfully consider Plaintiffs' proposal. The Court should deny Plaintiffs' range of alternatives claim on that basis.

*Second*, even had Plaintiffs timely raised their additional proposed alternative, the Forest Service's consideration of the proposed action and the no action alternative was sufficient under NEPA. The Ninth Circuit consistently has held that, when preparing an EA, agencies are only required to conduct brief discussions of reasonable, feasible alternatives that are reasonably related to the purpose of the project. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("an agency's obligation to consider alternatives under an EA is a lesser one

than under an EIS" and there is no "minimum number of alternatives that an agency must consider."); *Earth Island Inst. v. U.S. Forest Serv*., 697 F.3d 1010, 1022 (9th Cir. 2012 ) ("we are aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and preferred action alternative").

Here, Plaintiffs have offered no basis for the departure from the long line of cases that have upheld agencies' consideration of two alternatives when preparing an EA.[7] This is especially true because Plaintiffs have not shown that there would be any meaningful differences in the expected environmental impacts between the Forest Service's preferred alternative and Plaintiffs' proposal. Plaintiffs complain that the Project contemplates limited sales of some thinned trees, arguing that the Forest Service should consider a plan that does not include a commercial thinning component. *See* Pls.' Br. 17-19. Plaintiffs are incorrect that NEPA required the Forest Service to consider what is essentially the same proposal, but without any commercial sales of thinned timber. The Ninth Circuit, in *Native Ecosystems Council v. U.S. Forest Serv.*, rejected an argument similar to that which Plaintiffs make here, holding that the Forest Service's consideration of alternatives for a fire risk-reduction thinning project did not have to consider an alternative that did not have a commercial sale component. 428 F.3d at 1248 (whether or not the preferred alternative involved a commercial sale component, the environmental impacts of the project are the same: a commercial component does not affect the project's design because the project focuses on fuels reduction and not on profitability). *See also Westlands Water Dist.*, 376 F.3d at 868 ("Nor is an agency required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'") (quoting *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914

---

[7] Plaintiffs' reliance on *W. Watersheds Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013) is misplaced. There, the Ninth Circuit found that, because each of the agency's alternatives—including the no-action alternative—would have reauthorized grazing at the exact same level, the agency could not make a meaningful determination of any difference in impacts between those alternatives. *Id.* at 1051. Here, the preferred alternative and the no-action alternative are significantly different, allowing the Forest Service to evaluate their respective impacts.

F.2d 1174, 1181 (9th Cir.1990)). As in *Native Ecosystems Council*, the availability of commercial timber from the Three Creeks Project "is simply a collateral benefit to the government and does not change the purpose or scope of the project." Plaintiffs' range of alternatives claim fails.

**D. The Forest Service took a hard look at environmental impacts on wildlife species [Claim 3].**

The Forest Service's issuance of a Decision Notice and Finding of No Significant Impact (FONSI) in lieu of preparing an EIS was not arbitrary and capricious because there is not "a substantial dispute about the size, nature or effect" of the Project. *See Native Ecosystems Council*, 428 F.3d at 1240 (alterations and internal quotation marks omitted). NEPA requires the preparation of an EIS only for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C). In evaluating whether an agency's decision not to develop an EIS is reasonable, a reviewing court must consider whether, after taking a "hard look" at the consequences of the proposed action, the agency's decision was "arbitrary and capricious." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). An agency's reliance on own experts in determining whether there is a significant environmental impact entitled to deference *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332-33 (9th Cir. 1992).

With regard to impacts on aquatic and wildlife species, the Forest Service's subject matter experts prepared a Biological Evaluation ("BE") (AR 00604–630), an Aquatics BE (AR 00631–34), a Management Indicator Species ("MIS") Report (AR 00584–603; AR 00635–37 (Addendum)), and a Migratory Landbird Conservation Report (AR 00579–83), to evaluate project impacts on these species and their habitat within and adjacent to the project area. In the BE, the Forest Service analyzed federally-listed threatened and endangered species potentially occurring the project area, as well as the Pacific Southwest Regional Forester's list of sensitive species.[8]

---

[8] Plaintiffs complain that the Forest Service did not explain why a species is designated as sensitive or how a management indicator species is selected in the EA. Pls.' Br. 21, n.14 & 23, n.15. However, as Plaintiffs recognize these designations are in the administrative record. *Id.*

AR 00606-07. The Forest Service analyzed species habitat within and adjacent to the project area by reviewing aerial photographs, examining vegetation maps and wildlife siting records, reviewing the Forest Service's Geographical Information System, and through conducting several wildlife biologist site visits to assess species habitat. AR 00607.

