Thomas Buchele, (CA Bar No. 129657)
Morgan Staric, *Admitted Pro Hac Vice*
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland OR  97219-7799
Tel: 503-768-6736 (Buchele)
Tel: 503-768-6825 (Staric)
Email: tbuchele@lclark.edu
Email: mstaric@lclark.edu

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**EARTH ISLAND INSTITUTE**, a non-profit corporation; **CENTER FOR BIOLOGICAL DIVERSITY**, a non-profit corporation,

Plaintiffs,

v.

**UNITED STATES FOREST SERVICE,** an agency of the United States Department of Agriculture; **MARGIE B. DEROSE**, Acting District Ranger, Mono Lake and Mammoth Ranger District, Inyo National Forest, in her official capacity

Defendants.

No. 2:19-cv-1271

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................... 1

ARGUMENT .................................................................................................. 2

I.   The Forest Service Offered No Rational Basis for the Three Creeks Project and
     Failed to Ensure it was Consistent with the Forest Plan. (Claims 1 and 10) .................... 2

     A.   The Service violated NEPA by failing to offer a rational basis for the Project. ..... 2

     B.   The Forest Service violated NFMA by failing to ensure the Three Creeks
          Project was consistent with the 2004 Framework. ................................... 6

II.  The Forest Service's NEPA Documents Contain Substantial Inconsistencies
     and Uncertainties because they are Not Written in Plain Language. (Claim 6). ............... 7

III. The Forest Service Failed to Evaluate All Reasonable Alternatives. (Claim 2). .............. 11

     A.   Earth Island did not waive its ability to argue that the Forest Service should
          have considered other reasonable alternatives. ....................................... 11

     B.   The Forest Service must consider all reasonable alternatives. ............................. 14

IV.  The Forest Service Failed to Take a Hard Look at Impacts to Species. (Claim 3). .......... 16

     A.   The Forest Service failed to analyze how the Three Creeks Project's effects
          on current and future habitat would impact the black-backed woodpecker. ......... 17

     B.   The Forest Service failed to consider the Three Creeks Project's impacts
          on Pacific marten throughout the entire Project area. ......................................... 20

V.   The Forest Service Failed to Ensure the Quality of its Analysis. (Claims 4 and 5). ........ 24

     A.   The Forest Service failed to consider the recent studies regarding black-backed
          woodpecker's medium and large snag habitat requirements. ............................... 24

     B.   The Service failed to adequately analyze the conflicting Moriarty study............. 26

VI.  The Forest Service Failed to Provide an Opportunity to Comment on the
     January 2018 EA. (Claim 9). ......................................................................... 28

VII. The Forest Service Issued an Improper FONSI and Failed to Prepare an EIS.
     (Claims 7 and 8). ..................................................................................... 30

     A.   The Forest Service failed to adequately analyze the context of the Project.......... 31

     B.   The Forest Service failed to analyze the Three Creeks Project's intensity........... 31

VIII.    The Court should Vacate the DN/FONSI and 2018 EA. ................................................... 33

CONCLUSION ............................................................................................................................. 35

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Page(s)**

*Alliance for the Wild Rockies v. U.S. Forest Serv*., 907 F.3d 1105 (9th Cir. 2018) ..................... 34

*Bark v. U.S. Forest Serv.*, 958 F.3d 865 (9th Cir. 2020)........................................................ 24, 25

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998) ............. 17, 33

*Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584
    (9th Cir. 2018)........................................................................................................ 13, 14

*California v. Bernhardt*, 2020 WL 4001480 (N.D. Cal. July 15, 2020)...................................... 34

*Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d. 1189 (E.D. Cal. 2017). .......... 8, 11, 30

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004) ....................................................... 12

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
    538 F.3d 1172 (9th Cir. 2008)...................................................................... 11, 14, 15, 33

*Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954 (N.D. Cal. June 10, 2016) ....................... 34

*Curry v. U.S. Forest Serv.*, 988 F. Supp. 541 (W.D. Pa. 1997) .................................................... 31

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752 (2004)......................................................... 13, 32

*Earth Island Inst. v. Morse*, 2009 WL 2423478 (E.D. Cal. Aug. 5, 2009)................... 5, 24, 26, 27

*Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) ......................................... 5

*Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006),
    *overruled in part on other grounds, Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................ 16, 19, 20, 22

*Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010 (9th Cir. 2012) ....................................... 15

*Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 (D. Or. July 3, 2014)......................... 31

*Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957 (9th Cir. 2002) ................................. 2, 6

*Innovation Law Lab v. Wolf*, 951 F.3d 1073 (9th Cir. 2020)...................................................... 33

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*,
    387 F.3d 989 (9th Cir. 2004)................................................................................ 7, 10, 19

*The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)(en banc),
    *overruled in parton other ground, Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................................... 24, 26, 27

*Lands Council v. McNair*, 629 F.3d 1070 (9th Cir. 2010) ............................................................ 12

*League of Wilderness Defs./ Blue Mountains Biodiversity Project v. Peña*,
     2015 WL 1567444 (D. Or. April 6, 2015) ......................................................................... 33

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 130 S. Ct. 2743 (2010)............................ 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
     463 U.S. 29 (1983) .............................................................................................................. 20

*N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147 (9th Cir. 2008)............ 13

*N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ............ 2, 5, 25

*Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) .................................. 12, 13

*Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010) .......................................... 30

*Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233 (9th Cir. 2005).................... 15, 30

*Native Ecosystems Council v. Weldon*, 697 F.3d 1043 (9th Cir. 2012) .......................................... 6

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
     606 F.3d 1058 (9th Cir. 2010).......................................................................................... 12

*Navickas v. Conroy*, 575 Fed. App'x 758 (9th Cir. 2014), *unpublished*...................................... 10

*Nevada v. Dep't of Energy*, 457 F.3d 78 (D.C. Cir. 2006) ........................................................... 32

*Nw. Envtl. Defense Ctr. v. Wood*, 947 F. Supp. 1371 (D. Or. 1996) ........................................... 32

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005).................... 16, 31

*Or. Envtl. Council v. Kunzman*, 817 F.2d 484 (9th Cir. 1987) ...................................................... 7

*Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151 (D. Or. 2011) ................................... 12

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*,
     806 F.3d 520 (9th Cir. 2015)............................................................................................ 34

*Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*, 2013 WL 12120098
     (D. Or. May 29, 2013), *adopted in part, rejected in part*, 2013 WL 4786242
     (D. Or. Sept. 6, 2013)........................................................................................................ 10

*State of Cal. v. Block*, 690 F.2d 753 (9th Cir. 1982)................................................................... 28

*W. Watershed Project v. Abbey*, 719 F.3d 1035 (9th Cir. 2013)................................ 11, 14, 15, 16

*W. Watersheds Project v. Zinke*, 441 F.Supp.3d 1042 (D. Id. 2020), *appeal filed* ................ 34, 35

*WildEarth Guardians v. Jeffries*, 370 F. Supp. 3d 1208 (D. Or. 2019) ....................................... 12

**Federal Regulations**                                                                                                          **Pages(s)**

36 C.F.R. § 218.2 ........................................................................................................................... 13

36 C.F.R. § 218.8 ........................................................................................................................... 14

36 C.F.R. § 218.12 ......................................................................................................................... 28

36 C.F.R. § 218.22(d) .................................................................................................................... 28

40 C.F.R. § 1500.1(b) ........................................................................................................... 5, 24, 30

40 C.F.R. § 1500.1(c) ....................................................................................................................... 5

40 C.F.R. § 1500.2(d) .................................................................................................................... 28

40 C.F.R. § 1500.2(e) .................................................................................................................... 11

40 C.F.R. § 1508.27 ....................................................................................................................... 31

40 C.F.R. § 1508.27(a) ................................................................................................................... 31

40 C.F.R. § 1508.27(b)(1) ......................................................................................................... 31, 32

40 C.F.R. § 1508.27(b)(3) ..................................................................................................... 31, 32, 33

40 C.F.R. § 1508.27(b)(5) ......................................................................................................... 31, 33

40 C.F.R. § 1508.27(b)(10) ....................................................................................................... 31, 33

**Federal Register**                                                                                                             **Page(s)**

CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act
    Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981) ........................................................... 16

1

**TABLE OF ACRONYMS**

APA ............................................................................................ Administrative Procedure Act

CEQ ............................................................................ Council on Environmental Quality

DBH ........................................................................................... Diameter Breast Height

DN .............................................................................................................. Decision Notice

EA .................................................................................................... Environmental Assessment

EIS ............................................................................................ Environmental Impact Statement

FONSI ....................................................................................... Finding of No Significant Impact

MIS ............................................................................................. Management Indicator Species

NEPA ........................................................................................... National Environmental Policy Act

NFMA .......................................................................................... National Forest Management Act

WUI ............................................................................................... Wildland-Urban Intermix

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Large, fire and disease tolerant trees once dominated the Inyo National Forest, however, saplings and small trees have now taken over the region making it more susceptible to fire and disease. To increase the area's fire and disease resiliency and return it to historic conditions, the U.S. Forest Service ("Forest Service" or "Service") introduced the Three Creeks Project ("Three Creeks" or "Project"). This Project would likely be far less controversial if it truly focused on just treating the problematic smaller trees and returning the area to a forest dominated by larger, fire-resistant trees. However, without any explanation, the Service's decision also authorized removing some of the few remaining moderate and large trees that provide the fire and disease resiliency the Project seeks to achieve. The Service also failed to analyze or disclose the impacts from removing these trees, such as impacts to species that depend on such larger trees.

The Service's cross-motion for summary judgment does not remedy these failures; it points to nothing in the record to justify its logging of large trees. Instead the Service's cross-motion primarily responds with straw man arguments that ignore and/or misrepresent the thrust of Plaintiffs', the Earth Island Institute and the Center for Biological Diversity (collectively "Earth Island"), legal claims. All of Earth Island's claims focus, at least in significant part, on the Forest Service's removal of large trees: failing to offer a rational explanation for why its decided to log some of the area's last remaining large trees, ECF No. 52, Pls.' Amended Mot. for Summ. J. at 10–12 (Pls.' Mot.); failing to disclose and analyze the impacts of that decision in plain, consistent language, *id.* at 14–16; failing to consider alternatives to that decision, such as only removing or burning smaller trees that are the real forest health problem in the Project area, *id.* at 17–20; or failing to fully analyze the impacts of removing the area's larger trees, including the impacts on species that depend on larger trees, *id.* at 20–25. It is because of this entirely unexplained, and improperly disclosed and analyzed, decision to log larger trees—rather than authorizing treatments that address only the truly problematic smaller trees—that the 2018 Environmental

Assessment ("EA") and resulting Decision Notice ("DN") and Finding of No Significant Impact ("FONSI") for the Three Creeks Project are arbitrary and capricious and violate the National Environmental Policy Act ("NEPA") and the National Forest Management Act ("NFMA").

