1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   EARTH ISLAND INSTITUTE, et al.,          No.  2:19-cv-01271-MCE-DB

12                  Plaintiffs,

13          v.                                 **MEMORANDUM AND ORDER**

14   UNITED STATES FOREST SERVICE,
     et al.,
15
                    Defendants.
16

17          This case arises out of the approval of the Three Creeks Project (the "Three

18   Creeks Project" or the "Project") in the Inyo National Forest (the "Forest") by Defendants

19   United States Forest Service and Margie B. DeRose, Acting District Ranger, Mono Lake

20   and Mammoth Ranger District, Inyo National Forest, in her official capacity ("USFS,"

21   "Forest Service," or "Defendants").  According to Plaintiffs Earth Island Institute and

22   Center for Biological Diversity (collectively "Plaintiffs"), the USFS violated the National

23   Environmental Policy Act ("NEPA"), the National Forest Management Act ("NFMA"), the

24   USFS's Objection Regulations, and the Administrative Procedure Act ("APA").  Plaintiffs

25   seek to enjoin the Government from proceeding with the Project until they have complied

26   with the applicable laws.

27          Presently before the Court are the parties' Cross-Motions for Summary Judgment

28   (ECF Nos. 30, 44) and Amended Cross-Motions for Summary Judgment (ECF Nos. 74,

                                           1

82) and Defendants' Motion to Strike (ECF No. 47).  Very generally, it appears that the crux of the parties' dispute is Plaintiffs' disagreement with Defendants' decisions on how to manage forest habitat and how to protect and conserve the black-backed woodpecker and the Pacific marten.  In addition, Plaintiffs take issue with Project provisions that allow for commercial logging of larger trees.  Plaintiffs point to no actual legal error, however, and their summary judgment Motions (ECF Nos. 30, 74) are thus DENIED.  Defendants' Motions, on the other hand, are GRANTED (ECF Nos. 44, 82) and judgment shall be entered in their favor.[1]  Defendants' Motion to Strike is DENIED as moot.

## LEGAL BACKGROUND[2]

### A.    National Environmental Policy Act (NEPA)

NEPA is America's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  It has two aims.  First, it forces federal agencies to "consider every significant aspect of the environmental impact of a proposed action."  Kern v. Bureau of Land Mgmt., 284 F.3d 1062, 1066 (9th Cir. 2002).  Second, NEPA demands that agencies provide ample opportunity for public participation in decision-making processes.  Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt., 387 F.3d 989, 996 (9th Cir. 2004); 40 C.F.R. § 1506.6(a).[3]  An agency's NEPA process must result in the public receiving all relevant environmental information before the agency makes its decision and the information must be of high quality and contain accurate scientific analysis so that meaningful public participation can occur.  40 C.F.R. §§ 1500.1(b),

---

[1] Because oral argument would not have been of material assistance, the Court ordered the foregoing motions submitted on the briefs.  E.D. Cal. Local Rule 230(g).

[2] The following principles are taken verbatim from the parties' papers, ECF Nos. 45, 52, and are not in dispute.  Citations are to the law as it existed at the time of Project approval, not to the current versions of the regulations.

[3] Each agency has its own regulations adding detail to the controlling Council on Environmental Quality ("CEQ") regulations regarding how to conduct NEPA analyses.  See 40 C.F.R. §§ 1500-1508.28; 36 C.F.R. Part 220 (Forest Service NEPA regulations).

1500.2(d).  Agencies must use the NEPA process to identify and assess alternatives to

their proposed actions that avoid or minimize adverse impacts on the environment.  Id.

§ 1500.2(e).  To this end, NEPA mandates preparation of an Environmental Impact

Statement ("EIS") for all "major federal actions significantly affecting the quality of the

human environment."  42 U.S.C. § 4332(2)(C).  Agencies may first create an

Environmental Assessment ("EA") to determine whether an EIS is necessary.  40 C.F.R.

§ 1508.9.  An EA is a public document in which an agency must assess a range of

reasonable alternatives by weighing the direct, indirect, and cumulative environmental

impacts of each.  Id. §§ 1508.9(b) (citing to NEPA's mandate, 42 U.S.C. § 4332(2)(E) to

study, develop and describe appropriate alternatives), 1508.25(c).  If an EA concludes

the proposed action will result in no significant environmental impacts, the agency will

issue a Finding of No Significant Impact ("FONSI").  Id. § 1508.13.  A FONSI "must

supply a convincing statement of reasons" to support that determination.  Native

Ecosystems Council v. Tidwell, 599 F.3d 926, 937 (9th Cir. 2010).

## B.    The National Forest Management Act (NFMA)

Congress enacted the NFMA in 1976 to establish a legal framework for managing

natural resources on Forest Service lands.  16 U.S.C. §§ 1601 et seq.  Among other

things, NFMA requires the Forest Service to prepare a land and resource management

plan ("Forest Plan") for each national forest, Id. § 1604(a), and include in the Forest Plan

standards and guidelines for how the forest shall be managed.  Id. §§ 1604(c),

1604(g)(2), 1604(g)(3).  NFMA requires that all site-specific actions authorized by the

Forest Service be consistent with the Forest Plan.  Id. § 1604(i).  "Pursuant to the NFMA,

the Forest Service must demonstrate that a site-specific project would be consistent with

the land resource management plan of the entire forest."  Neighbors of Cuddy

Mountain v. U.S. Forest Serv., 137 F.3d 1372, 1377 (9th Cir. 1998); see also Idaho

Sporting Cong., Inc. v. Rittenhouse, 305 F.3d 957, 966 (9th Cir. 2002) ("All site specific

actions must be consistent with adopted forest plans").  "[T]he Forest Service's

interpretation and implementation of its own forest plan is entitled to substantial

1   deference," Native Ecosystems Council v. Weldon, 697 F.3d 1043, 1056 (9th Cir. 2012),

2   and will not be disturbed unless it is plainly erroneous.  Id. at 1052.

3   **C.     The USFS's Objection Regulations**

4   The USFS provides regulations establishing a pre-decisional administrative

5   review process (now known as the objection process) for proposed USFS projects

6   documented with a decision notice.  36 C.F.R. § 218.1.  An objection is a written

7   document seeking pre-decisional administrative review of a proposed project

8   implementing a Forest Plan and documented with an EA.  Id. at § 218.2.  Those who

9   submitted written comments on a proposed project can file an objection.  Id.  Certain

10  projects are required to be subject to legal notice and the opportunity to comment,

11  including proposed projects for which an EA is prepared as well as "proposed

12  projects . . . for which a supplemental or revised EA . . . is prepared based on

13  consideration of new information or changed circumstances."  Id. at §§ 218.22(a);

14  218.22 (d).  This provides the public the ability to comment on a proposed action, as well

15  as ensures that the right to file an objection is maintained for those who do comment.  Id.

16  at § 218.5.

17  **D.     The Administrative Procedures Act (APA)**

18  Judicial review of agency compliance with NEPA and NFMA is reviewed under

19  the standard set forth in the APA.  5 U.S.C. §§ 701-706; Native Ecosystems Council v.

20  Dombeck, 304 F.3d 886, 891 (9th Cir. 2002).  APA review is generally limited to the

21  administrative record that was before the agency at the time of its decision.  Id.; Sw. Ctr.