With respect to six federally listed species, the Forest Service determined that no species that are listed, or proposed to be listed, as "threatened or endangered" under the Endangered Species Act "are known to occur within the analysis area, nor is there suitable habitat present for any of those species." AR 00608. And with respect to twenty sensitive species considered, the Forest Service determined that "the analysis area provides habitat for two Pacific Southwest Region sensitive species"—the northern goshawk and the Pacific marten. AR 00609. "No other sensitive species are known to occur within the analysis area, nor is there suitable habitat present for any other species." *Id.*

In the MIS report, the Forest Service evaluated project impacts on habitat for thirteen MIS species identified in the Forest Plan and the Sierra Nevada MIS Amendment Record of Decision (AR 08333–350). AR 00585. Of those species, the Forest Service determined that the habitat for four indicator species, including the Pacific marten, would be directly or indirectly affected by the Project. AR 00589. It also determined that the black-backed woodpecker is among the indicator species "whose habitat is not in or adjacent to the project area and would not be affected by the project." *Id.*

After analyzing impacts on species, the Forest Service concluded that the Project would not affect any threatened or endangered species or their habitats. AR 00626. And while it "may impact . . . Pacific marten individuals," the Project "would not result in a trend towards federal listing or loss of viability." *Id.*

**1. The Forest Service adequately considered impacts on the Pacific marten.**

The BE and the MIS Report provide detailed analysis of the science on Pacific marten habitat, home range, distribution, diet, and regional and local survey findings. AR 00038–41; AR 00616–619; AR 00597–601. While martens are classified as a sensitive species, "[r]ecent studies

and sightings indicate that martens are relatively well distributed in a pattern similar to their historical distribution in the Sierra Nevada." AR 00617. In the BE, the Forest Service noted that high quality marten habitat has greater than 70 percent canopy closure and a high number of large snags (2-3 per acre) and down logs." AR 00616. In addition, the species' core elevation is from 5,500 to 10,000 feet, "and they are most often found in the Sierra above 7,200" feet. AR 00616-17.

The Project is expected to have little direct or indirect impact on the Pacific marten. AR 00040. Martens "generally do not use much of the area within proposed treatment units." *Id.* The exception to this are three treatments units (the "marten units") "where marten use has been well documented and habitat quality is generally high." *Id.* Within the cumulative effects analysis area that the Forest Service used to analyze impacts, "[a]pproximately 1,263 acres of moderate and high suitability marten habitat would be thinned over a 5 to 8 year period." *Id.* This represents five percent of available habitat within the analysis area. *Id.* As a result of the Project, there "would be no net loss of habitat post-treatment" and habitat quality would be reduced from high to moderate on just 26 acres. *Id.*

Within the three marten units (stands 0370014, 0390004, and 0390009), project treatments will be limited "to the extent that mechanical manipulation would protect or enhance habitat for Pacific martens." AR 00038; AR 00619. Within these stands, which provide 581 acres of high capability marten foraging habitat, "[o]nly minimal tree removal would occur to remove ladder fuels under large legacy trees," AR 00038, and "[t]here would be no reduction in canopy closure," AR 00020. In these units, "[t]here would be no change . . . in marten habitat suitability . . ." AR 00038.

The Forest Service determined that full implementation of the Project may improve marten habitat. The Project wildlife design features "attempt to retain up to 3 of the largest existing snags [*i.e.* standing dead trees] per acre" . . . and "3 of the largest . . . down logs per acre." AR 00020. In its analysis, the Forest Service cited a study finding that where fuels treatments are conducted at higher elevations within marten habitat, "data suggests that maintaining or increasing structural variation will increase the use of these stands by martens."

AR 00041 (citing Moriarty *et al.* 2016). And by maintaining snags and downed logs, the Project would "provide additional habitat for small birds and mammals, both important prey . . . for martens."[9] *Id.* It determined that "[s]trategically increasing structural complexity within managed stands, while increasing resilience from fire may be important for maintaining marten populations." *Id*.

Plaintiffs claim that the Forest Service did not sufficiently analyze the Project's impact on the Pacific marten, particularly outside of the marten units. Pls.' Br. 23–24. And they claim that the Project will reduce canopy closure on 1,220 acres of marten habitat "possibly below optimum levels." *Id.* Neither claim has merit.

The record shows that the Forest Service took a hard look at impacts on the Pacific marten across the entire project area, not just within the marten units. Impacts to the marten are discussed in the BE, the MIS report and the EA. In the BE, the Forest Service discussed marten habitat (AR 00616–18), marten home range (AR 00618), marten diet (*id.*), studies to monitor marten location in the Sierra Nevada (AR 00618–19), the effect of the Project on canopy closure (AR 00619), and the impact of project activities on individual animals and animal populations (AR 00620). None of these discussions is merely confined to marten units within the project area. For example, the discussion of marten habitat refers to "[g]eneralized habitat models based on best professional opinion for the eastern Sierra Nevada region. . ." AR 00617. In addition, it discusses a study of martens in Yosemite National Park, which found that martens avoid areas lacking overhead cover, especially when resting, AR 00617 (citing Hargis and McCullough), as well as the results of studies in the southern Sierra Nevada indicating that marten rest sites are associated with closed canopy, *id.* (citing Zielinski *et al*.). The cited studies upon which the Forest Service relied that concerned marten home ranges, diet, and monitoring all display the same breadth of analysis. AR 00618. In each case, the Forest Service relied upon studies that

---

[9] Although the EA refers to creating or maintaining five down logs per acre to provide habitat for small birds and mammals, this figure is incorrect. The correct number of down logs, noted in the Project's design features, provides that where few down logs exist, the Forest Service should "create up to 3 down logs per acre throughout each stand." AR 00020.

analyzed marten behavior in a variety of locations, including those outside of the project area. And based on those studies, it concluded that the Project would not impact the marten in a way that results in a trend towards federal listing or loss of viability. AR 00626. Plaintiffs do not acknowledge the Forest Service's experts' reliance on these studies, but the Forest Service's decision to rely upon them was reasonable and is entitled to deference. *See Price Rd. Neighborhood Ass'n v. DOT*, 113 F.3d 1505, 1511 (9th Cir. 1997) (agency has "discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."). The Forest Service took a hard look at impacts on the Pacific marten.