**ARGUMENT**

I.     **The Forest Service Offered No Rational Basis for the Three Creeks Project and Failed to Ensure it was Consistent with the Forest Plan. (Claims 1 and 10).**

Agencies must articulate a rational connection between the facts found and the choice made. *N. Plains Res. Council, Inc. v. Surface Trans. Bd.*, 668 F.3d 1067, 1078 (9th Cir. 2011). "[A]ll . . . actions [also] must be consistent with adopted forest plans." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 966 (9th Cir. 2002). The Service seeks to implement the Three Creeks Project to increase the area's fire and disease resiliency and return it to pre-European settlement conditions characterized by larger, more fire and disease tolerant trees. AR 00007, 00009. Currently however, as recognized by the Service, smaller trees dominate the Three Creeks area and the large trees that once commanded the forest are rare, non-existent, or have recently died. ECF No. 45, Defs.' Mot. for Summ. J. at 2 (Defs.' Mot.); AR 00010. Despite the lack of large, fire and disease tolerant trees in the area, the Service plans to cut an unknown amount of the few remaining large trees, as well as moderate-sized trees that could soon become large trees (collectively "larger trees"). AR 00015. The Service points to no explanation in the record, let alone a rational one, for why it needs to cut any of the few remaining larger trees. Authorizing the removal of any moderate or large trees from an area that already has so few of these larger trees is inconsistent with the 2004 Sierra Nevada Forest Plan Amendment ("2004 Framework") and the expressed purpose for this Project.

A.  **The Service violated NEPA by failing to offer a rational basis for the Project.**

The Three Creeks Project's purpose, which Earth Island does not challenge, is to promote forest health and resilience and to return the Project area to pre-European settlement conditions.[1]

---

[1] The Service takes issue with Earth Island referring to this as a "logging" Project. *See* Defs.' Mot. at 11 n. 5. However, to implement the Project, the Service will remove, cut, or log trees. The word used to describe the removal of trees, does not change Earth Island's legal claims, including the Service's failure to provide any explanation for why it is necessary to remove the few remaining large, fire and disease tolerant trees to increase forest health.

AR 00007, 00009. Currently, large, fire and disease tolerant trees (over 24 inches diameter breast height ("DBH")) make up roughly three percent of the entire Project area or approximately only 7 large trees per acre. AR 00560. Historically however, older, large trees, generally exceeding 24 inches DBH dominated the area and very large trees, exceeding 40 inches DBH and 100 feet in height were common. AR 00009. The Project seeks to return the area to these conditions and achieve an average of 14 large trees per acre. *Id.* However, despite the lack of large, fire and disease tolerant trees in the area, the Service proposes to remove some of these large trees, as well as moderate-sized trees. *See* AR 00015 (majority of merchantable trees to be removed are between 10–20 inches DBH and trees over 24 inches DBH may also be removed). The Service offers no explanation for why it needs to cut any of the few remaining large or moderate, fire and disease tolerant trees in order to restore the Project area to pre-settlement conditions.

Seemingly recognizing this fatal flaw, the Forest Service's cross-motion makes no attempt to point to any administrative record document to explain why it is necessary to remove moderate and large trees. Instead, the Service's cross-motion focuses primarily on its "explanation" for why the overall Project was necessary, despite the area already being within the desired condition for basal area. *See* Defs.' Mot. at 10–12. The Service misconstrues Earth Island's argument as being limited to concerns over basal area. *See id.* at 11 ("Plaintiffs' argument focuses exclusively on the metric of mean basal area"). The 2018 EA itself, focused heavily on basal area, *see* AR 00010, thus, it was reasonable for Earth Island to do the same. Earth Island believes that there is no need to remove larger trees when the area already resembles desired basal area conditions. *See* Pls.' Mot. at 10. However, Earth Island's overall focus in the opening brief was primarily on the Service's failure to offer any rational basis for why it needed to remove moderate sized (8–24 inches DBH) and large trees (over 24 inches DBH) when they are so rare. *See id.* at 10–12. Importantly, to achieve the desired basal area and stand density index, the Service's record does not support a finding that removing moderate and large trees is necessary, or that the Service could not meet these goals by only removing the high amount of problematic small trees.

The Service argues the Project area's current conditions present a "troubling scenario" because the stands are overly dense due to small trees dominating the area, which can increase the

area's risk of fire and disease outbreaks. Defs.' Mot. at 10. These facts however, support a finding that the Service should be removing small trees and retaining moderate and large trees, and do not support the Service's decision to remove both small *and* larger trees. To increase an area's resilience to fire and disease, forest managers should seek to retain moderate and large trees. AR 09198. Unfortunately, large, old forest structures take decades to centuries to develop, so in order to increase the number of large trees in the Project area, both large trees and moderate-sized trees that could soon become large trees, need to be maintained. *See* AR 00854. In fact, the Service specifically acknowledged the need to maintain large trees in the Sierra Nevada. *See* AR 05649 (given their deficit in the Sierra Nevada and time necessary for their renewal, the agency needs to protect large trees and snags from removal). These record facts make it even more arbitrary for the Service to decide to remove the few remaining large trees. By removing these larger, fire and disease tolerant trees, which take decades to develop,[2] the Service is actually placing the Project area at more risk of fire and disease, ultimately failing to meet the Project's purpose.

The Forest Service argues that the Project will move the area towards desired conditions by thinning from below and targeting smaller trees. Defs.' Mot. at 12. Even if the Service is in fact targeting smaller trees (less than 8 inches DBH), which is not certain based on the inconsistencies within the NEPA documents, *see infra* Section II, it does not dispute that it also authorized the removal of moderate trees and some of the few remaining large trees, which would move the area even further from desired conditions and fails to meet the Project's purpose. *Compare* AR 00015 (will thin trees between 10–20 inches DBH, and possibly over 24 inches DBH) *with* AR 00009 (seeks to achieve pre-settlement conditions, i.e. an area characterized by large trees), 00007 (purpose is to increase forest resiliency to wildfire and disease). There is no reason for the Service to remove *any* large or moderate trees, and it has provided no explanation

---

[2] The Service argues that the Project would speed up the growth of small trees into large trees. Defs.' Mot. at 10–11. Presumably such improved tree growth would also apply to the area's moderate-sized trees as well. While the Project may speed up tree growth, it could take decades for these small trees to become large trees, *see* AR 00854, and the more moderate-sized trees, if they are not removed, would become desired large trees much more quickly. Thus, the Service could attain the Project's purpose more quickly by retaining all of the moderate and large sized trees that are currently present in the Project area.

1   in the record, let alone a rational basis, for why removing these larger trees is a necessary part of

2   "thinning from below" to increase the Project area's forest health and resiliency. As such, the

3   Forest Service failed to make a reasoned decision based on an evaluation of the evidence. *See*

4   *Earth Island Inst. v. Morse*, 2009 WL 2423478 at *6 (E.D. Cal. Aug. 5, 2009).

5           The Forest Service attempts to distinguish *Earth Island Institute v. Morse* because it

6   focuses on the Service's use of erroneous stand density index data. Defs.' Mot. at 11–12.

7   Although the specific facts of *Earth Island Institute* may be different from the present case, that

8   court's rationale is applicable here. *Earth Island Institute* specifically stated that "[i]f an agency

9   has failed to make a reasoned decision based on an evaluation of the evidence, the Court may

10  properly conclude that an agency had acted arbitrarily and capriciously." 2009 WL 2423478 at

11  *6, *citing Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1301 (9th Cir. 2003). Here, the

12  Forest Service found that there are not enough large trees in the Project area, as such it is more

13  susceptible to fire and diseases; yet inexplicably, the Service also determined it should remove

14  some of the moderate and few remaining large, fire and disease tolerant trees. The Service never

15  explained why it was necessary to remove moderate and large trees, thus, its decision to do so,

16  and ultimately the Three Creeks Project, is arbitrary and capricious and violates NEPA.

17          The Three Creeks Project is also highly similar to other decisions rendered on the Inyo;

18  however, the Service never analyzed the outcomes or provided the monitoring data from these

19  projects. *See* Pls.' Mot. at 13–14. The Forest Service's cross-motion  fails to discuss these similar

20  projects, and in particular why the agency did not analyze them when preparing the Three Creeks

21  Project. While all of the outcomes and monitoring data of these similar projects should have been

22  made publicly available during the Three Creeks NEPA process, *see* 40 C.F.R. § 1500.1(b), Earth

23  Island is particularly interested in how the other projects impacted the black-backed woodpecker

24  and Pacific marten. In refusing to discuss the outcomes or offer monitoring data from these

25  projects, the Service failed to provide a reasoned explanation for the Three Creeks Project and is

26  seeking to undertake the Project without a full understanding of its environmental consequences,

27  in violation of NEPA. *See N. Plains Res. Council, Inc.*, 668 F.3d at 1078 (required to consider

28  relevant factors and articulate a rational basis); 40 C.F.R. §§ 1500.1(b), 1500.1(c) (environmental

consequences must be understood and the same information needs to be provided to the public).

## B. The Forest Service violated NFMA by failing to ensure the Three Creeks Project was consistent with the 2004 Framework.

The Service's failure to rationally move the Project area towards the pre-settlement desired conditions—an area dominated by large trees—similarly violates NFMA. While the Service's interpretation of its own forest plan is entitled to deference, its failure to comply with the applicable Forest Plan violates NFMA. *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). Thus, the Service's actions must be consistent with the 2004 framework. *See Idaho Sporting Cong.*, 305 F.3d at 966. While the Three Creeks Project complies with some portions of the 2004 Framework, it ultimately fails to implement the Project in a way that will achieve the desired conditions set out for Wildland-Urban Intermix ("WUI") and General Forest Lands in the 2004 Framework.

The 2004 Framework was adopted to reduce the risk of wildfires. AR 08126. While the 2004 Framework notes that the Forest Service may sometimes need to remove trees over 12 inches, and less than 30 inches DBH, in order to achieve this wildfire risk reduction goal, this flexibility in the size of trees that can be removed is for the Service to implement management decisions based on *individual sites*. AR 08129 (emphasis added). Importantly, even if removing moderate and large trees is permitted under the 2004 Framework, the Service needs to provide a rational explanation for its decision to remove these trees, which, as discussed above, the Forest Service failed to do. Moreover, the 2004 Framework also states that it is important to retain "basal area in the largest trees in all treated areas." AR 08128; *see also* AR 08174 (outside of WUI-defense zones retain 30 percent of the basal area; should generally be comprised of the largest trees). As outlined in the 2018 EA, the Service must implement projects in order to meet specific desired conditions. *See* AR 00008. The desired conditions for WUI lands in the 2004 Framework include stands dominated by large, fire-tolerant trees, in hopes of reducing fire severity in nearby developed areas. AR 00008, 00678, 08163–64. The desired conditions for General Forest lands in the 2004 Framework are for the area to resemble pre-settlement conditions, which here includes being dominated by large, fire-tolerant trees. AR 00008, 08164–65. Thus, to properly implement these desired conditions and be consistent with the 2004

1    Framework, the Three Creeks Project should seek to retain larger, fire-tolerant trees.

2         It may be true that there could be some circumstances where the Service can both achieve

3    the desired conditions of creating stands dominated by large, fire and disease tolerant trees, while

4    also removing larger sized trees. That however, is not the case for the Three Creeks Project. As

5    the Service noted, there are already not enough large trees in the Project area. *See* Defs.' Mot. at

6    2; *see also* AR 00009 (large trees once dominated), 00010 (large trees are now rare, nonexistent,

7    or have recently died; small trees now dominate), 00560 (there are approximately only 7 large

8    trees per acre, which makes up less than 3 percent of the entire Project area). Instead of retaining

9    these few remaining large trees, the Forest Service is proposing to remove some of them, as well

10   as moderate trees that could soon become large trees, AR 00015, making it incredibly difficult, if

11   not impossible, to create a stand dominated by large, fire and disease tolerant trees at any time in

12   the foreseeable future. As such, the Three Creeks Project fails to achieve the WUI and General

13   Forest desired conditions and is inconsistent with the 2004 Framework, in violation of NFMA.

14        The Forest Service's failure to offer a rational basis for the Project and ensure its

15   consistency with the 2004 Framework is arbitrary and capricious, and violates NEPA and NFMA.