22  for Biological Diversity v. U.S. Forest Srvc., 100 F.3d 1443, 1450 (9th Cir. 1996).  Under

23  the APA, a court may set aside an agency action if it determines that the action was

24  "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

25  5 U.S.C. § 706(2)(A).  This standard of review is "highly deferential, presuming the

26  agency action to be valid and affirming the agency action if a reasonable basis exists for

27  its decision."  Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv., 475 F.3d 1136, 1140

28  (9th Cir. 2007) (quotation marks and citation omitted).

4

The court's task in reviewing agency action under the APA is simply "to insure a fully informed and well-considered decision, not necessarily a decision [the court] would have reached had [it] been [a member] of the decisionmaking unit of the agency." Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, 435 U.S. 519, 558 (1978). Courts must therefore uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." Modesto Irrigation Dist. v. Gutierrez, 619 F.3d 1024, 1036 (9th Cir. 2010) (quotation and citation omitted). This is especially true in the context of management of Forest Service lands, for "Congress has consistently acknowledged that the Forest Service must balance competing demands in managing National Forest System lands." Lands Council v. McNair, 537 F.3d 981, 990 (9th Cir. 2008); rev'd on other grounds by Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008).

The APA instructs courts to "hold unlawful and set aside agency action, findings, and conclusions found to be[:] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2); see Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998). In order for an agency decision to withstand APA scrutiny the agency "must examine the relevant data and articulate a satisfactory explanation for its action." Soda Mountain Wilderness Council v. Norton, 424 F. Supp. 2d 1241, 1260 (E.D. Cal. 2006). When presented with supported scientific uncertainties, an agency must include a full and fair discussion of said uncertainties. The Lands Council, 537 F.3d at 1002–03. An agency's action is arbitrary and capricious if the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." Id. at 987 (citation and quotation marks omitted).

///

///

5

**FACTUAL AND PROCEDURAL BACKGROUND**[4]

A.      **The Inyo National Forest and the Three Creeks Area**

The Inyo National Forest lies on the eastern side of the Sierra Nevada mountain range.  For instant purposes, the Three Creeks Project area consisted of 130 stands totaling 9,590 acres of Jeffrey pine forest that are part of a much larger forested area located on both the Mono Lake and Mammoth Lakes Ranger Districts.  AR 00009.[5] Prior to the late 1800s, the Jeffrey pine forest in the Three Creeks area was typical of other Jeffrey and ponderosa pine forests in the western United States.  Id.  Stands were generally open, and older, larger trees dominated the area, which averaged 14 large trees (>24 inches diameter at breast height ("dbh")) per acre, with a mean tree diameter of 22 inches.  Id.  In the eastern region of the Sierra Nevada, stands burned frequently (every 7 – 15 years) at low intensities, which perpetuated a heterogeneous vertical and horizontal structure with multiple age classes of trees, groups of denser trees, gaps, and interspersed single trees.  AR 00007.

In 1924, the Forest Service and other land management agencies began suppressing and controlling wildland fires, which had historically played an important role in the ecosystem.  AR 0007.  In addition, logging practices removed the large diameter trees from the landscape.  Id.  Due to logging and the absence of fire, these forests grew back denser and more homogenous.  Both surface and aerial fuels increased as dead material accumulated on the forest floor, and young trees began to fill in available space. Id.  Since the 1970s, this increased density—combined with higher summer temperatures and prolonged droughts—has resulted in numerous and frequent high-intensity, large-scale wildfires.  Id. (citing Gruell (2001), AR 04683-89; Mallek (2013), AR 05224-05251; Miller (2009), AR 05354-05371; and Steel (2015), AR 06056-06078).

---

[4] Unless otherwise specified, the following recitation of facts is taken, again almost entirely verbatim, from the parties' briefs.  The underlying facts come from the administrative record and are undisputed.

[5] A bark beetle outbreak, discussed below, later decreased the Project area marginally.

The Project area consists of approximately 21% Wildland-Urban Intermix ("WUI")[6] and 79% General Forest ("GF").  See EA, Table 1 (AR 00026-00032).  The USFS divides the Project area by condition, identifying four general strata.  AR 00010. Throughout the Project area, stands are now dominated by smaller trees, i.e. those smaller than 8 inches dbh, and stand density has reached levels that are two to five times higher than the historical density.  See Fig. 1, below; AR 00560.  According to the silviculture report—which defines large trees as those measuring greater than 24 inches dbh—there are currently five large trees per acre ("TPA") in strata 1, six TPA in strata 2, five TPA in strata 3, and thirteen TPA in strata 4.  AR 000560.

Another metric that demonstrates the over-density trend in the Project area is stand density index ("SDI").  Silvicultural analysis of SDI indicates that when a tree stand "reaches a SDI of 230," it is "the beginning of a 'zone of imminent bark beetle mortality.'" AR 00011.  Analyzing current SDI for each strata within the project area, the USFS estimates that if no action is taken, all but one of the four strata will be above SDI 230 within 10 years.  Id.

**B.    The Forest Plan Framework**

In 2004, the Forest Service adopted the Sierra Nevada Forest Plan Amendment ("2004 Framework"), which replaced the 2001 Sierra Nevada Forest Plan Amendment to the Inyo National Forest Plan.  AR 08121-96.  The 2004 Framework presents a strategy for addressing the fire situation in the Sierras in combination with key components of the conservation strategy for old forest-dependent species.  AR 08126.  The 2004 Framework prioritizes areas in which thinning projects will occur and sets forth standards and guidelines for those projects in the different areas in the Sierra Nevada.  AR 08128. In the Record of Decision for the 2004 Framework, the Forest Service stated that its "first emphasis is on reducing fuels in the . . . WUI."  Id.  The Forest Plan includes in its standards and guidelines that "[t]rees 30 inches dbh and larger will be retained in all

---

[6] WUI is an area where human habitation is mixed with areas of flammable wildland vegetation. AR 08163.

thinning projects" and that "trees 25 inches dbh and above will be retained in most treated areas." Id.

The Framework recommends thinning, salvage, and prescribed and natural fires to make forests less susceptible to the effects of uncharacteristically severe wildfires, as well as invasive pests and diseases. AR 08139. The integrated strategy includes methods of thinning trees and brush removal ("fuels treatments"). The Framework recognizes that this strategy would provide for the removal of some medium-sized trees to increase the likelihood of accomplishing long-term desired conditions. AR 08140. The Framework includes a standard and guideline that "[f]or all mechanical thinning treatments, design projects to retain all live conifers 30 inches dbh or larger. Exceptions are allowed to meet needs for equipment operability." AR 08173. Further, for mechanical thinning treatments outside defense zones in the eastside pine type, projects should retain 30 percent of the existing basal area, with the retained basal area generally comprised of the largest trees. AR 08174.

### C. The Project

The purpose of this Project is to promote forest health by increasing resiliency to wildfire, drought, and pathogens, and to restore and improve a variety of habitat-types over the Project area. AR 00007–08. According to the Government, the project is needed because current conditions do not meet the desired conditions, primarily due to past fire suppression and forestry practices. AR 00009. Currently, across the Project area, several metrics present a troubling scenario. "[T]ree densities range from 2 to 5 times greater than [natural range of variability] conditions with much smaller average diameters." AR 00010. This large number of small trees create a homogenous environment that is conducive to high severity crown fires. Id. In addition, as these forests continue to grow, the densely-situated trees compete with each other, reducing available nutrients, light, and moisture, with the resultant stresses causing trees to become "more likely to succumb to pest and pathogen outbreaks, drought, and climate change resulting in higher mortality rates and increased fuel build-up." Id.