The record also shows that Project impacts to marten habitat will be minimal. Along with the California Spotted Owl and Norther Flying Squirrel, the Pacific marten is a management indicator species that represents late-seral closed canopy forest habitat.[10] This habitat is characterized by having "medium/large trees (equal to or greater than 24 inches dbh) with canopy closures above 40% within ponderosa pine, Sierran mixed conifer, white fir, and red fir coniferous forests." AR 00597. There are currently 1,006,923 acres of this late-seral closed canopy habitat on National Forest System lands in the Sierra Nevada. AR 00600. Martens prefer this coniferous habitat, with large diameter trees and snags, large down logs, moderate to high canopy closure, and an interspersion of riparian areas and meadows. *Id.* In the MIS report, the Forest Service noted that important attributes of this habitat are "vegetative diversity, with predominantly mature forest; snags; dispersal cover; and large woody debris." *Id.* It noted that outside of the marten units, there are approximately 1,220 acres of late-seral closed canopy habitat within the project area. AR 00598.

Presently, basal areas range up to 330 square feet per acre in the project area. *Id.* As the MIS report notes, thinning "would involve incrementally removing the smallest diameter conifers until a desired basal area" of 70 to 140 square feet per acre is achieved. *Id.* Contrary to Plaintiffs' claims, thinning would cause only a minor reduction in canopy closure, because large

---

[10] "Species are selected as MIS because their population changes may indicate the effects of land management activities." AR 08333.

overstory trees will be retained. *Id.* The Forest Service analyzed impacts on marten habitat and concluded that although "there would be no net loss of habitat . . . habitat quality would be reduced from high to moderate on 26 acres." AR 00040. This represents just a 0.1 percent reduction in available high suitability habitat within the cumulative effects analysis area. *Id.* As a result "[a]ll units would continue to provide late-seral coniferous habitat after thinning operations." *Id.* Down log density may decrease on these acres due to underburning operations, but it is not expected to alter the existing trend within the cumulative effect analysis area, which includes recruitment of down logs through natural tree mortality. AR 00598-99. Snag density is not expected to be appreciably affected as "cutting of snags would only occur if needed for operational safety." *Id.* Within the marten units, treatments are expected to have no effect on size or density class or quantity of snags and down logs. AR 00599.

Because "there would be no change in the amount of late-seral closed canopy coniferous forest," the Forest Service concluded that the Project would not alter the total amount of habitat available to the Pacific marten nor lead to a change in the species' distribution across the Sierra Nevada bioregion. AR 00601.

**2. The Forest Service adequately considered impacts on the black-backed woodpecker**.

Unlike the marten, the black-backed woodpecker is not a sensitive species. But like the marten, the woodpecker is a management indicator species, which the Forest Service addressed in the MIS report. And, as part of Sierra Nevada-wide MIS monitoring, the Institute for Bird Populations conducts ongoing monitoring in burned areas and other areas of high tree mortality in Sierra Nevada National Forests, including the Inyo National Forest. AR 00086. As an MIS species, black-backed woodpeckers represent medium and large snags in burned forest. AR 00589. This habitat is not present in the project area and the Project would have "no direct impact on this habitat type." AR 00041. And while "[s]nags are present at relatively low density throughout the green forest within the treatment units . . . . no snag cutting would occur as a result of project implementation." AR 00042. Although black-backed woodpecker habitat is not directly affected by the Project, the Project may enhance black-backed woodpecker habitat since

during underburning operations, it is not uncommon for trees to experience torching, die, and subsequently be utilized by black-backed woodpeckers. *Id*.

At the bioregional scale, there is other high quality snag habitat in burned forest that black-backed woodpeckers prefer. "Since 2015, three fires totaling approximately 12,000 acres have burned in the general vicinity of the project area." AR 00041. All or a portion of these fires "burned within coniferous forest vegetation and likely improved habitat for black-backed woodpecker." AR 00041–42. Moreover, at the regional scale, black-backed woodpeckers remain present within their historical range in California. AR 00042.

Plaintiffs claim that the Forest Service failed to discuss how the Project impacts future snag habitat recruitment. Pls.' Br. 21. They contend that because the Project would retain only 39–79 trees per acre, it would not provide sufficient post-fire disturbance black-backed woodpecker habitat, which they claim requires "roughly 100 medium and large snags per acre." *Id.* But "[t]here is no legal requirement to monitor black-backed woodpeckers on a project scale," AR 00086, much less to manage the Forest to promote potential future burned forest habitat. The actions that Plaintiffs advocate are fundamentally incompatible with the purpose of the Project, which is to promote forest health by increasing *resiliency* to wildfire, drought, and pathogens, and to *restore* habitat. AR 00007–08. And there is clearly no requirement that the Project be designed to promote the burned forest habitat that woodpeckers prefer over late-seral forest habitat that sensitive species such as martens prefer.