16   **II.   The Forest Service's NEPA Documents Contain Substantial Inconsistencies and
           Uncertainties because they are Not Written in Plain Language. (Claim 6).**

17

18        NEPA documents need to be clear and concise to provide the public with an

19   understanding of the proposed action's environmental impacts. *Or. Envtl. Council v. Kunzman*,

20   817 F.2d 484, 493–94 (9th Cir. 1987). "[Environmental assessments] shall be written in plain

21   language so that decisionmakers and the public can readily understand them . . . [EAs] are

22   unacceptable if they are indecipherable to the public." *Klamath-Siskiyou Wildlands Ctr. v. Bureau*

23   *of Land Mgmt.*, 387 F.3d 989, 996 (9th Cir. 2004), *citations omitted*. The Forest Service presented

24   substantial inconsistencies and uncertainties within and among its Three Creeks NEPA

25   documents, including the desired conditions of forest stands post-Project implementation and,

26   most fundamentally, how the Forest Service will achieve these conditions. By creating

27   inconsistencies and uncertainties within its NEPA documents, and ultimately confusing the public

28   as to what impacts the Three Creeks Project will have, the Forest Service failed to take a hard

1   look at the Project. *See Conservation Cong. v. U.S. Forest Serv.*, 235 F. Supp. 3d 1189, 1213–15

2   (E.D. Cal. 2017).

3       The Service asserts that Earth Island mischaracterized portions of the 2018 EA as being

4   inconsistent. Defs.' Mot at 12–13. The Service is incorrect and in fact it mischaracterized Earth

5   Island's most fundamental argument by failing to discuss it in its entirety. The Three Creeks EAs

6   (2016, 2017, and 2018) and numerous specialist reports are inconsistent regarding the size of

7   trees to be removed in order to meet the desired pre-settlement conditions. Within the 2018 EA

8   alone, the Service articulates three different statements regarding the size of trees to be removed,

9   noting that (1) while the majority of trees to be thinned are below 10 inches DBH, the majority of

10   merchantable trees to be thinned are between 10–20 inches DBH, AR 00015; (2) that there would

11   be multiple opportunities for commercial cutting, which is defined as the removal of trees over 8

12   inches DBH, AR 00009, 00460; and (3) that trees removed would range from 8–20 inches DBH,

13   but that trees up to 30 inches DBH could also be removed, AR 00038; *see also* ECF No. 33-1,

14   Decl. of Morgan Staric Ex. 1, ("Staric Decl. Ex. 1").[3] In its cross-motion the Service articulates

15   only the first statement, *see* Defs.' Mot. at 12–13, and argues it is not contradictory. While the

16   first statement alone is not contradictory, it cannot be reconciled with the other two statements.

17   The Service never addresses the other two statements or reconciles these inconsistencies in the

18   2018 EA. These inconsistencies create a fundamental uncertainty regarding how the Project will

19   be implemented; as such Earth Island, and the public at large, does not know which statement will

20   be followed during Project implementation and which trees will be cut—vast majority below 10

21   inches DBH or between 8–20 inches DBH—throughout the Project area.

22       The Forest Service also provides inconsistent definitions for large, moderate, and small

23   trees within and among its NEPA documents.[4] *See* Staric Decl. Ex. 1. The Service argues that this

24

25   [3] The Forest Service filed a motion to strike Exhibits 1 and 2 to the Declaration of Morgan Staric,
26   *see* ECF Nos. 47, 50, which Earth Island opposed because they are proper illustrative exhibits, or
   alternatively, are admissible extra record evidence because they explain complex subject matter,
27   meeting the third *Lands Council* exception, *see* ECF No. 48. The motion to strike is currently
   pending before this Court.
28   [4] Earth Island defines large trees as above 24 inches DBH, moderate/medium trees as between 8–
   24 inches DBH, and small trees as below 8 inches DBH.

is a "minor inconsistency" and that Earth Island is "fly-specking" because its "path may be reasonably discerned." *See* Defs.' Mot. at 13. The Forest Service is incorrect. The inconsistent definitions of tree sizes are not inconsequential deficiencies and actually make it impossible to determine how the Service will implement the Project. Knowing precisely what the Service means when it refers to small, moderate/medium, and large trees is crucial to understanding the Three Creeks Project's impacts. The 2018 EA states that the Service will thin from below and that smaller trees will be preferentially cut. AR 00015; *see also* Defs.' Mot. at 13. That same EA however defines small trees as (1) up to 6 inches DBH, AR 00021; (2) less than 8 inches DBH, AR 00010, 00016; and (3) 11–23.9 inches DBH, AR 00043, 00057. The Service could be cutting trees within any of these sizes, thus it is unclear to Earth Island, and the public, which "small" trees will in fact be preferentially cut. The Forest Service mistakenly argues that these different definitions do not alter the NEPA analysis. *See* Defs.' Mot. at 13. Whether or not the Service is cutting trees less than 8 inches DBH or between 11–23.9 inches DBH will greatly alter whether or not the Project achieves its purpose of returning to pre-settlement conditions characterized by large, fire and disease tolerant trees and what impacts the Project may have on the environment.

The NEPA documents are also inconsistent regarding the desired basal area and number of large trees per acre to be retained following Project implementation. The 2016 and 2017 EAs both state that the Service seeks to achieve a basal area of 147 square feet and 22 large trees per acre. AR 00127, 00244; Staric Decl. Ex. 1. The 2018 EA however, notes that the Service seeks to achieve either 70–152 square feet or 70–140 square feet of basal area, *see* AR 00009, AR 00015, and only 14 large trees (over 24 inches DBH) per acre. AR 00009; Staric Decl. Ex. 1. The Service never provided an explanation as to why the desired basal area changed, why the 2018 EA contained different desired ranges for basal area, or why the number of large trees per acre was reduced between the 2017 and 2018 EAs. The basal area and number of large trees per acre the Service seeks to achieve are important because how dense the stands are and how many large, more fire and disease tolerant trees they contain will show the extent to which the Service can achieve the Project's purpose of increasing the area's resiliency to both fire and disease. AR 00007. Thus managing for more open stands with large trees that once dominated the region is

1    crucial, AR 00009, and it was arbitrary for the Service to change these desired conditions without

2    any explanation. The Forest Service's cross-motion does not address these inconsistencies.

3        Interestingly, in its cross-motion the Service recognized an additional inconsistency in its

4    NEPA documents. The Service stated that "[a]lthough the EA refers to creating or maintaining

5    five down logs per acre . . . this figure is incorrect. The correct number of down logs . . . [is] 3

6    down logs per acre." Defs.' Mot. at 20 n. 9. Even though the Service now specifies the correct

7    number of down logs per acre, how was the public supposed to know, during the NEPA process,

8    which number was accurate? The Three Creeks NEPA documents are "unacceptable [because]

9    they are indecipherable to the public." *Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 996.

10       The Three Creeks NEPA documents also present uncertainties regarding how many

11   moderate or large trees per acre the Service intends to remove during Project implementation.

12   Despite the historical dominance of larger trees, small trees, less than 8 inches DBH, are the

13   current dominating force in the region. AR 00009, 00010. Currently, there are only 7 large trees

14   per acre throughout the Project area. AR 00560. In spite of this, the Service authorized the

15   removal of trees over 8 inches DBH and stated that some large trees could also be cut. *See e.g.*,

16   AR 00015, 00460; Staric Decl. Ex. 1. Due to the significant deficit of large trees in the area, the

17   Forest Service should be more certain as to how many larger trees it intends to remove and why,

18   and provide an estimate to the public. The Service argues NEPA does not require this type of

19   specificity, *see* Defs.' Mot. at 13–14, however, the cases it relies on are distinguishable.

20       In *Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*, the agency was

21   clear that not all infected trees would be removed and its EA adequately discussed the impact of

22   removing some of the infected trees. 2013 WL 12120098 at *6 (D. Or. May 29, 2013), *adopted in*

23   *part, rejected in part*, 2013 WL 4786242 (D. Or. Sept. 6, 2013). In the present case however, it is

24   unclear whether or not the Forest Service will retain *any* large trees per acre in some areas and the

25   Service also never took a hard look at the impacts of removing even some of the large trees. The

26   Forest Service also cites to *Navickas v. Conroy*, an unpublished decision, but *Navickas* only found

27   that agencies need not identify the specific trees to be removed. 575 Fed. App'x 758, 760 (9th

28   Cir. 2014), *unpublished*. Earth Island's claim however is not based on a failure to mark or identify

the specific trees to be cut, but rather, because there are so few remaining large trees—7 per acre—the Service should provide an estimate of how many large trees per acre it plans to remove. AR 00560. Without this estimate, it is impossible for the Service to analyze, or the public to understand, the Project's impacts.

The Forest Service also seeks to distinguish *Conservation Congress*. Defs.' Mot. at 14. However, due to the numerous inconsistencies and uncertainties, several of which the Forest Service fails to address in its cross-motion, *Conservation Congress* is in fact applicable to the present case and supports a finding that the Three Creeks Project violates NEPA. The confusion brought about by the Forest Service makes it difficult to discern the Three Creeks Project's impacts and makes it difficult for the public to play a role in the NEPA process, running counter to one of NEPA's principal aims. *Conservation Cong.*, 235 F. Supp. 3d at 1214.

The inconsistent and confusing discussions of the material circumstances surrounding the Three Creeks Project are arbitrary and capricious and violate NEPA.

**III.     The Forest Service Failed to Evaluate All Reasonable Alternatives. (Claim 2).**

Agencies must give full and meaningful consideration to all reasonable alternatives in an EA, including those that "will avoid or minimize" a proposal's adverse effects. *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008); 40 C.F.R § 1500.2(e). Despite being presented with several alternatives for the Three Creeks Project that both meets the Project's purpose and reduces its environmental impacts, the Forest Service failed to fully and meaningfully consider said alternatives, in violation of NEPA. 40 C.F.R. § 1500.2(e); *see W. Watershed Project v. Abbey*, 719 F.3d 1035, 1050, 1053 (9th Cir. 2013) ("The existence of a viable but unexamined alternative renders an EA inadequate."), *internal quotes omitted*. The Service's failure to consider such alternatives resulted in it never offering or considering a comparison of the environmental impacts of its decision to log both small and larger trees with alternatives that focused only on removing the problematic small trees.