### 1.   Treatment Methods

To meet its purpose and need, the Project will thin excess trees, treat fuels, and use prescribed fire.  AR 00012.  The USFS intends to thin trees using a thin from below technique, which will preferentially cut smaller diameter trees.  AR 00057.  "For all units, the vast majority of trees to be thinned would be less than 10 inches [dbh]."  AR 00015.  The Project design also will encourage heterogeneity by expanding existing gaps and creating new ones.  AR 00015-16.  The new gaps will promote vertical diversity and maintain and accentuate a diversity of tree age classes.  Id.  The Project also includes numerous design features and unit-by-unit treatment methods meant to protect or improve habitat for wildlife and plants and protect water quality and other resources.  AR 00015–26.

The USFS divided treatment units into four strata for sampling purposes.[7]  All four strata are dominated by smaller tree stands (nearly 60 percent less than 8 inches dbh).  AR 00560.  The EA distinguishes smaller trees (less than 10 inches) from the mid-size and large trees that it characterizes as "merchantable."  Id.  "The majority of merchantable trees which would be thinned would be 10 – 20 inches dbh."  And trees over 24 inches dbh would only be removed to protect larger trees or when goals could not be met by cutting smaller trees.  Id.; AR 00009.  No trees over 30 inches dbh would be cut as part of this project unless deemed a direct operational safety hazard.  AR 00522.  "While it is expected multiple commercial and public wood cutting opportunities will occur as a result of project approval, product extraction is a by-product of implementation, as forest health and restoration are the primary purpose of this proposal."  AR 00009.[8]

---

[7] As noted above, the Project area consists of approximately 79% GF, 18% WUI (T) and 3% WUI (D). The Forest Service tailored different design features for the different zones (AR 00016, 00018, 00020), and different desired conditions (AR 00008).

[8] Some Project documents differentiate trees that are smaller than 8 inches dbh from trees that are greater than 8 inches dbh by designating the smaller than 8-inch trees "pre-commercial" and the larger trees "commercial."  See, e.g., AR 00460.  However, the Project does not differentiate the method of removal between these two designations, as thinning of both "pre-commercial" and "commercial" trees would be done by "Hand fell/chainsaw or mechanical harvester."  Id.

1

2. **Public Involvement**

Public outreach for the Project began in fall 2012, when the USFS issued its scoping notice.  AR 01503-01507.  Over the following four years, the USFS completed necessary surveys and compiled reports, including silviculture, fuels and fire, wildlife and aquatics, hydrology and soils, and cultural resources.  The USFS published a draft EA in March 2016 ("2016 EA").  AR 00237-320.  The John Muir Project and Earth Island Institute, submitted comments on the draft EA the following month.  AR 00779-99.  They requested withdrawal of the Project and the Framework.  AR00779.  More specifically, they (1) disputed that fire intensity is above historic levels and is at risk of increasing and (2) further disputed the Project's baseline of Black-backed woodpecker habitat; (3) contended that larger stream buffers are needed to avoid potentially significant impacts to the Sierra Nevada Yellow-Legged Frog; and (4) argued that the 2004 Framework is "obsolete" because its assumption that risk of intense fires is undesirably high and its objective to reduce the intensity of fires is misguided.  Id.  During the summer of 2016—while the Forest Service was considering comments—the Clark and Owens River Fires burned within several units covered by the Project.  AR 00005.[9] Based on the impact of these fires, the Forest Service determined that treatments were not necessary in these units and removed nearly six hundred acres from the Project.  AR 00005, 00259-00263.[10]

In July 2017, the Forest Service completed a revised EA and draft decision notice for the Project ("2017 EA").  AR 00119-222, 00223-00236.  Plaintiffs submitted objections to the revised EA.  AR 00753-00758.

Plaintiffs argued that the Forest Service relied on the outdated 2004 Framework when it decided to maintain only a maximum of three snags (standing dead or dying

---

[9] For the Owens River Fire, approximately 74% of the 5,460 acres burned at high and moderate soil burn severity.  AR 10080.  As to the smaller area where the fire did not burn as severely, the Forest Service attributed that reduced severity in part to recent fuel reduction work.  Id.

[10] The Project size was amended following the Clark and Owens River fires in 2016, going from 138 units at 10,187 acres to the proposed 130 units at 9,590 acres. AR 00005, 00241.

1    trees) per acre.  According to Plaintiffs, numerous species, including the black-backed

2    woodpecker and Pacific marten require significantly more snags per acre and other near

3    ground cover.  AR 00753–54, 00779–80, 00791–95.  They also provided the Forest

4    Service with recent scientific studies detailing the black-backed woodpecker's snag

5    habitat requirements and the impacts that forest management activities can have on

6    Pacific martens, AR 00753–55, 00779–80, 00791–95.  Plaintiffs also objected that the

7    USFS had considered an inadequate range of alternatives.  AR 00755.

8         The USFS addressed these challenges in a Final Revised EA ("2018 EA"), which

9    highlighted six clarifications that were being incorporated in response to those

10   objections.  AR 00667-00672, 00115.  When it published the 2018 EA, the USFS also

11   published its final Decision Notice/FONSI approving the Three Creeks Project.

12   AR 00105–118.

13                   **3.      Analysis of Alternatives**

14        During the scoping and comment periods, the USFS developed project

15   alternatives based on input from the public and other agencies.  AR 00006.  Based on

16   the issues raised by the public, the USFS developed two alternatives—the proposed

17   Project and a "no action" alternative.  The USFS then considered the impacts of the

18   Project in comparison with the expected impacts from the no action alternative.

19   AR 00034.

20        In analyzing the impacts of the no action alternative, the USFS used data on

21   existing conditions such as over-competition, homogeneity, and high fuel loads.  From

22   these, the USFS predicted impacts that included insect and disease outbreaks and the

23   possibility of high-intensity wildfire, which would in turn create increased risk to all

24   resources and decreased forest health, including destruction of wildlife habitat.

25   AR 00033–34.  The USFS rejected the no action alternative on the basis that it did not

26   meet the Project's purpose and need and would perpetuate overly dense stand

27   conditions and decreased forest health.  AR 00114.

28        In contrast, the USFS found that proposed treatments in the action alternative

1   would improve stand growth and vigor "almost immediately," which would expedite the

2   growth of smaller diameter trees into the larger diameter classes and result in decreased

3   mortality from inter-tree competition, pests and pathogens.  AR 00562–63.  See also

4   AR 00413 (Fuel and Fires Report) (In comparison to no treatment, "all modeled

5   treatments reduced the mean flame length, rate of spread, and burn probability both

6   across the project area and within the wildlife habitat prescription stand.")

7                **4.    Analysis of Environmental Impacts**

8            The USFS analyzed the direct, indirect, and cumulative effects of the proposed

9   action (AR 00033-53, 00056-00061) and incorporated and discussed resource specialist

10  reports that analyzed the proposal's impacts to various resources, including, inter alia,

11  silviculture (AR 00551-578), wildlife habitat (BE) (AR 00604-00630), cultural resources

12  (AR 00348-00406), and air quality (AR 00321-328).  The USFS's cumulative impacts

13  analysis (AR 00055-61) included discussion of how the Project would impact resources,

14  when combined with other past, present and reasonably foreseeable future actions in

15  and around the Project area, including additional thinning and fuels reduction measures,

16  previous fires, off-highway vehicle use and recreational activity, and the town of June

17  Lake's water management.  Id.  To determine whether the effects of the Project would be

18  "significant" and require the preparation of an environmental impact statement, the USFS

19  also analyzed CEQ significance factors to determine the context and intensity of the

20  Project impacts.  AR 00033–62; 40 C.F.R. § 1508.27(b).  The USFS concluded the

21  actions in Alternative 2 do not individually, or cumulatively, cause any significant

22  environmental impacts.