The Forest Service analyzed project impacts on burned forest habitat. It acknowledged that the Project may have the indirect effect of modifying the future recruitment rate of habitat on up to 9,590 acres: "If fuels treatments are effective, the treated units would be less likely to experience high intensity fire or the extent of high intensity fire could be reduced." AR 00042. But wildfire is a stochastic event, and there is no way to predict whether a fire would occur on treated stands or not. *Id.* In response to comments, the Forest Service explained that the Project allows for the "creation of Black-backed woodpecker-type habitat (snags) on a limited scale using

prescribed fire under controlled conditions." AR 00091. "The project will do nothing to decrease that habitat, and will likely cause minor increases."[11] *Id.*

Plaintiffs' claim that the Project will not provide sufficient black-backed woodpecker habitat is belied by the record, and the facts. As noted above, the black-backed woodpecker is a management indicator species for "medium and large snags in burned forest." The "overall goal of this project [is] to grow and retain larger trees, and as a result, create higher quality and more diverse habitat for a majority of species." AR 00091. Thus, the "vast majority of trees to be thinned" are not medium or large trees, but are instead trees that are "less than 10 inches diameter at breast height. . ." AR 00015. The Project is not designed to reduce, and it may enhance, potential black-backed woodpecker habitat.

Plaintiffs claim that black-backed woodpeckers "have become increasingly rare" and are threatened by activities that have the potential to reduce "future burned areas." Pls.' Br. 21. But the facts show that in recent years high quality black-backed woodpecker habitat in the region has been increasing due to wildfire:

> Between 2009 and 2016 approximately 281,000 acres of coniferous forest burned within the range of the black-backed woodpecker and became higher quality nesting and foraging habitat. Approximately 84,000 acres were subsequently treated (salvage sale, hazard tree removal, fuels reduction) and habitat quality may have been reduced. The remaining approximately 197,000 acres were available for use by black-backed woodpeckers during 2017.

AR 00059. Because there is no salvage logging associated with the Project, the Forest Service reasonably concluded that there will be "no direct cumulative impact to the existing trend in the habitat, nor will it lead to a change in the distribution of black-backed woodpecker across the Sierra Nevada bioregion." *Id.* That conclusion is supported by the record and should be upheld.

---

[11] Plaintiffs also claim that the Forest Service failed to analyze green forest habitat, where black-backed woodpeckers nest and forage if there are a high number of snags. Pls.' Br. 22. Plaintiffs are incorrect. The Forest Service analyzed impacts to habitat containing medium and large snags in green forest. AR 00589. The management indicator species for that habitat is the hairy woodpecker. In analyzing impacts on this habitat, the Forest Service acknowledged that "[s]nags are present at relatively low density throughout the green forest within the treatment units. . . . but noted that "[n]o snag cutting would occur" in this Project. AR 00589. Thus, the Project will have no impact on potential black-backed woodpecker habitat in green forest within the project area.

**3. The Forest Service reasonably considered and applied high quality science [Claims 4, 5].**

Plaintiffs claim that the Forest Service did not apply high quality science on the issue of snag habitat. But Plaintiffs fundamentally fail to recognize that the Project is a forest health and resiliency project. While the Project is not exclusively designed to create additional snag habitat at the expense of other forest health objectives, it does not remove snags nor prevent their development. The creation of up to three snags per acre would provide additional habitat for small birds and rodents. . ." AR 00039. Any reduction in snag habitat "should be negligible as cutting of snags would only occur if needed for operational safety." AR 00044.

The Forest Service addressed Plaintiffs' comments and noted that "[r]ecent tree mortality may make the [Project's] discussion of creation of snags and down logs moot. Tree mortality in the project area is increasing and there are currently far more than 3 snags per acre . . . in most of the units." AR 00085. Moreover, black-backed woodpecker habitat is not present within the project area and would not be affected by the Project. AR 00589. The Forest Service considered the relevant science and reasonably concluded that the Project would not impact habitat for medium and large snags in burned forest, AR 00589, would have "no direct impact on this habitat type, "AR 00040, and may enhance black-backed woodpecker habitat due to underburning operations. AR 00042. The Forest Service addressed the science concerning black-backed woodpecker habitat and reasonably determined to retain or create up to three snags per acre.