> **A.  Earth Island did not waive its ability to argue that the Forest Service should have considered other reasonable alternatives.**

The Forest Service incorrectly claims that Earth Island waived its ability to argue that the Service should have analyzed specific alternatives. Defs.' Mot. at 14–15. Earth Island's comment

alerted the Forest Service of its need to analyze alternatives beyond the no action and proposed

action alternatives. "[T]he Ninth Circuit has repeatedly held that the issue exhaustion requirement

should be interpreted broadly." *Or. Nat. Desert Ass'n v. McDaniel*, 751 F. Supp. 2d 1151, 1158

(D. Or. 2011), *citing Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058,

1065 (9th Cir. 2010). Commenters "need not raise an issue using precise legal formulations . . .

alerting the agency in general terms will be enough if the agency has been given 'a chance to

bring its expertise to bear to resolve the claim.'" *Lands Council v. McNair*, 629 F.3d 1070, 1076

(9th Cir. 2010), *citing Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899, 900 (9th Cir.

2002). Alternatively, even if the Court finds Earth Island's comment was not clear enough, Earth

Island's objection specifically raised the other alternatives, offering the Forest Service the

opportunity to correct its error and analyze them in its 2018 EA before it made a final decision.

Plaintiffs may raise arguments during judicial review of an agency action if underlying

comments, submitted during the administrative process, provide enough clarity for the decision

maker to understand the issue raised. *Lands Council*, 629 F.3d at 1076; *see also Or. Nat. Desert

Ass'n*, 751 F. Supp. 2d at 1161 ("[P]laintiffs also can satisfy the exhaustion requirement merely

by making a general objection under a statute to an agency action without referencing any

specific violations of that statute."), *internal quotes omitted*; *City of Sausalito v. O'Neill*, 386 F.3d

1186, 1208 (9th Cir. 2004) (parties must alert the agency to its position and claims). Plaintiffs

need not use precise legal terms or cite to statutes or regulations. *WildEarth Guardians v. Jeffries*,

370 F. Supp. 3d 1208, 1236 (D. Or. 2019). The Ninth Circuit's opinion in *Native Ecosystems

Council v. Dombeck* is informative; there the court held that plaintiffs sufficiently raised their

concern about the agency's decision to waive a road density standard by asserting generally that

the underlying timber sale violated NFMA requirements and raising concerns that the sale would

result in too much open space, without ever mentioning road density specifically. 304 F.3d at

899–900. Similarly, here, although Earth Island's comment did not use the term "alternative," it

put the Service on sufficient notice that it should consider reasonable alternatives to the Project

because it raised concerns regarding the risks of removing moderate and large trees and the

ineffectiveness of thinning. AR 00779 (Project "proposes to remove large, live, old trees, and old-

growth trees"), 00791–95 (Service should not remove large trees that are necessary for species),

00797–98 (mechanical thinning is ineffective for reducing fire intensity; fire itself is the only way

to reduce future fire intensity). Given Earth Island's comment regarding the ineffectiveness of

thinning and the impacts of large tree removal, the Service should have considered other obvious

alternatives to the Project, such as utilizing only prescribed fire in lieu of thinning, only removing

small trees less than 8 inches DBH (i.e. pre-commercial thinning) in lieu of removing moderate

and large trees, or a combination of prescribed fire and small tree removal.

Alternatively, regardless of whether specific alternatives were offered in the comment,

they were explicitly raised in Earth Island's September 2017 objection, AR 00755–56, giving the

Service sufficient opportunity to meaningfully consider those proposed alternatives in its

subsequent, revised January 2018 Final EA. *See Native Ecosystems Council*, 304 F.3d at 899 (one

exhausts their administrative remedies if they provide the agency an "opportunity to rectify the

violations"). In September 2017, Earth Island, without question, notified the Service of

reasonable alternatives to the Project. AR 00755–56. When the objection was submitted, the

Project was still a proposal, *see* 36 C.F.R. § 218.2 (objections are documents seeking pre-

decisional review of proposed projects), thus the Service had the opportunity to consider and

analyze Earth Island's proposed alternatives in its January 2018 EA.[5] The Service however,

ignored the proposed alternatives and continued to only analyze the no action and proposed action

alternatives. *See* AR 00015. Because the Service had the opportunity to consider and analyze the

proposed alternatives, the cases it relies on in its cross-motion are readily distinguishable. *See*

Defs. Mot. at 15; *see also Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764–65 (2004)

(plaintiffs never identified any alternatives for the agency to consider, so they forfeited their

argument); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1156 n.2 (9th

Cir. 2008) (EA finalized in 2005 and the alternative was raised in mid-2006); *Cachil Dehe Band

of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 604–05 (9th Cir. 2018)

---

[5] The Service in fact made other significant changes to the 2018 EA in an effort to address other
concerns Earth Island raised in its objection. *See infra* Section VI.

1  (alternatives raised in court for the first time, and not during the public involvement period).[6]

2  Earth Island's comment and objection sufficiently alerted the Forest Service to its need to

3  consider other alternatives to the Three Creeks Project, thus this argument is not waived.

4  **B. The Forest Service must consider all reasonable alternatives.**

5  The alternatives presented by Earth Island—using only prescribed fire, only removing

6  small trees, or a combination of both—meet the Three Creeks Project's purpose and need, while

7  also reducing environmental impacts, making them reasonable, viable alternatives. Despite their

8  viability, the Forest Service arbitrarily decided not to consider or analyze these alternatives.

9  Reasonable alternatives must be given full and meaningful consideration. *Ctr. for Biological*

10  *Diversity*, 538 F.3d at 1217. Failing to analyze viable alternatives renders an EA inadequate.

11  *Abbey*, 719 F.3d at 1050.

12  The purpose of the Three Creeks Project is to increase the forest's resiliency by returning

13  the area to pre-settlement conditions characterized by older, larger trees. AR 00007, 00009. The

14  2018 EA only analyzes two alternatives—a no action and a proposed action alternative. AR

15  00015. The proposed action includes the removal of both small trees *and* ecologically critical

16  moderate and large trees, *id.*, causing the Project to deviate even further from pre-settlement

17  conditions and puts the forest and wildlife in the area at greater risk. The alternatives proposed by

18  Earth Island however, will improve the forest's resiliency by eliminating the decades of fuels that

19  have built up in the area through the removal of saplings and small trees, all while maintaining

20  the critical moderate and large trees. These alternatives represent viable, but less environmentally

21  damaging alternatives that the Forest Service should have considered.

22  The Forest Service incorrectly argues that it was not required to consider more than two

23  alternatives—the no action and proposed action. Defs.' Mot. at 15–16. While NEPA does not

24  _____

25  [6] Although *Cachil Dehe* states the alternatives were not raised in the comment period, *see* 889
   F.3d at 604–05, the case is distinguishable because for many agencies, including the Bureau of

26  Indian Affairs in *Cachil Dehe*, the pre-decisional public involvement process is limited to only
   submitting comments, whereas the Forest Service's unique NEPA public involvement process

27  permits interested persons to submit both comments and objections, *see* 36 C.F.R. § 218.8. Earth
   Island clearly suggested the need for different approaches in its comment and specifically raised

28  the alternatives in its objection, thus it can assert an alternatives argument during judicial review.

1    impose a minimum number of alternatives an agency must consider, the agency must consider

2    appropriate and reasonable alternatives. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d

3    1233, 1246 (9th Cir. 2005) ("[T]he substance of the alternatives has been a focus, not the sheer

4    number of alternatives considered"). While evaluating only two alternatives may be proper in

5    certain circumstances, the Service's insistence that it is proper in every NEPA analysis is

6    incorrect. The Service relies on *Earth Island Institute v. U.S. Forest Service*, arguing that since

7    2005 the Ninth Circuit has not found an EA "arbitrary and capricious when it considered both a

8    no-action and preferred action alternative." Defs.' Mot. at 16, *citing* 697 F.3d 1010, 1021–22 (9th

9    Cir. 2012). While this citation is technically correct, it is misleading. Ninth Circuit cases decided

10   both before and after *Earth Island* have found EAs that considered *more* than these two

11   alternatives to be arbitrary and capricious because they failed to consider all reasonable

12   alternatives. *See Ctr. for Biological Diversity*, 538 F.3d at 1218–19 (decided before *Earth Island*

13   and held that an EA considering five alternatives failed to properly evaluate all reasonable

14   alternatives); *Abbey*, 719 F.3d at 1050 (decided after *Earth Island* and held that an EA

15   considering four alternatives failed to properly evaluate all reasonable alternatives, particularly

16   one that reduced environmental impacts).

17          The Service also argues that the alternatives offered by Earth Island have no meaningful

18   difference than the proposed action alternative because the commercial sale of trees does not

19   change the Project's environmental impact. Defs.' Mot. at 16. The Service misrepresents Earth

20   Island's arguments and the alternatives they offered. Earth Island does not challenge the sale of

21   trees. Instead Earth Island's claims are based on the unexplained removal of moderate and large

22   trees, which is often referred to as commercial thinning because these trees are more

23   merchantable. *See* AR 00460 (defining commercial thinning). Earth Island would be asserting

24   these claims even if the Service chose not to sell any trees. Thus, *Native Ecosystems Council* is

25   distinguishable. 428 F.3d at 1248 (claims focused on the commercial sale of trees, not the

26   removal of trees). Because the alternatives offered by Earth Island retain moderate and large trees

27   (i.e. do not include commercial thinning), they are in fact distinguishable from the proposed

28   action and will reduce environmental impacts. Indeed, absent the consideration of such

1   alternatives, the Service's NEPA analysis never considers or compares the likely different

2   impacts of alternatives that retain all large and moderate trees and only focus on removing the

3   problematic small trees. *See* CEQ, Forty Most Asked Questions Concerning CEQ's National

4   Environmental Policy Act Regulations, 46 Fed. Reg. 18026, 18027 (Mar. 23, 1981) (a "full

5   spectrum of alternatives[] must be analyzed and compared"). Large trees provide a clear benefit

6   in the Project area, both for improving fire resiliency and for wildlife. *See e.g.*, Defs.' Mot. at 21

7   (martens prefer habitat with large trees and down logs), 22 (black-backed woodpeckers represent

8   medium and large sized snags); AR 09198 (retaining large trees increases resiliency). In light of

9   these admitted benefits, the Forest Service cannot assert that its Project—which includes logging

10  large and moderate trees—would not have at least some adverse impacts on fire resiliency and

11  wildlife, especially when compared to alternatives that retain all large and moderate trees. The

12  public was entitled to see, and NEPA required, such a discussion and comparison in the EA.

13         Earth Island offered the Forest Service viable, reasonable alternatives; the Service's

14  failure to consider and examine these alternatives violates NEPA. *Abbey*, 719 F.3d at 1050.

15         **IV.     The Forest Service Failed to Take a Hard Look at Impacts to Species. (Claim 3).**

16         Throughout the NEPA process agencies are required to take a "hard look" at their actions

17  by providing a "complete discussion of relevant issues as well as meaningful statements regarding

18  the actual impact of proposed projects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147,

19  1159, 1172 (9th Cir. 2006), *overruled in part on other grounds*, *Winter v. Nat. Res. Def. Council,*

20  *Inc.*, 555 U.S. 7 (2008). Providing only general statements about possible impacts without

21  justifying why more information could not be provided is insufficient to satisfy the hard look

22  requirement. *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868 (9th Cir. 2005).