23           **D.    This Litigation**

24           In July 2019, Plaintiffs initiated this action for vacatur, injunctive and declaratory

25  relief.  The parties subsequently filed cross motions for summary judgment resting on the

26  administrative record, ECF Nos. 30, 44, and Defendants filed a Motion to Strike Extra-

27  Record Materials.  ECF Nos. 43, 47.  During the course of briefing, however, a bark

28  beetle outbreak occurred in the Project area, prompting the USFS to issue a

1  Supplemental Information Report ("SIR") evaluating whether additional environmental

2  analysis was necessitated.  Upon completion of the SIR, the USFS determined no

3  supplemental NEPA analysis was required, and it decided to drop two of the "pine

4  marten units" from the Project because portions of those units (approximately 220 acres)

5  had been impacted by the bark beetle outbreak. AR 16475, 16477.

6      Then, in June 2021, the USFS announced a neighboring project, the Inyo Craters

7  Bark Beetle Hazard Tree Abatement Project ("Inyo Craters Project"), which proposes

8  "treatment" of hazard trees (including many large trees) on up to 950 acres, adjacent to

9  the Three Creeks Project and encompassing the two "pine marten units" previously

10  dropped from the Three Creeks Project.  Buss Decl., Ex. 2 at 1–3.  The Inyo Craters

11  Project and its potential impacts to marten were not discussed in the October 2020 SIR;

12  however that SIR does specifically note the possibility of future projects in the same or

13  nearby areas.  AR 16484.  The scoping notice for the Inyo Craters Project indicates that

14  the USFS plans to rely on a categorical exclusion ("CE") to avoid conducting NEPA

15  analysis for that Project.  Buss Decl. Ex. 2 at 2.

16      Given the foregoing, Plaintiff filed an unopposed Motion to Amend the Complaint,

17  ECF Nos. 60, 64, which the Court granted.  ECF No. 68.  The parties also stipulated to a

18  schedule permitting supplemental summary judgment briefing and the lodging of a

19  supplemental administrative record.  ECF No. 70.  That schedule was also adopted by

20  the Court.  ECF No. 71.  The record as supplemented is now complete and the parties'

21  dispute is ripe for adjudication.

22

23  **STANDARD**

24

25      The Federal Rules of Civil Procedure provide for summary judgment when "the

26  movant shows that there is no genuine dispute as to any material fact and the movant is

27  entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v.

28  Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to

1  dispose of factually unsupported claims or defenses.  <u>Celotex</u>, 477 U.S. at 325.

2       Rule 56 also allows a court to grant summary judgment on part of a claim or

3  defense, known as partial summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a) ("A party may

4  move for summary judgment, identifying each claim or defense—or the part of each

5  claim or defense—on which summary judgment is sought."); <u>see also</u> <u>Allstate Ins. Co. v.</u>

6  <u>Madan</u>, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a

7  motion for partial summary judgment is the same as that which applies to a motion for

8  summary judgment.  <u>See</u> Fed. R. Civ. P. 56(a); <u>State of Cal. ex rel. Cal. Dep't of Toxic</u>

9  <u>Substances Control v. Campbell</u>, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary

10  judgment standard to motion for summary adjudication).

11       In a summary judgment motion, the moving party always bears the initial

12  responsibility of informing the court of the basis for the motion and identifying the

13  portions in the record "which it believes demonstrate the absence of a genuine issue of

14  material fact."  <u>Celotex</u>, 477 U.S. at 323.  If the moving party meets its initial

15  responsibility, the burden then shifts to the opposing party to establish that a genuine

16  issue as to any material fact actually does exist.  <u>Matsushita Elec. Indus. Co., Inc. v.</u>

17  <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>First Nat'l Bank v. Cities Serv. Co.</u>,

18  391 U.S. 253, 288-89 (1968).

19       In attempting to establish the existence or non-existence of a genuine factual

20  dispute, the party must support its assertion by "citing to particular parts of materials in

21  the record, including depositions, documents, electronically stored information,

22  affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

23  not establish the absence or presence of a genuine dispute, or that an adverse party

24  cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

25  opposing party must demonstrate that the fact in contention is material, i.e., a fact that

26  might affect the outcome of the suit under the governing law.  <u>Anderson v. Liberty Lobby,</u>

27  <u>Inc.</u>, 477 U.S. 242, 248, 251-52 (1986); <u>Owens v. Local No. 169, Assoc. of W. Pulp and</u>

28  <u>Paper Workers</u>, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also

demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.  In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Id. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).  As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586.  Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).


**ANALYSIS**


The bulk of Plaintiffs' original and newly raised causes of action arise under NEPA.  As to those claims, Plaintiffs now contend that:

> (a) Defendants failed to ensure the scientific accuracy and integrity of the Project or to offer a rational basis for it (Claim 1);

> (b) The USFS "fail[ed] to evaluate all reasonable alternatives" (Claim 2), ECF No. 52 at 25;

> (c) Defendants failed to take a hard look at the impacts of the

15

Project on identified species (Claim 3);

(d) The USFS failed to properly "ensure the quality of its scientific analysis" (Claims 4 and 5);

(e) Defendants "fail[ed] to write in plain language, creating inconsistencies and causing confusion" (Claim 6), ECF No. 52 at 22;

(f) The USFS impermissibly declined to prepare an EIS, opting instead to issue a FONSI (Claims 7 and 8);

(g) The USFS failed to provide a required objection period to the 2018 EA (Claim 9);

(h) The USFS "failed to consider whether new information, the proposed Inyo Craters Project, warranted supplemental NEPA analysis for the Three Creeks Project" (Claim 11), ECF No. 75 at 18;

(i) The USFS's conclusion in the SIR that no supplemental NEPA analysis was required in light of the bark beetle outbreak was arbitrary and capricious (Claim 12).

In addition, Plaintiffs contend that Defendants violated the NFMA by failing to ensure that the Project was consistent with the applicable Forest Plans (Claim 10).  Plaintiffs' arguments are not well taken.

## A.    Claim One: Defendants offered a rational explanation for the Project, and its purposes and need are clearly articulated.