Plaintiffs also claim that the Forest Service failed to sufficiently discuss a study (Moriarty) analyzing impacts on Pacific martens. Pls.' Br. at 27. While Plaintiffs acknowledge that the Forest Service considered the study, they claim that it did not consider the study's claim that "fuels treatments that simplify forest structure . . . have negative effects on marten movement dynamics . . ." and its recommendation that fuels treatment projects should occur outside marten habitat. *Id.* at 29 (citing AR 05563). The Forest Service considered the Moriarty study and noted that it identified habitat elements preferred by martens such as high density, high canopy cover, and more complex stand structure, which are similar as those identified in the BE. AR 00675. The Forest Service cited the Moriarty study when it stated that "habitat components may be

improved through full implementation of the proposed action. Where fuels treatments are planned in higher elevation forests within marten habitat, data suggests that maintaining or increasing structural variation will increase the use of these stands by martens." AR 00041 (citing Moriarty). Thus, the Forest Service concluded that increasing structural complexity within stands while increasing fire resilience "may be important for maintaining marten populations." *Id.* By maintaining or creating snags and downed logs, the Project aims to provide additional habitat for small birds and mammals, which are important prey for martens. *Id.* In addition, the increased snag and log densities would provide martens with resting and potential denning structures. *Id.* This conclusion is consistent with the Moriarty study, which found that "[s]trategically increasing structural complexity within managed stands, while increasing resilience from fire will be important for maintaining marten populations." AR 05563 (citing Moriarty study, internal citations omitted). The Forest Service was not required to adopt the study's recommendation that fuel treatment projects should occur outside of marten habitat. "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Here, the record contains everything the Court needs to examine the agency's assessment of the Project's impact on the Pacific marten.

Although the BE does not cite the Moriarty study, the Forest Service made the same observations about marten habitat: "[m]artens are forest habitat dwellers usually associated with late successional forest stages that have a highly complex stand structure including multiple vegetation layers, snags, and downed logs." AR 00616 (citing Ruggiero). The Forest Service acknowledged that thinning may reduce crown cover and that fuels treatments were "likely to remove structural complexity and near ground cover which are both important features for martens." AR 00040. However, it concluded that the consequence of this would be that "[m]artens may avoid the treated stands for some period: until crown closure increases. *Id.*

At bottom, Plaintiffs' grievance is with the Forest Service's conclusion that silvicultural treatments can be instituted in a manner that benefits the marten. The Forest Service considered

the impacts that its silvicultural treatments would have in the project area and concluded that the Project would not alter the total amount of habitat available to the Pacific marten nor lead to a change in the species distribution across the Sierra Nevada bioregion. AR 00601. In doing so, it considered a number of scientific reports and made its decision based upon the science. That decision is entitled to deference and should be upheld.

### E. The Forest Service took a hard look at the Project's impacts and properly concluded that an EIS is not required. [Claims 7, 8].

The Forest Service took a hard look at the Project's potential effects on each of the Forest's resources. For each resource, the Forest Service relied on a specialist's analysis of the Project's impact to that resource. *Id.* As discussed above, the resource specialists applied high quality science. And each resource specialist found that the Project would have no significant impact on the environment. AR00033. The Forest Service also evaluated the Project using the ten intensity factors set forth in the Council on Environmental Quality's ("CEQ") regulations and determined that the Project would not result in significant environmental impacts. AR00116-17. Because the Forest Service arrived at its FONSI determination after taking a hard look at the Project's impacts and reasonably relying on the analysis of its specialists, its FONSI determination is reasonable and is entitled to deference.

Plaintiffs argue that the Forest Service arbitrarily ignored the context of the Project and that four intensity criteria are implicated by the decisions, requiring the preparation of an EIS. Pls.' Br.34. However, Plaintiffs' argument that the Forest Service failed to consider the Project's context is untethered from the CEQ regulations or any case law in the Ninth Circuit. And Plaintiffs cannot show that any of the CEQ intensity factors give rise to a requirement to prepare an EIS. 40 C.F.R. § 1508.27.

#### 1. The Forest Service Applied the Proper Context

Plaintiffs argue that the Forest Service's evaluation of the Project's context was arbitrary and capricious because it failed to recognize that "The Three Creeks Project's context is significant due to the size of the Project and the Forest Service's removal of some of the few remaining large trees." Pls.' Br. 33. Plaintiffs seem to argue that, if a project area meets a certain

size, then the "the project's context is significant" and thus the project's impacts are automatically significant. This is a misreading of the CEQ regulations on context. *See* 40 C.F.R. § 1508.27(a) ("[c]ontext ... means that the significance of an action must be analyzed in several contexts such as society as a whole ... the affected region, the affected interests, and the locality"… In the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole." *id.*

Contrary to Plaintiffs' argument, the fact that the Project is proposed to take place over an area of a particular size does not by itself translate into significant impacts [12]. The CEQ regulations require the Forest Service to consider the Project's impacts to the affected region and interests. And the CEQ regulations state that—for a site-specific project such as this one—the context is usually local. The Forest Service properly considered the context to be the local geographic area, including the cumulative impacts areas. Plaintiffs' argument that the Project's "context is significant" has no basis in the CEQ regulations or Ninth Circuit law.[13] Plaintiffs' claim on this issue fails.