23  The black-backed woodpecker and Pacific marten both rely on moderate and large sized trees, *see*

24  *e.g.*, AR 00608, 00791, which the Service proposes to remove when implementing the Project.

25  The Forest Service however, provided only insufficient general, conclusory statements about how

26  the Three Creeks Project may impact black-backed woodpeckers and Pacific marten, and

27  ultimately failed to meet NEPA's hard look requirement.

28         Although the Forest Service prepared, and now relies on, several specialist reports for the

Three Creeks Project that were incorporated into the 2018 EA, *see* Defs.' Mot. at 17; AR 00037, these reports do not adequately discuss the Project's impacts to the black-backed woodpecker and Pacific marten and cannot satisfy NEPA's hard look requirement. Even if these reports took a hard look at impacts to federally listed species or other sensitive species or management indicator species ("MIS"), which Earth Island does not concede, they do not sufficiently discuss impacts to black-backed woodpeckers and marten.[7] In fact, none of the reports discuss the black-backed woodpecker in any detail. *See* AR 00579–83 (Migratory Landbird report provides only conclusory and unsupported assertions regarding black-backed habitat); 00584–603 (MIS report simply lists the black-backed in a table). The Service is unable to point to any Three Creeks NEPA document that sufficiently discusses how the viability of the black-backed woodpecker and marten will be impacted by the Project's effects on the woodpecker's future burned forest habitat and current green forest habitat or on marten habitat throughout the entire Project area.

Providing only conclusory assertions regarding impacts to species, without analyzing how these species' overall viability will be impacted, fails to meets NEPA's hard look requirement.

### A. The Forest Service failed to analyze how the Three Creeks Project's effects on current and future habitat would impact the black-backed woodpecker.

The black-backed woodpecker is a rare, habitat specialist that relies on forest stands with a high density of medium and large snags (standing, dead or dying trees)—roughly 100 per acre. AR 01111, 00791–95. While black-backed woodpeckers prefer areas that have recently experienced a high intensity, stand-replacing fire or high beetle mortality, AR 01357, they also nest and forage in green forests with a high number of large snags. AR 00868; *see also* AR

---

[7] In their opening brief, Earth Island noted that no Three Creeks EA explained why species are designated as sensitive or selected as an MIS and provided the Court with the relevant selection criteria. Pls.' Mot. at 21 n.14, 23 n.15. The Service claims that because Earth Island cited to the administrative record to explain to the Court how the species were selected these omissions from the EA were irrelevant. Defs.' Mot. at 17 n.8. What the Service fails to acknowledge is Earth Island cites non Three Creeks specific NEPA documents—a Forest Service manual (AR 02647) and the Sierra Nevada MIS amendment (AR 08333). Thus the general public who may not know to access, or how to access, these documents would not know why species were selected as sensitive or as an MIS. The legality of NEPA documents must be evaluated based on the NEPA documents themselves. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir. 1998) (the Service's defense of its position must be found in the EA). This information should have been in the Three Creeks EAs and thus available to the interested public.

01111–17. Black-backed woodpeckers are an MIS representing medium and large snags in burned forests. AR 00589. This increasingly rare species, AR 00852, is threatened by landscape level thinning, fire suppression, and other pre-fire fuels reduction activities that reduce tree densities, including large and moderate trees, in future burned areas. AR 00869, 00885.

The Service acknowledged that the Project may impact the future recruitment rate of high quality black-backed woodpecker habitat—recently burned forests with roughly 100 medium and large snags per acre—throughout the entire Project area. AR 00042. The Project is in fact designed to decrease this type of habitat by increasing the forest's resiliency to fire, AR 00007, making it less likely for burned high-density medium and large snag habitat to occur. In its cross-motion the Service argued that high quality black-backed woodpecker habitat is "fundamentally incompatible with the purpose of the Project." Defs.' Mot. at 23. Unfortunately however, the Service never analyzed how the Project would impact the black-backed woodpecker's viability, which is another in a long line of thinning projects in the Inyo. *See supra* Section I(A). Earth Island is not asking for the Service to manage the Project to promote black-backed woodpecker habitat, *see* Defs.' Mot. at 32, but is instead simply asking the Service to comply with its NEPA requirement to take a hard look at the Project's impacts on the black-backed woodpecker's viability generally, and more specifically how the prolonged loss of 9,590 acres of habitat, along with other habitat eliminated by earlier thinning projects, may impact the species.

The Service also, in a contradictory fashion, argues that the Project could in fact enhance black-backed woodpecker habitat. Defs. Mot. at 23–24. It is perplexing for the Service to claim that black-backed woodpecker habitat is "fundamentally incompatible" with the purpose of the Project, but is also going to be enhanced by the Project. The Service claims black-backed habitat will be enhanced because wildfire is a stochastic event and thus may occur, resulting in snag creation and black-backed woodpecker habitat. *Id.* However, as detailed in Earth Island's opening brief, the Project proposes to retain only 39–79 trees per acre of all size classes, quality black-backed habitat however, requires roughly 100 medium and large snags per acre; thus even if the entire Project area were to contain only medium and large trees and all 39–79 trees burn and become snags, it would still not create quality black-backed habitat. Pls.' Mot. at 21. Even if a

1    few more large and medium snags are created during Project implementation, this only provides

2    minimal, low quality black-backed habitat and the Service still failed to take a hard look at how

3    the Project will impact the black-backed woodpecker's overall viability.

4            The Service finally argues that because high quality black-backed woodpecker habitat has

5    increased in the region[8] and because there will be no salvage logging associated with the Project

6    that black-backed woodpeckers will face no direct cumulative impacts. Defs.' Mot. at 24. Even if

7    black-backed woodpeckers will not face direct impacts, *but see infra*, the Service acknowledged

8    they will face the indirect effect of the Project modifying the future recruitment rate of high

9    quality habitat on the entire Project area. AR 00042. The Service, however, fails to analyze how

10   this loss of future habitat could impact the already rare black-backed woodpecker. *See* AR

11   00852–53 ("Black-backed woodpeckers have become increasingly rare" in the Sierra Nevada).

12   The EA's general statement about effects to future habitat, without any analysis of how this

13   habitat loss will impact the black-backed woodpecker's viability, fails to satisfy NEPA's hard

14   look requirement. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 995 (NEPA requires a

15   "sufficient description of the actual environmental effects that can be expected," simply stating an

16   environmental concern may be impacted, without more information does not constitute a hard

17   look); *see also Earth Island*, 442 F.3d at 1159 (hard look requires a complete discussion of

18   relevant issues and statements regarding the actual impacts of a proposed project).

19           Black-backed woodpeckers also rely on medium and large snags in green forests to help

20   maintain their populations in the face of ongoing fire suppression. AR 00780, 00910. In its

21   analysis of impacts to the black-backed woodpecker, the Service however, focused solely on the

22   black-backed woodpecker's use of burned forests, never discussing its use of green forests. *See*

23   ─────────────────

24   [8] While a species' status within a specific region is important to the Service's MIS analysis, *see* AR 00585, the Service is mistaken in claiming that high quality habitat is increasing within the relevant *region*. To support this claim the Service cites to sources stating that *within the range* of

25   the black-backed woodpecker more quality nesting and foraging habitat has been created. Defs.' Mot. at 24. The black-backed woodpecker's range however, is quite vast and the Inyo and Sierra Nevada region, located in the southernmost extent of the species' range, make up only a small

26   portion of this range. *See* AR 00895. There is no proof that habitat quality has substantially increased within the Inyo and Sierra Nevada region, and in fact, there are studies concluding the

27   opposite, AR 00852–53 ("Black-backed woodpeckers have become increasingly rare [in the

28   Sierra Nevada] because their optimal habitat has shrunk to a fraction of its historical extent.").

AR 00041–42, 00058–59. In its cross-motion the Service claims, in a footnote, that it analyzed impacts to medium and large snags in green forests and because the Project does not involve snag cutting, there will be no impacts on black-backed woodpecker green forest habitat. Defs.' Mot. at 24 n.11. First, this is an unacceptable post-hoc explanation and analysis. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[C]ourts may not accept . . . counsel's *post hoc* rationalizations for agency action."). When discussing impacts to the black-backed woodpecker in its NEPA document, the Service never discusses its use of green forests; the Service cannot conclude in its legal briefing, years after the decision was made, that there will be no impacts on black-backed woodpecker green forest habitat by pointing to its hairy woodpecker analysis. Second, this conclusion is not supported by the facts. Black-backed woodpeckers require 11 large snags per acre in green forest habitat, AR 00780, yet the Project will maintain only three snags per acre, AR 00020. Moreover, snags are in short supply in the Project area, AR 00589, and snag recruitment is quite slow throughout the Inyo. AR 06213. Removal of fuels, including large and moderate trees, and low snag retention—both of which are proposed in the Project—threaten black-backed woodpecker green forest habitat. AR 00870. The Service's failure to discuss, in its NEPA analysis, how the Project could impact black-backed woodpecker green forest habitat violates NEPA. *See Earth Island*, 442 F.3d at 1159, 1172.

**B. The Forest Service failed to consider the Three Creeks Project's impacts on Pacific marten throughout the entire Project area.**

The Pacific marten is a Forest Service sensitive species and an MIS requiring highly complex stand structures with large diameter trees, large snags and down logs, and high to moderate canopy closure. AR 00608, 00616. "The marten's association with mature and old-growth forests . . . makes it vulnerable to the loss of large trees." AR 15483. Forest thinning projects, like Three Creeks, are the largest potential direct threats from human activities to martens. AR 09653. During the NEPA process, the Forest Service designated three Project units as "marten units" where less invasive tree removal will occur. AR 00020–21. These three marten units are located in the eastern portion of the Project. *See* AR 00020 (listing stand numbers), 00031–32 (listing size of stand numbers), 00104 (stand numbers into unit numbers; marten units are units 82, 105, 109). However, in the other 127 Project units, some of which also experience

marten use or are adjacent to the three marten units, the Service failed to adequately analyze the impacts facing martens. *See* AR 00619 (listing stands that experience marten use), 00104 (stand numbers into unit numbers; other units experiencing marten use are units 76, 79, 86, 91; units adjacent to the three marten units are units 81, 103, 104, 106, 107, 108, 110); *see also* ECF No. 33, Staric Decl. ¶¶ 8–12; ECF No. 33-2, Staric Decl. Ex. 2. In these other 127 units, the Service plans to implement the full scale of the Project, thus martens will experience more significant impacts in these 127 units than in the three marten units, where the Project will be less invasive.