As to the first cause of action, Plaintiffs contend that Defendants "offered no rational explanation for why it needs to conduct the Three Creeks Project [or] why it needs to conduct commercial logging, including the logging of larger trees."  ECF No. 52 at 17.  More specifically, Plaintiffs argue that "the Three Creeks area is already achieving the desired pre-settlement conditions for basal area" so "it is unclear as to why the proposed logging needs to occur at all."  Id. at 18.  In addition, Plaintiffs contend that the USFS "also failed to explain how the Project as proposed, which includes commercial thinning that removes moderate-sized trees (8-24 inches DBH) and large trees (over 24 inches DBH), will meet the Project's purpose and need and achieve the overall pre-settlement desired stand conditions."  Id.  Plaintiffs take the position that the USFS

16

1   "should inform the public of the exact number of large trees it intends to remove, or at

2   least offer a much more specific estimate."  Id. at 19.  At base, Plaintiffs reason, "[t]he

3   [USFS] offers no rational explanation for . . . why it needs to conduct commercial logging

4   at all, or at a minimum why it needs to conduct commercial logging that authorizes the

5   removal of some of the few remaining large, fire-resistant trees."  Id.  The crux of

6   Plaintiffs argument is thus that:

> [T]he Forest Service failed to discuss why it needs to conduct
> the Three Creeks Project when the basal area already
> resembles pre-settlement conditions and why in implementing
> the Project it needs to conduct commercial logging and log the
> few remaining larger, fire-resistant trees. In failing to offer
> these explanations it appears as though the Three Creeks
> Project is not based on an understanding of the environmental
> consequences it may cause, in violation of NEPA.

12   Id. at 20.  Finally, Plaintiffs argue that the USFS violated NEPA by failing to sufficiently

13   review outcomes of similar projects, instead only providing a conclusory statement that

14   where those other treatments were implemented "conditions for tree growth and

15   development and resilience to wildland fire and insects/diseases were improved."  Id.

16   at 21 (quoting AR 00054).

17        The Court disagrees.  First, Defendants are afforded "considerable discretion to

18   define the purpose and need of a project."  Friends of Se. Future v. Morrison, 153 F.3d

19   1059, 1066 (9th Cir. 1998).  In this case, the USFS explained the baseline conditions in

20   the Project area, discussed how they diverged from historic conditions, and explained

21   how the current "over-density increases the risk of high severity crown fires and invites

22   inter-tree competition, creating risk for disease and infestation."  ECF No. 45 at 16 (citing

23   AR0009, 00559-61).  The USFS then utilized modeling to demonstrate how the Project

24   as contemplated would result in smaller trees growing into larger trees and would

25   decrease tree mortality.  While Plaintiffs substantively disagree with the fact that the

26   Three Creeks Project does not prohibit removal of all medium and large trees, that

27   disagreement does not rise to the level of a NEPA violation.  Despite that disagreement,

28   Defendants have shown that the Project is supported by a rational basis and that

1   Defendants did not act arbitrarily or capriciously in designing the Project.

2          Second, Plaintiffs' focus on basal area alone is not enough to support a finding

3   that Defendants' evaluation of the Project purpose and need was arbitrary and

4   capricious because basal area is just one of several metrics considered by Defendants

5   in crafting the Project plan.  For example, tree densities are currently much greater than

6   natural conditions would allow, making trees more susceptible to climate changes and

7   pest or pathogen outbreaks.  AR 00010.  In addition, the EA looks to projected stand

8   density in the future absent treatment and concludes that "three of the four stands will

9   approach a 'zone of imminent bark beetle mortality' within ten years, if action is not

10  taken." Id. at 17 (quoting AR 00011).

11         Finally, Plaintiffs do not point to any case law standing for the proposition that

12  monitoring data from past projects must be provided in order to reach the conclusion that

13  Defendants took a hard look at the instant Project.  Even if that was not the case,

14  however, Defendants did in fact consider and discuss past projects to conclude that the

15  Three Creeks Project was scientifically supported and uncontroversial in its impacts.

16  See AR 00014.  Defendants' Motion for Summary Judgment is thus granted as to

17  Plaintiffs' first claim.

18
       **B.     Claim Two: The USFS evaluated sufficient alternatives for the Three
               Creeks Project.**
19

20         As to this claim, Plaintiffs contend that "despite being presented with multiple

21  alternatives for the Three Creeks Project—including the use of only prescribed fire,

22  precommercial thinning, or a combination of both—the Forest Service failed to fully and

23  meaningfully consider said alternatives, arbitrarily and capriciously violating NEPA."

24  ECF No. 52 at 25.  Specifically, Plaintiffs take issue with Defendants' refusal to consider

25  any suggested alternatives other than the proposed action alternative and a no action

26  alternative.  According to Plaintiffs, "[g]iven the Forest Service's knowledge of the

27  impacts associated with commercial thinning, the agency's refusal to consider prescribed

28  fire or precommercial thinning, or a combination of these alternatives amounts to a

1  failure to give full and meaningful consideration to all reasonable alternatives as required

2  by NEPA."  Id. at 27.

3       NEPA does not specify a minimum number of alternative actions Defendants are

4  required to consider, and discussion of two alternatives (i.e., a proposed plan and a no

5  action plan) have uniformly been deemed sufficient.  See Earth Island Institute v. U.S.

6  Forest Service, 697 F.3d 1010, 1022 (9th Cir. 2012).  The Court concludes that

7  consideration of two options suffices here as well, especially because Plaintiffs have not

8  shown that their proposal is significantly different from the proposed action when both

9  plans focus on thinning small trees and utilizing prescribed fire.  Nor have Plaintiffs

10  shown that their preferred plan would achieve the same optimal results contemplated

11  under Defendants' proposed option.  Accordingly, Defendants' Motion is granted as to

12  Plaintiffs' second claim.

13       **C.    Claim Three: The USFS took a hard look at the impacts to species.**

14       The USFS is required to prepare an EIS for "major Federal actions significantly

15  affecting the quality of the human environment . . ."  42 U.S.C. § 4332(2)(C).  To

16  determine whether it was reasonable to forego an EIS, this Court must consider whether

17  the agency took a "hard look" at the potential consequences and, if so, whether the

18  decision to proceed on an EA was arbitrary and capricious.  Nat'l Parks & Conservation

19  Ass'n v. Babbitt, 241 F.3d 722, 730 (9th Cir. 2001), abrogated on other grounds by

20  Monsanto Co. v. Geerston Seed Farms, 561 U.S. 139 (2010).

21       Plaintiffs take the position that the USFS failed the hard look requirement because

22  it did not: (1) "analyze how the Three Creeks Project's effects on the black-backed

23  woodpecker's current and future habitat would impact the species," ECF No. 52 at 28; or

24  (2) "consider the Three Creeks Project's impacts on Pacific marten throughout the entire

25  Project area," id. at 31.  Defendants describe their efforts as follows:

26            With regard to impacts on aquatic and wildlife species, the
              Forest Service's subject matter experts prepared a Biological
27            Evaluation ("BE") (AR 00604–630), an Aquatics BE (AR
              00631–34), a Management Indicator Species ("MIS") Report
28            (AR 00584–603; AR 00635–37 (Addendum)), and a Migratory

Landbird Conservation Report (AR 00579–83), to evaluate project impacts on these species and their habitat within and adjacent to the project area. In the BE, the Forest Service analyzed federally-listed threatened and endangered species potentially occurring the project area, as well as the Pacific Southwest Regional Forester's list of sensitive species. AR 00606-07. The Forest Service analyzed species habitat within and adjacent to the project area by reviewing aerial photographs, examining vegetation maps and wildlife siting records, reviewing the Forest Service's Geographical Information System, and through conducting several wildlife biologist site visits to assess species habitat. AR 00607.

With respect to six federally listed species, the Forest Service determined that no species that are listed, or proposed to be listed, as "threatened or endangered" under the Endangered Species Act "are known to occur within the analysis area, nor is there suitable habitat present for any of those species." AR 00608. And with respect to twenty sensitive species considered, the Forest Service determined that "the analysis area provides habitat for two Pacific Southwest Region sensitive species"—the northern goshawk and the Pacific marten. AR 00609. "No other sensitive species are known to occur within the analysis area, nor is there suitable habitat present for any other species." Id.