**2. Plaintiffs also fail to show that any of the CEQ intensity factors are present.**

The Forest Service took a hard look at all ten of the CEQ intensity factors in making its FONSI determination. AR0033-62. The EA addresses every intensity factor, explains why the Project does not trigger that respective factor, and incorporates by reference the specialist reports that support that finding of no significant impact. *Id*. Plaintiffs argue that the Project implicates four intensity factors. Pls.' Br. 34.[14] As discussed below, the Forest Service properly found that

---

[12] Here, the project area constitutes a small percentage of the Forest. AR 00017 (EA, Fig. 1)

[13] Plaintiffs cite to a district court case in Pennsylvania, but that case does not support Plaintiffs' arguments on context. In that case, the district court found that, because the project implicated several "intensity" factors, including cumulative impacts and controversy, the Forest Service's FONSI was arbitrary and capricious. *See Curry v. U.S. Forest Serv.*, 988 F. Supp. 541, 553 (W.D. Pa. 1997). The district court did not base its decision on the "context" factor, and it made no finding that would support Plaintiffs' argument that timber projects covering a certain acreage make "the project's context [ ] significant.

[14] Plaintiffs cite § 1508.27(b)(1) (impacts that may be both beneficial and adverse), § 1508.27(b)(3) (Unique characteristics of the geographic area), 1508.27(b)(5)(uncertain impacts), and 1508.27(b)(10) (violation of law).

none of these factors required an EIS.

**a. Beneficial impacts**

The first intensity factor that Plaintiffs cite is "impacts that may be both beneficial and adverse." Pls.' Br. 33 (citing § 1508.27(b)(1)). Plaintiffs do not discuss these types of impacts; rather, they repeat their "hard look" arguments about large trees, black-backed woodpeckers, and martens. *Id.* As discussed elsewhere in this brief, the Forest Service took a hard look at the impacts to resources in the Forest. Plaintiffs offer no basis for a finding that the 1508.27(b)(1) factor weighs in favor of requiring an EIS.

**b. Unique Characteristics**

Plaintiffs next claim that the unique characteristics of the project area—specifically "ecologically critical areas or wild and scenic rivers[15] "—trigger the third intensity factor so as to require an EIS although they do not explain which unique characteristics of the wild and scenic rivers they believe will be affected by the project. Courts should uphold FONSI determinations where agencies have carefully considered the potential impacts on wildlife or critical areas and have found that no significant impacts would occur. *See Nw. Envtl. Defense Ctr. v. Wood*, 947 F. Supp. 1371, 1385 (D. Or. 1996)), aff'd, 97 F.3d 1460 (9th Cir. 1996).

In addition to the Forest Service's analysis of impacts found throughout the EA and the resource specialists' reports (see above discussion on species; *see also e.g.* AR 00452, Hydrology and Soil Report), the Forest Service specifically looked to determine whether the Project would have impacts to any unique characteristics of the area. AR 00053. The Forest Service found that "there are no parklands, prime farmlands, wetlands or ecologically critical areas within the project area," and there is no designated wilderness within the project area. *Id*. The Forest Service also found that the watershed design criteria would prevent impacts to the three segments of stream that are designated "scenic" or "recreational" under the Wild and Scenic Rivers Act and that no new roads would be built in an inventoried roadless area. *Id*. The Forest Service reasonably

[15] Plaintiffs' mention of the impacts to Wild and Scenic Rivers is the first time they have raised this issue. Plaintiffs did not raise it in either comment period or the objection period. *See generally* AR 01388-99; AR00779-99; AR 00758-58.

considered the impacts to the unique characteristic resources and applied its expertise to determine that there would be no significant impact to these resources. This conclusion thus should be afforded deference by the Court. *Marsh*, 490 U.S. at 376-77.

**c. Uncertainty**

Plaintiffs claim that the Project's effects on the human environment are "extremely uncertain." *See* Pls.' Br. 34. The only basis that Plaintiffs give for this alleged uncertainty is to repeat their arguments about the supposed lack of clarity in the Project description and about the impacts to the black-backed woodpecker. *Id*. As discussed elsewhere in this brief, the Forest Service clearly described the Project and took a hard look at the impacts to the black-backed woodpecker. The Forest Service's analyses do not leave uncertain the understanding of any impacts, and its FONSI was reasonable. "NEPA regulations . . . do not require a reviewing agency to eliminate all uncertainty prior to issuing a FONSI." *Nw. Envtl. Def. Ctr.*, 947 F. Supp. at 1385 (upholding FONSI where agency had a "good understanding" of the risks) (citing *Greenpeace Action*, 14 F.3d at 1336 (agency not required to achieve "a degree of certainty that is ultimately illusory")). Plaintiffs' argument on this issue fails.

**d. The Project not threaten violation of any law**.

As discussed in detail below (*see* Section III.G), the Forest Service appropriately implemented the 2004 Framework and complied with the NFMA. The Project approval therefore does not threaten any violation of law. Plaintiffs have failed to show that this factor weighs in favor of requiring an EIS.

**F. Plaintiffs and the public had an adequate opportunity to comment on the Project and the Forest Service was not required to conduct a new comment period for the 2018 EA [Claim 9]**.

The Forest Service issued an EA in 2017. Plaintiffs and other parties filed objections. Upon receipt of objections to the 2017 EA, the Acting Forest Supervisor—who was the reviewing officer—provided a written response to the objections. AR 00666-72 The reviewing officer responded in writing and informed the objectors that he was providing six instructions—made in response to the objections—to the District Ranger to incorporate into the Project. AR 00671.