As an MIS, martens represent late-seral, closed canopy coniferous forests, which are characterized as trees over 24 inches DBH and canopy closure over 40 percent. AR 00044. Within the 127 units outside the three marten units, there are approximately 1,220 acres of late-seral, closed canopy marten habitat. *Id.* Canopy closure and near ground cover are important marten habitat components; canopy closure over 70 percent represents high quality marten habitat. AR 00616. Currently however, canopy closure rarely exceeds 50 percent, except in the densest stands, and near ground cover (e.g. large snags and down logs) is often absent. AR 00619. Despite the current conditions, the 2018 EA states that the Project would reduce canopy closure and down logs on 1,220 acres of marten habitat outside the three marten units, AR 00044 (canopy closure reduced), 00058 (down logs reduced). Some of these reductions in canopy closure would be below optimum levels. *See* AR 00613 (provides the class and percentage of canopy closure), 00624 (moving to sparse cover (designated as "S") is below optimum levels; Table 13 shows that throughout the 1,220 acres of marten habitat outside of the three marten units, pre-treatment there are only five acres with sparse canopy cover (less than 25 percent), but post-treatment there are 962 acres with sparse canopy cover and only 68 acres with moderate cover (between 40–60 percent)). These canopy cover and down log reductions simplify the forest structure, which the Service admits, Defs.' Mot. at 26; *see also* AR 00040, and negatively impacts martens within the other 127 Project units. *See* AR 00619 (treatment areas are unsuitable for marten denning or reproduction), 05554 (simple structures impact martens ability to forage, affect marten movement and habitat connectivity); *see also infra* Section V(B). Instead of analyzing how these reductions on 1,220 acres would impact the species' viability, the Service simply states that martens may

1   avoid treated stands until crown closure increases. AR 00040. The crown closure however, will

2   not reach pre-treatment levels for 10 years. AR 00043. The failure to analyze the impacts from

3   this long-term loss of habitat quality violates NEPA. *Earth Island*, 442 F.3d at 1172.

4           The Forest Service bases its arguments and conclusions regarding the Project's impacts on

5   marten on the assumption that martens generally do not use much of the area within the Project

6   units, except for the marten units. *See* Defs.' Mot. at 19; *see also* AR 00040, 00625. Thus, the

7   Service concludes that because the three marten units have limits on Project implementation,

8   there will be little direct or indirect impacts on martens. *See* Defs.' Mot. at 19; *see also* AR

9   00040–41, 00625. While there may be little impacts on martens *within the marten units*, there is

10  no analysis on how the Project would impacts martens *elsewhere in the Project area*. Martens do

11  in fact use other Project units—there are seven units that experienced marten detections, *see* AR

12  00619, but only three were designated as marten units. In addition to the four other units with

13  marten detections, it is reasonable to assume that martens use units adjacent to the three marten

14  units because martens have very large home ranges (2,749 acres for males and 1,155 acres for

15  females) and the three marten units encompass only 623 acres. AR 00038, 08748. Because

16  martens do use units other than the three marten units, the Service should have expanded its

17  analysis to determine how the sensitive species would be impacted by full-scale Project impacts.

18          The Service argues that because some of the studies it analyzed, which are not specific to

19  the marten units, discuss marten habitat, range, and diet, it should receive deference. Defs.' Mot.

20  at 20–21. While agencies can receive deference for their actual analysis, this is irrelevant to Earth

21  Island's argument regarding the Service's complete failure to actually analyze impacts on marten

22  throughout the entire Project area. The Service never took the findings from these studies and

23  analyzed them with regard to martens in the other 127 Project units. After providing general

24  marten information, AR 00616–19, the Service concluded that because martens supposedly do

25  not use much of the area within the Project units, there will be little direct or indirect impacts on

26  martens. AR 00625. This analysis fails to take a hard look at impacts to martens throughout the

27  entire Project area.

28          The Service claims that there will be no net loss of late-seral closed forests or marten

1    habitat post treatment, and that habitat quality will only be reduced on 26 acres. Defs.' Mot. at

2    21–22; *see also* AR 00044. The fact that there will be no loss of late-seral closed forests does not

3    mean that marten habitat quality will not be impacted to a greater extent. Seral stages focus on the

4    age class in the region and late-seral is defined by the oldest trees; thus so long as one older, large

5    tree remains after Project implementation, an area will remain within a late-seral age class, but

6    may not provide sufficient marten habitat. Moreover, the canopy cover throughout the 1,220 acres

7    of marten habitat outside the marten units would, for the most part, be reduced below optimum

8    levels. Post-treatment, 962 acres would contain "sparse cover" or less than 25 percent canopy

9    cover and none would contain more than 60 percent cover or "dense cover" (i.e. "D"). AR 00613,

10   00624. Thus, no area in the 127 Project units outside of the three marten units would provide high

11   quality marten habitat—70 percent canopy cover. AR 00616. The Forest Service should have

12   analyzed how this loss in habitat quality, from the reduction of canopy closure and down logs,

13   would impact martens throughout the entire Project area.

14         The Service also argues that the Project may improve marten habitat by increasing

15   structural variation. Defs.' Mot. at 19–20. Martens do prefer complex forest stands. *See e.g.*, AR

16   00616. However, there is little or no record evidence to support that the Three Creeks Project

17   would achieve these conditions. *See supra* Section II. Currently the area is dominated by small

18   trees and contains only 7 large trees per acre. AR 00560. Despite this, the Service may remove

19   moderate trees and some of these few remaining large trees, which would in fact eliminate or

20   decrease the slight structural complexity the stands currently have, negatively impacting martens.

21         The Service's failure to consider impacts on the black-backed woodpecker and marten is

22   particularly egregious given the Sierra Nevada represent the southernmost extent of both species'

23   range. AR 00895, 15483. These edge populations are important to these species' viability. Pls.'

24   Mot. at 24–25. The Service fails to consider this fact in both its NEPA analysis and cross-motion.

25         The general, conclusory statements about how the Three Creeks Project may impact

26   species, and its failure to analyze the Project's impacts on the black-backed woodpecker's future

27   burned and current green forest habitat or on the Pacific marten outside of the three marten units,

28   are arbitrary and capricious and insufficient to meet NEPA's hard look requirement.

**V.      The Forest Service Failed to Ensure the Quality of its Analysis. (Claims 4 and 5).**

When conducting a NEPA analysis an agency must seriously consider the issues and respond to reasonable opposing viewpoints, otherwise it may corrupt the scientific accuracy and integrity of its analysis, in violation of NEPA. *Earth Island Inst.*, 2009 WL 2423478 at * 6, *8; *see also* 40 C.F.R. § 1500.1(b) (accurate scientific analysis is essential to implementing NEPA). An agency's failure to engage with and consider contrary scientific opinions renders an EA inadequate. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 871 (9th Cir. 2020). The agency must also support its conclusions with studies that it deems reliable, and "explain the conclusions it has drawn from its chosen methodology, and the reasons it considers the underlying evidence to be reliable." *The Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008)(en banc), *overruled in part on other ground*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008). During the NEPA process Earth Island provided the Forest Service with numerous studies that contradicted the EAs' conclusions, but the Service failed to fully consider the studies and failed to explain why the studies it relied upon were reliable in light of these new studies, in violation of NEPA.

**A.  The Forest Service failed to consider the recent studies regarding black-backed woodpecker's medium and large snag habitat requirements.**

The Three Creeks Project seeks to maintain a maximum of only three snags per acre, AR 00020, which is insufficient for certain species. In its comments and objection, Earth Island informed the Forest Service that several, recent studies concluded that the black-backed woodpecker requires approximately 100 medium and large snags per acre for quality habitat, *see* AR 00791–95, and that within green forest habitat specifically, the species requires at least 11 large snags per acre. AR 00780. The Project's three snags per acre requirement stems from the 2004 Framework, *see* AR 08174, but the Framework did not base this requirement on snag-dependent species. The Service however, continued to rely on the 2004 Framework's three snags per acre requirement without any acknowledgement or discussion of the studies provided by Earth Island or discussion regarding why the 2004 Framework was still reliable in light of the more recent, species specific studies, in violation of NEPA. *See Earth Island Inst.*, 2009 WL 2423478 at * 6 (must respond to reasonable opposing viewpoints); *The Lands Council*, 537 F.3d at 994 (Service must explain its conclusions and discuss why the underlying evidence is reliable);

1   *see also N. Plains Res. Council, Inc.*, 668 F.3d at 1075 (extending *The Lands Council*

2   requirement to NEPA).

3          The Service argues that it addressed Earth Island's comments, citing to its response to

4   comments, *see* Defs.' Mot. at 25,[9] however, its response was insufficient. The Service's response

5   never acknowledged the black-backed woodpecker's snag habitat requirements, for either quality

6   burned or green forest habitat, and instead notes the Project allows for snag creation on a *limited*

7   scale. AR 00091 (emphasis added). The Service's response also failed to acknowledge that the

8   Project allows for a maximum of only three snags per acre, AR 00020, and although the Service

9   states no snag cutting would occur, AR 00042, there is no certainty to this statement because it is

10  not included in the Project's design features or the DN/FONSI. *See* AR 00015–26, 00105–18. The

11  Service's failure to consider the recent studies provided by Earth Island, which discuss the black-

12  backed woodpecker's snag habitat requirements, renders the EA inadequate. *See Bark*, 958 F.3d

13  at 871 (Service must engage contrary scientific opinion).

14         The Service also argues, relying on the MIS report, that because "black-backed

15  woodpecker habitat is not present within the [P]roject area," it reasonably concluded the Project

16  would not impact the species' burned forest habitat. Defs.' Mot. at 25; *see also* Defs.' Mot. at 22.

17  This however, is misleading and continues to disregard the black-backed woodpecker's green

18  forest habitat.[10] *See supra* Section IV(A). The MIS report, analyzed the black-backed

19  woodpecker's *burned* forest habitat and noted that this *burned* habitat is not within the Project

20  area. AR 00589. The MIS report never discussed the black-backed woodpecker's green forest

21  habitat, and while it does state that there are snags in green forests within the Project area, this

22  snag density is low. AR 00589. The Service's continued failure to acknowledge or discuss the

23  black-backed woodpecker's green forest habitat as well as its overall snag requirements, for both

24  _____

25  [9] In its cross-motion the Service cites to its response to another group's comments—AR 00085—
    the Service's response to Earth Island's comment regarding the snag requirements for the black-
26  backed woodpecker however, is located at AR 00091–92. *See* AR00079 ("4" relates to comments
    from Friends of the Inyo; "5" relates to comments from Earth Island).

27  [10] Although not necessary to prove its habitat-based claim, Earth Island notes that its standing
    declarants, while studying black-backed woodpeckers in the Project area, have found black-
28  backed woodpeckers nesting in the Project area's green forest habitat. *See* ECF No. 36, Hanson
    Decl. ¶ 21; ECF No. 35, Chi Decl. ¶ 17.