In the MIS report, the Forest Service evaluated project impacts on habitat for thirteen MIS species identified in the Forest Plan and the Sierra Nevada MIS Amendment Record of Decision (AR 08333–350). AR 00585. Of those species, the Forest Service determined that the habitat for four indicator species, including the Pacific marten, would be directly or indirectly affected by the Project. AR 00589. It also determined that the black-backed woodpecker is among the indicator species "whose habitat is not in or adjacent to the project area and would not be affected by the project." Id.

After analyzing impacts on species, the Forest Service concluded that the Project would not affect any threatened or endangered species or their habitats. AR 00626. And while it "may impact . . . Pacific marten individuals," the Project "would not result in a trend towards federal listing or loss of viability." Id.

ECF No. 45 at 23-24.

### 1.    The Black-Backed Woodpecker

More specifically as to the black-backed woodpecker, Plaintiffs contend that the species "is a rare, habitat specialist that relies on forest stands with a high density of medium and large snags—roughly 100 per acre." ECF No. 52 at 28 (citing AR 01111, 00791-95). "Optimal black-backed habitat includes dense, mature forests that have

1 recently experienced a high intensity, stand-replacing fire or high beetle mortality."  Id.

2 (citing AR 01357).  As is relevant here, Plaintiffs argue that the USFS "failed to discuss

3 how the proposed logging's effects on future snag habitat recruitment and green forests

4 would impact black-backed woodpeckers."  Id. at 29.

5       The Court holds that while Plaintiffs would have the Court reach contrary

6 conclusions than did the USFS, the USFS nonetheless properly relied on its experts and

7 reached a permissible conclusion in determining that the Project would have no

8 significant impacts.  See Earth Island Inst. v. U.S. Forest Serv., 351 F.3d 1291, 1301

9 (9th Cir. 2003) ("[A]n agency is entitled to wide discretion in assessing the scientific

10 evidence, so long as it takes a hard look at the issues and responds to reasonable

11 opposing viewpoints."); Marsh v. Ore. Natural Res. Council, 490 U.S. 360, 378 (1989)

12 ("When specialists express conflicting views, an agency must have discretion to rely on

13 the reasonable opinions of its own qualified experts, even if . . . a court might find

14 contrary views more persuasive").

15       While the black-backed woodpecker is an MIS, it is not considered a sensitive

16 species and is thus not subject to special management requirements.  Moreover, as

17 indicated above, the woodpeckers' desired habitat is, very generally, snags in burned

18 forests.  "Because this type of burned forest snag habitat is absent from the Project

19 Area, the Forest Service in its EA concluded that the Project would have 'no direct

20 impact on this habitat type.'"  ECF No. 58 at 19 (quoting AR 00041).  There is no

21 requirement that the USFS conclude otherwise or conduct any further analysis.[11]

22 Finally, the USFS also permissibly concluded that the Project "may enhance black-

23 backed woodpecker habitat because during underburning operations, it is not

24 uncommon for trees to experience torching, die, and subsequently be utilized by black-

25 backed woodpeckers."  ECF No. 58 at 21 (citing AR 00042).  Given the foregoing, the

26 USFS's conclusions regarding Project impacts on the black-backed woodpecker are

27

28

[11] Because the Project is in a green forest, this conclusion by its nature shows that the USFS evaluated the impact the Three Creeks Project would have in a green forest.  Plaintiffs' argument to the contrary is unpersuasive.

1    reasonable and supported by NEPA.  Plaintiffs' Motion as to their NEPA claim thus fails.

2                    **2.    The Pacific Marten**

3           With regard to the Pacific marten, Plaintiffs contend it is a "sensitive species as

4    well as an MIS representing late-seral, closed canopy coniferous forests."  ECF No. 52

5    at 31.  They thus aver that "[p]resumably recognizing the possible impacts facing

6    martens, the [USFS] designated 3 units as 'marten units' where less invasive logging will

7    occur."  Id. (citing AR 00020, 00038).  According to Plaintiffs, however, the USFS "fails to

8    adequately analyze the impacts martens face in the other 127 Project units—some of

9    which experience similar marten use as the 3 marten units or are within or adjacent to

10   the marten units."  Id.

11          It seems to the Court that Defendants did in fact analyze the relevant data and

12   Plaintiffs merely disagree with the conclusions the USFS reached.  The USFS concluded

13   that "[a] reduction in habitat quality as a result of project implementation is expected to

14   have little or indirect impact on martens as they generally do not use much of the area

15   within proposed treatment units."  AR 00040.[12]  It also reasoned that the Project might

16   improve habitat because it would retain existing snags and because "data suggests that

17   maintaining or increasing structural variation will increase the use of these stands by

18   martens."  AR 00040-41 (citing Moriarty, et al 2016).  Finally, the USFS determined the

19   Project would favor martens in the long run by providing habitat for prey animals and by

20   "[s]trategically increasing structural complexity within managed stands, while increasing

21   resilience from fire."  AR 00041.  The USFS took a hard look at the impact on the

22   martens, discussed those impacts throughout the relevant documents and reasonably

23   relied on its own experts.  See AR 00579-634; see also Greenpeace Action v. Franklin,

24   14 F.3d 1324, 1332-33 (9th Cir 1992).  Defendants' Motion is granted as to this claim.

25   ///

26   ///

27   _____

28          [12] The exception, of course, was the three marten units, two of which were later removed from the
     Project given the subsequent bark beetle outbreak discussed in greater detail below.

1
2

**D.    Claims Four and Five:  The USFS properly considered and applied high quality science.**

3   Plaintiffs next contend that the USFS "violated NEPA by failing to ensure the

4   quality of its scientific analysis."  ECF No. 52 at 33.  According to Plaintiffs, Defendants

5   relied on outdated science and improperly analyzed conflicting science.  ECF No. 69

6   at 23-24.  More specifically, Plaintiffs contend that the USFS failed "to discuss the

7   uncertainties regarding the impacts to species and the required amount of snags to be

8   maintained in the Project area" or "to meaningfully consider a recent study discussing

9   forest-thinning's negative impacts on Pacific marten."  ECF No. 52 at 33.

10   Plaintiffs argue that while the USFS relied on the 2004 Framework to determine

11   that three snags per acre will be maintained in the Project area, recent data on the

12   black-backed woodpecker shows many more snags to ensure viability.  Plaintiffs also

13   presented the USFS with a study, the Moriarty study, that "analyzes impacts on Pacific

14   marten from activities that reduce the structural complexity of forest stands."  Id. at 35.

15   Plaintiffs acknowledge that the USFS considered the study, but contend the Government

16   did not include a full discussion and evaluation of its impact on the Project.  Finally,

17   Plaintiffs argue that the USFS improperly failed to engage with a wide body of research

18   they presented in their objections, going to the needs of both the black-backed

19   woodpecker and the Pacific marten.

20   The Court disagrees.  As Defendants point out, first and foremost, "the Project is

21   a forest health and resiliency project."  ECF No. 45 at 31.  "While the Project is not

22   exclusively designed to create additional snag habitat at the expense of other forest

23   health objectives, it does not remove snags nor prevent their development."  Id.  "Any

24   reduction in snag habitat 'should be negligible as cutting snags would only occur if

25   needed for operational safety.'"  Id. (citing AR 00044).  As indicated above, the USFS

26   adequately considered Project impacts on the black-backed woodpecker and reasonably

27   concluded that retaining and/or creating up to three snags per acre is sufficient.