The revisions did not significantly change the Project or the substance of the EA. AR 00115 ("These alterations are semantic in nature and do not alter the purpose and need, or proposed action of the document"). The Acting District Ranger signed the Decision Notice in January 2018, approving the Project. AR 00118.

The Forest Service's actions are consistent with its NEPA notice and comment regulations. *See* 36 C.F.R. § 218.12 (authorizing the responsible officer to sign a decision notice after she has responded to pending objections and addressed concerns raised by the reviewing officer ). The NEPA regulations did not require the Forest Service to open a new comment period following the revisions when it issued the 2018 EA. Nor was there any reason to do so.

Plaintiffs claim that NEPA and the APA required the Forest Service to initiate an additional comment period following the publication of the 2018 EA. Pls.' Br. 30; 36 C.F.R. § 218.22(d) (requiring notice and comment on a revised EA that is prepared "based on consideration of new information or changed circumstances"). They claim that the 2018 EA "is considerably different from the 2016 and 2017 EAs"). Plaintiffs offer three topics about which they claim the 2018 EA significantly changed from the prior EAs. None presented significant changes that required a new comment period.

First, Plaintiffs assert that the Forest Service changed its desired forest conditions between the 2017 and 2018 EA. *Pls.' Br.* at 31. But the only differences that Plaintiffs identify between those documents relate to the desired mean basal area and the number of large trees per acre. *Id.* As discussed in detail above (*see* Section III. A), neither of those two data points drove the Forest Service's rationale for the Project or figured meaningfully into the Forest Service's analysis of the Project's impacts. The density metrics—e.g. density rates, SDI, and FRCC—that the Forest Service found to have presented the "troubling scenario" that drove the Project's purpose and need did not change in the 2018 EA. AR 00010-11.

Second, Plaintiffs assert that the 2018 EA changed from prior EAs by clarifying that "the vast majority of trees to be cut are below 10 inches DBH." Pls.' Br. 31. This clarification was made in response to an objection seeking clarification for inconsistencies on the size of trees which would primarily be treated under the Project. AR 00669. The reviewing officer agreed

that the prior version of the EA contained inconsistencies on this subject. *Id*. at 00669-70. The Final EA incorporated the reviewing officials' instructions and clarified that the vast majority of the trees to be removed will be under 10 inches dbh. This clarification aligns with both the purpose and need and with the analysis of impacts in the prior EA and other prior NEPA documents. Thus, the clarification is not based on the type of new information or changed circumstances that would necessitate a new comment period.

Finally, Plaintiffs assert that the 2018 EA contains "new information about the black-backed woodpecker and Pacific marten." Pls.' Br. 31. However, none of the additional information about the black-backed woodpecker and the Pacific marten constitutes significant new information that would require an additional round of comments. The 2018 EA reaches the exact same conclusions as the prior EAs that the Project would have little or no overall effect on marten persistence within the analysis area, and that direct effects to black-backed woodpecker may include some habitat enhancement. *Compare* AR 00040–41 (2018 EA) to AR 00158–59. The additional information underscores these conclusions. *See* AR 00040–41 (because there is no burned forest in the treatment areas, the Project "would have no direct impact" on black-backed woodpecker habitat, but may have an indirect impact since treated units would be less likely to experience high-intensity wildfire); *id.* (observing that multiple fires in the vicinity of the project since 2015 have likely improved habitat for black-backed woodpeckers).[16] With respect to the Moriarty study on Pacific marten that Plaintiffs cite, the inclusion of a reference to that study in

---

[16] Plaintiffs also claim that the 2018 EA recognized black-backed woodpecker as an MIS for the first time. Pls.' Br. 31. This is incorrect. In response to comments, in the 2017 EA, the Forest Service recognized that "[t]here is no legal requirement to monitor black-backed woodpeckers on a project scale. However, as part of Sierra Nevada-wide Management Indicator Species (MIS) monitoring, the IBP conducts ongoing monitoring in burned areas and other areas of high tree mortality in Sierra Nevada National Forests, including the Inyo National Forest, and has collected this data for the past ten years and plans to do so into the future." AR 00204. Likewise the 2017 MIS Report that was made available for the objection period, shows that black-backed woodpeckers are an MIS for snags in burned forest. AR 00589. The 2018 EA just confirms what these previous reports already disclosed. AR 00041 ("The black-backed woodpecker is a Management Indicator Species (MIS) representing snags in burned forests. No burned forest is present within the proposed treatment units and project implementation would have no direct impact on this habitat type.")

the 2018 EA changes nothing in the 2017 EA's analysis. The 2018 EA cites Moriarty for the proposition that " increasing structural variation" may be important to martens, AR 00041, and the 2017 EA already acknowledged this: "structural complexity and near ground cover . . . are both important features for martens." AR 00158.

The Forest Service properly issued the 2018 EA and DN/FONSI and was not required to initiate another rounds of comments. Plaintiffs' Claim 9 fails.