1  burned and green forests, is arbitrary and capricious. *The Lands Council*, 537 F.3d at 994, 1002

2  (must conduct a full and fair discussion of impacts and explain its conclusions and why the

3  underlying evidence is reliable**.**

### B.  The Service failed to adequately analyze the conflicting Moriarty study.

5  Earth Island also provided the Service with the recent Moriarty study, AR 00754–55,

6  which concluded that efforts to reduce wildfire intensity often simplify forest structures and can

7  have negative effects on Pacific marten movement dynamics and foraging capability. AR 05554,

8  05563. Martens are one of the most habitat specific mammals, AR 13382, and rely on highly

9  complex stand structures with large trees. AR 00608, 00616. Moriarty recommended that fuels

10  treatments should be planned outside of marten habitat. AR 05563. Upon receiving the study, the

11  Service stated that it needed to review and incorporate it into the marten analysis as appropriate.

12  AR 00671. In its 2018 EA however, the Service cited to only one sentence from the Moriarty

13  study, discussing marten's preference for structural variation, *see* AR 00041, but otherwise failed

14  to acknowledge or meaningfully consider the study's overall conclusion and recommendations

15  regarding the harmful effects fuels treatments may have on marten or how the Moriarty study

16  impacted the reliability of the studies the Service relied upon. The Service's failure to consider

17  the overall findings of the Moriarty study or its impact on the other studies it relied upon

18  corrupted the scientific accuracy and integrity of its 2018 EA. *See Earth Island Inst.*, 2009 WL

19  2423478 at *8 (misinterpretation of a relevant study corrupted the Service's analysis); *The Lands

20  Council*, 537 F.3d at 994 (agencies must explain why the studies they use are reliable).

21  The Service argues its conclusions in the 2018 EA are consistent with the Moriarty study.

22  It is mistaken. Although increasing structural complexity of forest stands benefits martens, Defs.'

23  Mot. at 26, *citing* Moriarty study, the Project will actually simplify the area's stand structure. In

24  fact, the Forest Service admits that the Project could "remove structural complexity and near

25  ground cover." Defs.' Mot. at 26. Within the area, there are only 7 large trees per acre, AR 00560,

26  however, the Project proposes to remove an unknown amount of the few remaining large trees or

27  moderate trees. *See supra* Section II. Losing some moderate trees or any of the few remaining

28  large trees will reduce the area's canopy closure, a vital aspect of marten habitat, and only

1   exacerbate the dominance that small trees have in the area, creating an even more homogenous

2   forest structure than currently exists. *See* AR 00010. This simplified forest structure runs directly

3   counter to the guidance issued in the Moriarty study to increase structural complexity.

4          The Service also argues it had discretion to rely on its own experts and was not required to

5   adopt the Moriarty study's recommendations. Defs.' Mot. at 26. Agencies can rely on their own

6   experts; however, they are also required to respond to reasonable opposing viewpoints, *Earth*

7   *Island Inst.*, 2009 WL 2423478 at *6, and support their conclusions with studies they deem

8   reliable, with an explanation for why these studies are reliable. *The Lands Council*, 537 F.3d at

9   994. Here, the Service both failed to adequately respond to the contrary Moriarty study and to

10  discuss the studies it relied upon and explain why they are reliable. The Service claims that the

11  "record contains everything the Court needs to examine the agency's assessment of the Project's

12  impact on the Pacific marten," but cites to no record documents to support its assertion. Defs.'

13  Mot. at 26. In fact, in a report from 2013, separate from the Three Creeks Project, but in the

14  Project record, the Service stated that how thinning projects fragment marten habitat is poorly

15  understood and that to move forward in treating fuels, it needs more information and notes that

16  Moriarty is currently undertaking this study. AR 09653, 09664. Despite knowing that Moriarty

17  filled this knowledge gap, the Service failed to adequately consider the study. Without a

18  reasonable response to the Moriarty study's findings or a discussion of the studies it relied upon

19  and why they are still reliable in light of the Moriarty study, the Service's NEPA analysis is

20  arbitrary and capricious.

21         The Service claims Earth Island's grievance is with its conclusion that the Project can

22  benefit martens. Defs.' Mot. at 26–27. The Service is, once again, mistaken. While Earth Island

23  does question whether or not the Project will benefit martens, that uncertainty results from the

24  Service's failure to fully analyze the Project's effects on marten throughout the entire Project

25  area. *See supra* Section IV(B). Here however, Earth Island's legal claim is that the Forest Service

26  failed to adequately support its conclusion regarding the Project's benefits for marten, in violation

27  of NEPA. *See The Lands Council*, 537 F.3d at 994.

28         The Forest Service's failure to disclose and meaningfully consider the recent studies

1    submitted and identified by Earth Island was arbitrary and capricious in violation of NEPA.

2    **VI.    The Forest Service Failed to Provide an Opportunity to Comment on the January 2018 EA. (Claim 9).**

3        Agencies must encourage and facilitate public involvement in the NEPA process. 40

4    C.F.R. § 1500.2(d). Public comments are the heart of the NEPA process. *State of Cal. v. Block*,

5    690 F.2d 753, 770 (9th Cir. 1982). Under its own regulations, the Forest Service must provide an

6    opportunity to comment on an EA when, after consideration of new information or changed

7    circumstances, the Service prepares a supplemental or revised EA.[11] 36 C.F.R. § 218.22(d). The

8    Three Creeks' 2018 EA was prepared after the Service considered new information and it

9    contained significant differences from the prior 2016 and 2017 EAs that were available for public

10   review. *See* AR 00759–60 (notice for 2017 EA), 00775 (notice for 2016 EA). The Service's

11   refusal to provide for comments on the 2018 EA violates NEPA and Forest Service regulations.

12       In its objection, Earth Island identified numerous concerns with the 2017 EA. *See* AR

13   00753–58. In response, the Forest Service stated that it would make several changes to the final

14   EA. AR 00671. The Service did in fact makes changes to the 2018 EA, some of which were based

15   on new information presented in Earth Island's objection, and the 2018 EA was ultimately

16   substantially different from the prior EAs. In spite of these changes, and a specific request to

17   comment on any revised EA, *see* AR 00664–65, the Forest Service never offered Earth Island or

18   other interested members of the public an opportunity to comment on the 2018 EA.

19       First, the Forest Service incorrectly states the standard for when a comment period should

20   be issued for revised EAs. In its cross-motion, the Service states that because there are no

21   *significant* changes or new information, no comment period was necessary. Defs.' Mot. at 31–32

22   (emphasis added). The regulations however, simply require new information or changes to be

23   presented; they do not need to be significant. 36 C.F.R. § 218.22(d). Even if it is necessary to

24   show significance, the changes and new information in the 2018 EA would meet this threshold.

25

26   ---

27   [11] While the Service's regulations allow the responsible officer to sign a decision notice after responding to objections and addressing concerns, Defs.' Mot. at 31, *citing* 36 C.F.R. § 218.12, the officer must also ensure that if the EA is supplemented or revised with new information that the interested public is given an opportunity to comment on the revised EA. 36 C.F.R. § 218.22(d).

28

Second, the desired forest conditions within the 2018 EA significantly changed from those presented in the 2016 and 2017 EAs. In prior EAs, the Service stated it wanted to achieve a basal area of 147 square feet and maintain 22 large trees per acre. AR 00127, 00244. The 2018 EA stated the Service seeks to achieve a basal area between 70–152 square feet and maintain only 39–79 trees per acre with 14 of them being large trees. AR 00009. The Service offered no explanation for why the desired conditions changed. While the desired basal area and number of large trees do not drive the need for the Project, *see* Defs.' Mot. at 31, they do change the Project's end result and its environmental impact. Managing for large trees is essential to meet the Project's purpose of increasing the forest's resiliency and returning to historic conditions, AR 00007; in fact, large trees once dominated this area, AR 00009, but now one may find only 7 large trees per acre. AR 00560. It was arbitrary for the Service to reduce the number of desired large trees per acre from 22 to only 14, without any explanation or analysis regarding how retaining fewer large trees may impact the environment or the Service's ability to achieve the Project purpose.

Third, the 2018 EA stated that the vast majority of trees to be removed are less than 10 inches DBH. AR 00015. The 2018 EA is the first time that this new information (smaller size of trees to be removed) was provided to the public. In the prior EAs and other NEPA documents, the Service continually stated that the majority of trees to be removed would be *over* 10 inches DBH. *See* AR 00133 (2017 EA); 00250 (2016 EA); 00552, 00619 (project specific reports); *see also* 00330, 00460, 00502, (Project includes commercial thinning, or removal of trees over 8 inches DBH). The Service claims this change was simply a "clarification" and that the 2018 EA aligns with the purpose and need and the analysis in prior NEPA documents. Defs.' Mot. at 32. The Service is mistaken. The 2018 EA clarifies nothing because it contains inconsistent statements regarding the size of trees to be removed, stating both that the vast majority of trees to be thinned are less than 10 inches DBH and that trees removed would range from 8–20 inches DBH. AR 00015, 00038; *see also supra* Section II. Also, even if the vast majority of trees the Service would remove are less than 10 inches DBH, it would still remove some moderate and large trees, and thus fail to meet the Project's purpose. *See supra* Sections I(A), III; *see also* Pls.' Mot. at 18 n.3.

1  The new information in the 2018 EA did not provide any clarity or meet the Project's purpose;

2  thus, the public should have been given the opportunity to comment regarding this change.

3      Finally, the 2018 EA contains new information and analysis regarding the black-backed

4  woodpecker and Pacific marten. *See* Pls.' Mot. at 31. The Service argues that because the new

5  information in the 2018 EA did not change its prior conclusions or analyses regarding impacts to

6  these species, additional comments were not necessary. Defs.' Mot. at 32. The purpose of NEPA

7  however is not for agencies to confirm prior conclusions, but is instead to foster better decision-

8  making and informed public participation at every step of the decision-making process.

9  *Conservation Cong.*, 235 F. Supp. 3d at 1213; *see also* 40 C.F.R. § 1500.1(b) (NEPA procedures

10  must ensure that information is available before decisions are made and actions are taken; public

11  scrutiny is essential). Thus, the new information in the 2018 EA was significant because it raised

12  the issue of whether the Service's unchanged conclusions were still supported in light of the new

13  information. The public should have been given an opportunity to comment on the Service's

14  analysis of the new information and whether its conclusions could still stand.

15      The Forest Service's refusal to provide an opportunity to comment on the 2018 EA

16  circumvented the heart of the NEPA process, in violation of NEPA and its own regulations.

17  **VII.   The Forest Service Issued an Improper FONSI and Failed to Prepare an EIS.
        (Claims 7 and 8).**

18

19      "An agency is required to prepare an [Environmental Impact Statement ("EIS")] where

20  there are substantial questions about whether a project *may* cause significant degradation of the

21  human environment." *Native Ecosystems Council*, 428 F.3d at 1239 (emphasis in original). If

22  however, during its preparation of an EA, an agency decides to issue a FONSI in lieu of an EIS, it

23  "must supply a convincing statement of reasons" to support that FONSI determination. *Native
    Ecosystems Council v. Tidwell*, 599 F.3d 926, 937 (9th Cir. 2010). Here, the Forest Service

24  provided no convincing statement to support its FONSI and ultimately failed to prepare an EIS by

25  improperly addressing the context and intensity of the Three Creeks Project.

26      As detailed throughout Earth Island's opening brief and this combined reply and response,

27  the Forest Service continually cut corners during the Three Creeks NEPA analysis by failing to

28  undertake the requisite hard look at impacts, failing to reasonably consider contradicting scientific

studies, and failing to facilitate public participation. These NEPA violations render both the 2018 EA and resulting DN/FONSI arbitrary and capricious. *See Gifford Pinchot Task Force v. Perez*, 2014 WL 3019165 at *40 (D. Or. July 3, 2014). The DN/FONSI also arbitrarily and capriciously determined that the context of the Three Creeks Project was not significant and that none of the ten intensity factors were implicated by the Project. AR 00115–17; *see also* 40 C.F.R. § 1508.27.