28   In addition, the USFS did consider and discuss the Moriarty study:

> Several habitat components may be improved through full implementation of the proposed action. Where fuels treatments are planned in higher elevation forests within marten habitat, data suggests that maintaining or increasing structural variation will increase the use of these stands by martens (Moriarty el al 2016). Strategically increasing structural complexity within managed stands, while increasing resilience from fire may be important for maintaining marten populations. Creation of up to three snags and five downed logs per acre would provide additional habitat for small birds and mammals, both important prey items for martens. Increased snag and log densities would also provide martens additional resting and potential denning structures.

AR 00041.  As Defendants contend, the USFS "was not required to adopt the study's recommendation that fuel treatment projects should occur outside of marten habitat." ECF No. 45 at 31; see Marsh, 490 U.S. at 378.  In sum, the USFS considered quality science and is entitled to deference in reaching its conclusions.

### E.    Claim Six:  The USFS adequately explained the Project in plain language.

"[Environmental assessments] shall be written in plain language so that decisionmakers and the public can readily understand them . . . [EAs] are unacceptable if they are indecipherable to the public."  Klamath-Siskiyou Wildlands Ctr., 387 F.3d at 996, citing 40 C.F.R. § 1502.8.  Here Plaintiffs argue that:

> The purpose of the Three Creeks Project is to increase resiliency to wildfire and return the Project area to pre-European settlement conditions.   AR 00007–008, 00009.  Thus, the description of desired pre-settlement conditions as well as how the Forest Service proposes to meet these conditions is crucial for understanding how the Project will be implemented and thus what effects it will have.  Unfortunately, the Three Creeks NEPA documents, including the draft and final EAs as well as specialist reports, are inconsistent and unclear regarding both the desired conditions of forest stands post-logging and how the Forest Service will achieve these conditions.

ECF No. 52 at 22-23.  Again, the Court disagrees.  The documents are clear that the Project employs a "thin from below" technique that will "remove smaller, suppressed, intermediate, and co-dominant trees."  ECF No. 45 at 18.  "[T]he vast majority of trees to be thinned would be less than 10 inches [dbh]."  AR 00015.  "If the NEPA documents

24

1    here contain slight variations on the measurements that distinguish 'small' from 'medium'

2    trees, those definitional differences do not alter the analysis of impacts."  ECF No. 45 at

3    19.  Nor is the USFS required identify with specificity the exact number of medium or

4    large trees that may be removed.  See Navickas v. Conroy, 575 F. App'x 758, 760

5    (9th Cir. 2014) ("The Forest Service had no obligation to identify the specific trees that

6    would be removed as part of the Project.").  Accordingly, the Court concludes that the

7    USFS adequately explained the Project in plain language.

8         **F.      Claims Seven and Eight:  The USFS permissibly determined an EIS
              was not necessary and instead issued a FONSI.**
9

10        As to claims Seven and Eight, Plaintiffs argue that the USFS's "FONSI is based

11   on an improper EA, making the FONSI improper and it further failed to supply a

12   convincing statement of reasons to support its FONSI and failed to properly address the

13   context and intensity of the Three Creeks Project."  ECF No. 52 at 40.  According to

14   Plaintiffs, "[t]he [USFS] should have instead prepared an EIS because a review of the

15   Project's context and intensity shows the Project's impacts on the human environment

16   are significant."  Id. (citing 40 C.F.R. § 1508.27).  Plaintiffs take the position that "[t]he

17   Three Creeks Project's context is significant due to the size of the Project and the Forest

18   Service's removal of some of the few remaining large trees."  Id. at 41.  A FONSI is also

19   purportedly required under four of ten intensity factors set forth in the CEQ regulations

20   (i.e., beneficial impacts, unique characteristics, uncertainty, threatened violation of law).

21        "The Forest Service properly considered the context to be the local geographic

22   area, including the cumulative impacts areas."  ECF No. 45 at 34.  No other basis for

23   finding context significant is before the Court.  Nor are Plaintiffs' intensity factor

24   arguments persuasive.  The Court already concluded that the USFS took a hard look at

25   Project impacts.  The USFS considered and permissibly determined the Project would

26   not affect "parklands, prime farmlands, wetlands, or ecologically critical areas within the

27   [P]roject area," was designed to "protect and retain Wild and Scenic River

28   characteristics," would not result in road construction, and would not result in "adverse

25

1  effects to historic or prehistoric cultural resources."  AR 00053-54.  No uncertain effects

2  on the human environment have been identified, and there is no evidence that Project

3  approval violates or potentially violates any law.[13]  On this record, it thus appears to the

4  Court that preparation of a FONSI was permissible.

5      **G.      Claim Nine:  The USFS was not required to open an additional
        comment period after issuing the 2018 EA.**

6

7          Plaintiffs contend here that the USFS should have provided the public opportunity

8  to comment on the 2018 EA.  That was the third EA issued on the Project, two others

9  having been issued in 2016 and 2017, respectively.  According to Plaintiffs, the 2018 EA

10  is substantially different (e.g., containing new information regarding desired conditions

11  and both the black-backed woodpecker and the Pacific marten) from the prior two and a

12  new comment period should have been opened.  However, none of these topics

13  changed the prior EAs to the point that a new comment period was required.  See

14  36 C.F.R. § 218.22(d) (new notice and comment period required for revised EA if the

15  revisions are prepared "based on consideration of new information or changed

16  circumstances").  The Court adopts Defendants' arguments here:

17              First, Plaintiffs assert that the [USFS] changed its desired
            forest conditions between the 2017 and 2018 EA.  Pls.' Br. at
18          31.  But the only differences that Plaintiffs identify between
            those documents relate to the desired mean basal area and
19          the number of large trees per acre.  Id.  As discussed in detail
            above, . . . neither of those two data points drove the [USFS's]
20          rationale for the Project or figured meaningfully into the
            [USFS's] analysis of the Project's impacts.   The density
21          metrics—e.g. density rates, SDI, and FRCC—that the [USFS]
            found to have presented the "troubling scenario" that drove the
22

23              Project's purpose and need did not change in the 2018 EA.
            AR 00010-11.
24
                Second, Plaintiffs assert that the 2018 EA changed from prior
25          EAs by clarifying that "the vast majority of trees to be cut are
            below 10 inches DBH."  Pls.' Br. 31.  This clarification was
26          made in response to an objection seeking clarification for

27  _____

28  [13] The only potential violations of law Plaintiffs have identified are the USFS's failure to comply
    with the 2004 Framework or to offer an opportunity to object to the 2018 EA.  The Court has determined
    no such violations occurred and they cannot provide a basis for Plaintiffs' arguments here.

inconsistencies on the size of trees which would primarily be treated under the Project.  AR 00669.  The reviewing officer agreed that the prior version of the EA contained inconsistencies on this subject.  Id. at 00669-70.  The Final EA incorporated the reviewing officials' instructions and clarified that the vast majority of the trees to be removed will be under 10 inches dbh.  This clarification aligns with both the purpose and need and with the analysis of impacts in the prior EA and other prior NEPA documents.  Thus, the clarification is not based on the type of new information or changed circumstances that would necessitate a new comment period.