### G. The Project Complies with NFMA [Claim 10].

Plaintiffs' NFMA claims fail because the Forest Service reasonably determined that the Project complies with the 2004 Framework's Management Standards and Guidelines. This determination is supported by the record and is entitled to substantial deference. *See Native Ecosystem Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012) (noting Forest Service's "interpretation and implementation of its own forest plan is entitled to substantial deference.") The Forest Service appropriately used its discretion in designing and approving the Three Creeks project. The Project's reliance on 'thinning from below" to accomplish fuels reduction is not only consistent with the 2004 Framework; it derives directly from the Framework, which states that "thinning from below" is a central tenet of the Framework:

> "Thinning from below and uneven-age management are the principal silvicultural prescriptions to achieve immediate objectives. Thinning trees and removing underbrush in strategic locations, whether by mechanical means or wildfire, will be the primary processes that create forest openings to encourage regeneration of shade-intolerant species and maintain gene pools of these species.

AR 08127

Further, the Project's contemplation of thinning of some trees between 10 and 24 dbh is consistent with the Forest Plan. The Forest Plan contemplates mechanical thinning of trees up to 30 inches dbh. 08128-29 ("Some trees larger than 12 inches dbh, but smaller than 30 inches dbh, may be removed mechanically"). And the 2004 Framework specifically authorizes that "Revenues from the sale of commercial forest products may be obtained from some fuels treatments." AR 008158.

Plaintiffs claim that the Forest Service violated NMFA "by failing to demonstrate that the Three Creeks Project is in compliance with the 2004 Framework." Pls.' Br. 12. Plaintiffs assert

that the Forest Service's decision to include commercial thinning as a part of the project is inconsistent with the 2004 Framework and thus violates NFMA. Pls.' Br. 13. First, Plaintiffs mischaracterize the Project as being driven by an objective of commercial sales. As discussed above, any commercial sale of thinned timber is a by-product of Project, the purpose of which is fuels treatment. Second, to the extent that the Project will have the second-order effect of some commercial forest product sales, that would not be inconsistent with the 2004 Framework, which specifically authorizes revenues from the sale of commercial forest products. AR 008158. The Forest Service's interpretation of the Forest Plan "is neither plainly erroneous nor inconsistent with the regulation, it is accorded substantial deference." *See Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir.2003); *see also Griffin v. Yuetter*, 944 F.2d 908 (9th Cir. 1991) (NFMA "breathes discretion from every pore").

### H. Vacatur would be an unwarranted and overbroad remedy.

In the event the Court finds against Federal Defendants on any claim, Plaintiffs contend that the Court should vacate the agency action. Pls.' Br. 34-35. However, vacatur is not automatic, and particularly not so in cases such as this, where it would have the immediate effect of enjoining the Forest Service from proceeding with the Project.

Even where a plaintiff prevails on one or more claim, a flawed agency decision "need not be vacated." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012). When "equity demands," courts may leave in place an agency action "while the agency follows the necessary procedures to correct" its error. *Id.* (citation and internal quotation marks omitted). Whether an agency action should be vacated depends on a number of factors, including "how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995) (district court "is not required to set aside every unlawful agency action.").

Here, where Plaintiffs' complaint concerns procedural defects in the decision, vacatur is inappropriate. Courts have ordered remand without vacatur where more explanation would cure the defect. *See, e.g.*, *Greenpeace, Inc. v. Cole*, 50 F. Supp. 3d 1158, 1167-68, 1170 (D. Alaska

2014) (ordering remand without vacatur where the Forest Service did not adequately explain how timber sales complied with forest plan standards for deer winter habitat capability). Vacatur requires a "fundamental flaw[]" that would prevent the agency from adopting the same conclusion if the matter were remanded. *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

The equities here weigh heavily against vacating or enjoining the Project and the Court should deny Plaintiffs' request for vacatur. Vacating the decision would have disruptive consequences on the Forest Service's ability to improve forest health, restore habitats, and increase forest resiliency to insects, disease, and wildfire. AR 00106. When compared with the harms Plaintiffs present, the balance of harms clearly favors the Forest Service. Likewise, the public has an interest in a healthy forest with diverse habitat for numerous species and lower risk of uncontrolled wildfire and insect and disease outbreaks. Thus, the public interest favors the Forest Service. And any defect the Court might identify is likely to be remediable by additional explanation or analysis on the part of the agency. At a minimum, should the Court find any legal error in the Forest Service's decision and believe that some equitable relief is appropriate, the government respectfully requests the opportunity for additional briefing on the proper remedy in light of the Court's decision.

**CONCLUSION**

For all of the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment, grant the United States' cross-motion for summary judgment, and enter judgment in favor of the United States.

Respectfully submitted: July 10, 2020.

PAUL SALAMANCA
Attorney
United States Department of Justice
Environment & Natural Resources Division

*/s/ Taylor Ferrell*
TAYLOR FERRELL
SEAN C. DUFFY
Trial Attorneys
Natural Resources Section

150 M Street NE
Washington, DC 20002
Ph: (202) 305-0874 (Ferrell)
Ph: (202) 305-0445 (Duffy)
Fax: (202) 305-0506
taylor.ferrell@usdoj.gov
sean.c.duffy@usdoj.gov

*Attorneys for Federal Defendants*