### A.  The Forest Service failed to adequately analyze the context of the Project.

The Forest Service improperly analyzed the Project's context. NEPA requires the agency to consider the significance of an action in several contexts, including the affected region, the affected interests, and locality. 40 C.F.R. § 1508.27(a). The Project's effects on the local area are in fact significant because of its large size and proposed removal of moderate and large trees. The Service argues that an action's significance cannot be based on its size, Defs.' Mot. at 27–28, but cites to no case to support this assertion. The Service is also mistaken and misinterprets *Curry v. U.S. Forest Service. See* Defs.' Mot. at 28 n.13. In *Curry*, the magnitude of the proposed project (which exceeded 5,000 acres) and the Service's desire for even-aged management (stands composed of a single age class) undermined its determination that there would be no significant impacts. 988 F. Supp. 541, 551 (W.D. Pa. 1997). Based on the magnitude of the project and the intensity factors implicated by the project, the Service's failure to prepare an EIS violated NEPA. *Id.* at 553. *Curry*, which aligns with the fact of the present case, is persuasive. The Three Creeks Project encompasses 9,590 acres and proposes to remove moderate trees and some of the few remaining large trees, AR 00005, 00015, which would ultimately cause the small trees to continue to dominate the area. These impacts, as well as the intensity factors that are implicated, *see infra*, show the Forest Service violated NEPA by failing to prepare an EIS for the Three Creeks Project.

### B.  The Forest Service failed to analyze the Three Creeks Project's intensity.

The Three Creeks Project fails to adequately analyze or disclose the Project's (a) beneficial or adverse impacts, 40 C.F.R. § 1508.27(b)(1); (b) impacts on unique resources, *id.* § 1508.27(b)(3); (c) certainty, or uncertainty, of impacts, *id.* § 1508.27(b)(5); and (d) violations of other federal law, *id.* § 1508.27(b)(10). If even *one* of the intensity factors exists, an EIS may be required. *Ocean Advocates*, 402 F.3d at 865.

1       By failing to discuss the extent to which larger trees will be removed, the Service did not

2   analyze or even acknowledge the effects of this tree removal. Moderate and large trees are more

3   fire and disease tolerant than the smaller trees that currently dominate the Project area. The

4   Service fails to discuss how removing these larger trees will impact the Project area, as well as

5   the Project purpose. *See supra* Section I(A). The Service also fails to analyze how the Project will

6   affect the black-backed woodpecker and Pacific marten. While the Service appears to

7   acknowledge there will be some impacts to these species, it fails to analyze how the Project will

8   affect the species' viability. *See supra* Section IV. These inadequate analyses support a finding

9   that the Service failed to disclose the Project's impacts. 40 C.F.R. § 1508.27(b)(1).

10       The Forest Service's determination that the Project will have no impacts on unique

11   resources, such as ecologically critical areas or wild and scenic rivers, is also inadequate. *See id.*

12   § 1508.27(b)(3); *see also* Pls.' Mot. at 33. Black-backed woodpecker and Pacific marten

13   peripheral populations are both at risk from the Three Creeks Project, which the Forest Service

14   failed to acknowledge during the NEPA process, as well as its cross-motion; these populations are

15   ecologically critical because they often hold the key to species' persistence, *see supra* Section IV.

16   The Project area also includes rivers designated as *Scenic* and *Recreational* under the Wild and

17   Scenic Rivers Act, but only provides conclusory statements about design features protecting these

18   segments, failing to fully disclose and/or analyze impacts to these areas.[12] Pls.' Mot. at 33.

19       The Service relies on *Northwest Environmental Defense Center v. Wood* to support its

20   FONSI, Defs.' Mot. at 29, however the case is distinguishable because the agency's

21   administrative record was "replete with information bearing on the impact" to wetlands, a unique

22   resource. 947 F. Supp. 1371, 1382 (D. Or. 1996). Here, the Forest Service simply stated that

23   design criteria would protect the unique wild and scenic rivers, without disclosing or analyzing

24

---

25   [12] The Service's duty to consider impact to unique resources, such as wild and scenic rivers, is so

26   obvious and clearly understood by the Service, *see* AR 16467, that Earth Island was not also required to raise this concern in its comment or objection. *See* Defs.' Mot. at 29 n.15; *see also*

27   *Pub. Citizen*, 541 U.S. at 764–65 (if flaws are obvious "there is no need for a commenter to point them out specifically" to preserve their appeal); *Nevada v. Dep't of Energy*, 457 F.3d 78, 88 (D.C.

28   Cir. 2006) ("judicial review may be had if an issue was raised" by another party).

1    any impacts the rivers may face. AR 00053. The Service also argues Earth Island did not explain

2    which unique characteristics of the wild and scenic rivers will be affected by the Project, Defs.'

3    Mot. at 29, but the wild and scenic rivers themselves are a unique characteristic of the Project

4    area, Earth Island need not provide any more information. *See* 40 C.F.R. § 1508.27(b)(3).

5    Moreover, Earth Island does not need to analyze or specify impacts to the wild and scenic rivers,

6    that is the Forest Service's duty; Earth Island need only show "that there are substantial questions

7    [about] whether a project may have a significant effect." *Ctr. for Biological Diversity*, 538 F.3d at

8    1219, *internal quotes omitted*.

9         The Project's effects on the human environment are also extremely uncertain. *See* 40

10   C.F.R. § 1508.27(b)(5). The Forest Service, having provided contradictory information

11   throughout the NEPA process, has not clearly informed the public about how the Project will be

12   implemented, *see supra* Section II, and never discusses how the black-backed woodpecker and

13   Pacific marten will be impacted by the loss of habitat brought about by the Project. *See supra*

14   Section IV. While the Service need not eliminate all uncertainty prior to issuing a FONSI, Defs.'

15   Mot. at 30, its "cursory" treatment of the Project's impacts to species as well as its "inconsistent

16   treatment" regarding how the Project will be implemented raises substantial questions about the

17   Project's effects, thus it must prepare an EIS. *See Blackwood*, 161 F.3d at 1213–14.

18        The Three Creeks Project also threatens a violation of federal law, 40 C.F.R. §

19   1508.27(b)(10), by failing to comply with the 2004 Framework's desired conditions of retaining

20   large, fire-resistant trees, in violation of NFMA and by refusing to provide an opportunity to

21   comment on the 2018 EA, in violation of Forest Service regulations. *See supra* Sections I(B), VI.

22        The Project's magnitude and its implication of several intensity factors supports a finding

23   that the Service's DN/FONSI is arbitrary and capricious and an EIS should be prepared.

24   **VIII.   The Court should Vacate the DN/FONSI and 2018 EA.**

25        Vacatur is the standard remedy when a court concludes that an agency's decision is

26   unlawful under the Administrative Procedure Act ("APA"). *League of Wilderness Defs./ Blue*

27   *Mountains Biodiversity Project v. Peña*, 2015 WL 1567444 *1 (D. Or. April 6, 2015); *see also*

28   *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020) ("[I]n a case where § 706(2)(A)

1   applies, there is a statutory directive . . . telling a reviewing court that its obligation is to "set

2   aside" any unlawful agency action."). It is the defendant's burden to demonstrate that vacatur, the

3   presumed remedy, is unwarranted. *Ctr. for Envtl. Health v. Vilsack*, 2016 WL 3383954 *13 (N.D.

4   Cal. June 20, 2016); *see also Alliance for the Wild Rockies v. U.S. Forest Ser*v., 907 F.3d 1105,

5   1121–22 (9th Cir. 2018) (defendant failed to "overcome the presumption of vacatur").

6        Courts may apply a remedy other than vacatur in "limited circumstances," such as where

7   vacatur "could result in possible environmental harm." *California v. Bernhardt*, 2020 WL

8   4001480 *43 (N.D. Cal. July 15, 2020) (quoting *Pollinator Stewardship Council v. U.S. Envtl.

9   *Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015)). The present case however, is clearly not one of

10  the rare cases where vacatur is not the appropriate remedy. The seriousness of the Forest

11  Service's statutory violations strongly outweighs the disruptive consequences resulting from

12  vacatur. *See W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042, 1083 (D. Id. 2020)

13  (defendant's self-evident errors weighed heavily in plaintiff's favor), *appeal filed*. The Forest

14  Service claims vacatur will interfere with its ability to improve forest health, but it has not met its

15  burden of establishing "the type of serious consequences required to disrupt the APA's

16  presumptive vacatur remedy." *Id.* at 1084. The only disruption the Forest Service may face by the

17  2018 EA and DN/FONSI being vacated is a delay in implementing any new, reconsidered

18  decision regarding the Three Creeks Project; it will be entirely within the Forest Service's control

19  how long that delay lasts. Without vacatur, the Forest Service could seek to remove the few

20  remaining moderate and large sized trees in the area and those trees could not be replaced, even if

21  the Forest Service decided on remand that it was in fact a mistake for it to authorize the removal

22  of those moderate and large trees in this project area.

23        The Forest Service relies on *Pollinator Stewardship Council*, but it seriously misconstrues

24  the case by suggesting that vacatur requires a "fundamental flaw" that would prevent the agency

25  from adopting the same conclusion on remand. Defs.' Mot. at 35. Contrary to the Forest Service's

26  assertion, *Pollinator Stewardship Council* does not state that an agency's decision *requires* a

27  fundamental flaw in order for a court to vacate it; it is instead just one factor in the court's

28  evaluation. 806 F.3d at 532. The Forest Service also incorrectly relies on the factors for issuing an

injunction in their attempt to demonstrate that vacatur is unwarranted. Defs.' Mot. at 35. The two

remedies—injunctions and vacatur—are distinct in that an injunction constitutes an

"extraordinary remedy," that is unwarranted if a less drastic remedy, such as vacatur, could

sufficiently redress plaintiff's injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 166–

67 (2010). Under the traditional test for injunctions, courts consider the whether the requesting

party has suffered irreparable harm, whether available remedies are inadequate to compensate for

that injury, the balance of the equities, and the public interest, *id.* at 156–57, whereas the two-part

vacatur test weighs the seriousness of the agency's errors and then the disruptive consequences

that would result from vacatur. *W. Watersheds Project*, 441 F. Supp. 3d at 1083.

The Forest Service fails to meet its burden to show that vacatur is unwarranted.

Accordingly, the Court should vacate the challenged DN/FONSI and 2018 EA.

## **CONCLUSION**

The Court should grant Earth Island's motion, deny the Forest Service's motion, and

vacate the Three Creeks Project's DN/FONSI and 2018 EA because the Project's administrative

record shows the Forest Service repeatedly and pervasively failed to comply with NEPA, NFMA,

and its objection regulations.


Respectfully submitted on this 14th day of August, 2020


/s/ Thomas Buchele
Thomas Buchele (CA Bar No.129657)
/s/ Morgan Staric
Morgan Staric, *Admitted Pro Hac Vice*
Earthrise Law Center
Lewis & Clark Law School
10015 SW Terwilliger Blvd.
Portland OR  97219-7799
Tel: 503-768-6736 (Buchele)
Tel: 503-768-6825 (Staric)
Email: tbuchele@lclark.edu
Email: mstaric@lclark.edu

*Attorneys for Plaintiffs Earth Island Institute and Center for Biological Diversity*