Finally, Plaintiffs assert that the 2018 EA contains "new information about the black-backed woodpecker and Pacific marten."  Pls.' Br. 31.  However, none of the additional information about the black-backed woodpecker and the Pacific marten constitutes significant new information that would require an additional round of comments.  The 2018 EA reaches the exact same conclusions as the prior EAs that the Project would have little or no overall effect on marten persistence within the analysis area, and that direct effects to black-backed woodpecker may include some habitat enhancement.  Compare AR 00040–41 (2018 EA) to AR 00158–59.  The additional information underscores these conclusions.  See AR 00040–41 (because there is no burned forest in the treatment areas, the Project "would have no direct impact" on black-backed woodpecker habitat, but may have an indirect impact since treated units would be less likely to experience high-intensity wildfire); id. (observing that multiple fires in the vicinity of the project since 2015 have likely improved habitat for black-backed woodpeckers).  With respect to the Moriarty study on Pacific marten that Plaintiffs cite, the inclusion of a reference to that study in the 2018 EA changes nothing in the 2017 EA's analysis. The 2018 EA cites Moriarty for the proposition that "increasing structural variation" may be important to martens, AR 00041, and the 2017 EA already acknowledged this: "structural complexity and near ground cover . . . are both important features for martens."  AR 00158.

ECF No. 45 at 37-39.  Given the foregoing, there was no reason to open yet another comment period.  Defendants' Motion is granted as to the ninth claim.

### H.      Claim 10: Defendants have demonstrated that the Three Creeks Project complies with NFMA.

Plaintiffs next contend that the USFS "violated NMFA by failing to demonstrate that the Three Creeks Project is in compliance with the 2004 Framework."  CF No. 52 at 20.  According to Plaintiffs, "managing for large fire-tolerant trees is crucial to ensuring

1  compliance." Id.  Plaintiffs thus contend that the Project runs contrary to that Framework

2  because the USFS "is proposing to log some of the few remaining large trees and

3  moderate trees that may become large trees, making it incredibly difficult, if not

4  impossible, to create a stand dominated by large trees at any time in the foreseeable

5  future." Id. at 21.  Plaintiffs take the position that the USFS is improperly forgoing

6  removal of small trees with no commercial value to log moderate and large trees instead.

7          The USFS's "interpretation and implementation of its own forest plan is entitled to

8  substantial deference." Native Ecosystem Council, 697 F.3d at 1056.  Here, the Project

9  relies on "thinning from below," which is a central tenet of the 2004 Framework.  That

10  Framework also permits thinning of trees up to 30 inches and the decision to generate

11  commercial revenue from the by-products of fuels treatments.  AR 008158.  Accordingly,

12  despite Plaintiffs' preference that the Three Creeks Project place a moratorium on the

13  removal of medium and large trees, such a moratorium is not required by the 2004

14  Framework.  Defendants are entitled to judgment on Plaintiffs' tenth claim as well.

15        **I.**      **Claim 11: Defendants were not required to engage in supplemental**
             **NEPA analysis to consider the Inyo Craters Project.**

16

17          According to Plaintiffs, announcement of the Inyo Craters Project is new

18  information triggering the requirement that the USFS prepare supplemental NEPA

19  analysis.  This argument fails because: (1) such a claim is not included in Plaintiffs' FAC;

20  and (2) no supplemental NEPA discussion was required.  A claim raised for the first time

21  in a summary judgment motion is not properly before this Court.  See Navajo Nation v.

22  U.S. Forest Serv., 535 F.3d 1058, 1080 (9th Cir. 2008) ("[W]here, as here, the complaint

23  does not include the necessary factual allegations to state a claim, raising such claim in

24  a summary judgment motion is insufficient to present the claim to the district court.").

25  Even if that was not the case, however, the SIR itself sufficiently analyzed impacts on

26  martens in both the Three Creeks and the Inyo Craters areas.

27          "The cumulative effects analysis area for the marten, as defined in the EA,

28  contained 24,900 acres of moderate and high suitability habitat."  ECF No. 80 at 13

1  (citing AR 56).  "The tree mortality caused by bark beetles resulted in a loss of 450 acres

2  (1.8 percent) of that habitat, which the [USFS] concludes is 'a minor loss.'"  Id. (quoting

3  AR 16482).  "The Inyo Craters project thus does not constitute significant new

4  information requiring another supplemental information report or additional NEPA

5  analysis about the environmental effects of the Three Creeks Project."  Id.  Finally, if the

6  Inyo Craters Project moves forward, its impacts will be considered during the course of

7  its approval process.  Defendants' motion is granted as to this claim.

8          **J.      Claim 12: The USFS was not required to engage in supplemental**
                     **NEPA analysis in response to the bark beetle kill.**
9

10         Finally, Plaintiffs contend that additional NEPA analysis was required given the

11  bark beetle outbreak in two of the marten units.  More specifically, Plaintiffs argue:

12                  The Final EA analyzed a project that included hundreds of
                    acres that would be managed to affirmatively benefit marten.
13                  It did not contain an action alternative substantially devoid of
                    enhancement to Pacific marten habitat. As a consequence, the
14                  public has never considered, commented, or otherwise
                    evaluated the environmental effects of this version of the Three
15                  Creeks Project. The public deserves—indeed NEPA
                    requires—a full public analysis and comment on the
16                  environmental effects of this new project. By concluding in the
                    SIR that such additional, public NEPA analysis was
17                  unnecessary, the Service acted arbitrarily and in violation of
                    NEPA. 5 U.S.C. § 706(2); 40 C.F.R. §1502.9(c)(1) (2018).
18

19  ECF No. 75 at 10.

20         The Court disagrees.  "Within the Project area, the beetle infestation affected 220

21  acres in the marten units."  ECF No. 80 at 6 (citing AR 16475).  "Many of the trees are

22  dead and the fuels treatments authorized by the Project cannot meet the Project's

23  purpose and need, nor restore the units to high quality marten habitat."  Id.  Two marten

24  units were thus removed from the Project "resulting in a 559-acre reduction in the Project

25  treatment footprint."  Id.  At base, because "the area affected by the . . . tree mortality

26  event is so small compared to the overall available habitat," the event did not constitute

27  a "significant new circumstance" dictating a supplemental NEPA analysis.  AR 16482.[14]

28  _____
    [14] The Court is not persuaded by Plaintiffs' argument that the work planned in the marten units

1     Defendants' Motion is thus granted as to this claim as well.

2

3                                     **CONCLUSION**

4

5            For the reasons set forth above, Plaintiff's Motions for Summary Judgment (ECF

6     Nos. 30, 74) are DENIED, Defendants' Motions for Summary Judgment (ECF Nos. 44,

7     82) are GRANTED, and Defendants' Motion to Strike (ECF No. 47) is DENIED as moot.

8     The Clerk of the Court is directed to enter judgment for Defendants and to close this

9     case.

10           IT IS SO ORDERED.

11

12    Dated:  September 9, 2022

13

14                                        MORRISON C. ENGLAND, JR.
                                          SENIOR UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22

23

24

25

26    _____

27    was intended to offset the Project's impacts on the species as a whole.  As Defendants point out, the
      purpose of the marten units was never to mitigate the effects of treatments in the remaining Project area.
28    The purpose of the project was to increase resiliency to fire, insects and disease.  Those goals will still be
      met by the Project as slightly modified.